In the
# UNITED STATES COURT OF APPEALS
for the Seventh Circuit

## No. 24-1534

UNITED STATES OF AMERICA,

**Plaintiff-Appellant,**

v.

HERIBERTO CARBAJAL-FLORES,

**Defendant-Appellee.**

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 20 CR 613 — Sharon Johnson Coleman, *Judge*.

# BRIEF AND SHORT APPENDIX
# OF THE UNITED STATES

MORRIS PASQUAL
Acting United States Attorney
  for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois  60604
(312) 353-5300

DEBRA RIGGS BONAMICI
Assistant United States Attorney
Criminal Division Counsel

MARGARET STEINDORF
Assistant United States Attorney

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ ii

JURISDICTIONAL STATEMENT ................................................... 1

ISSUE PRESENTED FOR REVIEW ............................................... 1

STATEMENT OF THE CASE ......................................................... 1

SUMMARY OF ARGUMENT ......................................................... 9

STANDARD OF REVIEW ............................................................. 11

ARGUMENT ............................................................................... 12

   I.    Statutory Background ....................................................... 12

   II.   Analysis .......................................................................... 14

      A.    Section 922(g)(5)(A) is Facially Constitutional Under the Second Amendment ........................................................ 14

        1.    The Possession of Firearms by Undocumented Noncitizens is Not Protected Under the Plain Text of the Second Amendment ................................................................ 17

        2.    Section 922(g)(5)(A) Is Consistent With This Nation's Historical Tradition of Firearms Regulation and Thus Constitutional Under the Second Amendment. ...................... 27

        3.    Section 922(g)(5)(A) Is Sufficiently Similar to Historical Traditions of Disarming Individuals Outside of the Political Community and Disarming Individuals Who Are Untrustworthy Adherents to the Law. ................................... 40

      B.    Section 922(g)(5)(A) Is Constitutional As Applied to Carbajal-Flores. ................................................................ 45

CONCLUSION .............................................................................. 50

# TABLE OF AUTHORITIES

## CASES

*Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023) .................................*passim*

*Bayard v. Singleton*, 1 N.C. 5 (1787) ............................................................. 23

*Cabell v. Chavez-Salido*, 454 U.S. 432 (1982) ............................................... 17

*District of Columbia v. Heller*, 554 U.S. 570 (2008)................................*passim*

*Elk v. Wilkins*, 112 U.S. 94 (1884) ................................................................. 23

*Friedman v. City of Highland Park, Ill.*, 784 F.3d 406 (7th Cir. 2015) .......... 43

*Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976) ........................................... 44

*Huddleston v. United States*, 415 U.S. 814 (1974)................................... 13, 43

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ...................................... 30, 45, 46

*Lewis v. United States*, 445 U.S. 55 (1980)........................................ 12, 13, 43

*Mathews v. Diaz*, 426 U.S. 67 (1976) .............................................................. 44

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) ................ 18, 25, 28, 41

*Medina v. Whitaker*, 913 F.3d 152 (D.D.C. 2019) ...................................... 37, 38

*New York Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) .....................*passim*

*Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023), *cert. granted, judgment vacated sub nom. Garland v. Range*, No. 23-374, 2024 WL 3259661 (July 2, 2024) .........................................................................*passim*

*Range v. Att'y Gen. United States of Am.*, 53 F.4th 262, *reh'g en banc granted, opinion vacated sub nom. Range v. Att'y Gen. United States of Am.*, 56 F.4th 992 (3d Cir. 2023), a*nd on reh'g en banc sub nom. Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023), *cert. granted, judgment vacated sub nom. Garland v. Range*, No. 23-374, 2024 WL 3259661 (July 2, 2024) (3d Cir. 2022)........................................................................................................... 42

*Scarborough v. United States*, 431 U.S. 563 (1977) ......................................... 13

ii

*Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953) .................. 44

*United States v. Agee*, No. 21-CR-350, 2023 WL 6443924 (N.D. Ill. Oct. 3, 2023) ................................................................................................ 34

*United States v. Bass*, 404 U.S. 336 (1971) ...................................................... 14

*United States v. Booker*, 644 F.3d 12 (1st Cir. 2011) ...................................... 46

*United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012) .......................... 20

*United States v. Cook*, 970 F.3d 866 (7th Cir. 2020)....................................... 12

*United States v. Gates*, No. 22-CR-397, 2023 WL 5748362 (N.D. Ill. Sept. 6, 2023).............................................................................................................. 43

*United States v. Gay*, 98 F.4th 843 (7th Cir. 2024)............................ 22, 45, 49

*United States v. Griffin*, --- F. Supp. 3d ----, No. 21-CR-00693, 2023 WL 8281564 (N.D. Ill. Nov. 30, 2023) .................................................................. 6, 7, 8

*United States v. Holden*, 70 F.4th 1015 (7th Cir. 2023) .................................. 12

*United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012)............ 20, 40

*United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023), *cert. granted, judgment vacated*, No. 23-6170, 2024 WL 3259675 (U.S. July 2, 2024) ..............*passim*

*United States v. Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022) ...........*passim*

*United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015) .............*passim*

*United States v. Muñoz-De La O*, 586 F. Supp. 3d 1032 (E.D. Wash. 2022), aff'd, No. 22-30100, 2024 WL 1873006 (9th Cir. Apr. 30, 2024) (E.D. Wash. Feb. 18, 2022)......................................................................................................... 38

*United States v. Perez*, 6 F.4th 448 (2nd Cir. 2021)....................... 20, 24, 26, 29

*United States v. Pope*, 613 F.3d 1255 (10th Cir. 2010) ................................... 47

*United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011) ...................... 20

*United States v. Protho*, 41 F.4th 812 (7th Cir. 2022) ..................................... 11

iii

*United States v. Rahimi*, 602 U.S. ---, 144 S. Ct. 1889 (June 21, 2024) ..*passim*

*United States v. Rangel-Tapia*, No. 23-1220, 2024 WL 966385 (6th Cir. Mar. 6, 2024) .................................................................................... 17

*United States v. Salerno*, 481 U.S. 739 (1987) ................................................. 12

*United States v. Singh*, 979 F.3d 697 (9th Cir. 2020) ...................................... 21

*United States v. Sitladeen*, 64 F.4th 978 (8th Cir. 2023) .......................... 16, 20

*United States v. Stevens*, 559 U.S. 460 (2010) .................................................. 12

*United States v. Thompson*, No. 21-CR-00284, Dkt. 58 (N.D. Ill. Feb. 21, 2024) ............................................................................................................. 43

*United States v. Toner*, 728 F.2d 115 (2d Cir. 1984) ....................................... 39

*United States v. Torres-Rosario*, 658 F.3d 110 (1st Cir. 2011) ....................... 47

*United States ex rel. Turner v. Williams*, 194 U.S. 279 (1904) ...................... 21

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ............................... 21

## STATUTES

18 U.S.C. § 922(g) .................................................................................*passim*

18 U.S.C. § 922(y) ........................................................................................ 42

18 U.S.C. § 3231 ............................................................................................ 1

18 U.S.C. § 3731 ............................................................................................ 1

28 U.S.C. § 1291 ............................................................................................ 1

## CONSTITUTIONAL PROVISIONS

Ala. Const. (1819) ....................................................................................... 26

Conn. Const. (1818) ..................................................................................... 26

Me. Const. (1819) ........................................................................................ 26

Miss. Const. (1817) ........................................................................... 26

Ky. Const. (1792) ............................................................................. 26

Pa. Const. (1790) ............................................................................. 26

U.S. Const. pmbl ............................................................................. 21

U.S. Const., amend. II ..................................................... 14, 17, 26

U.S. Const., amend. X ...................................................................... 21

U.S. Const., amend. XVII ................................................................ 21

**RULE**

Fed. R. Crim. P. 12 ......................................................................... 47

**OTHER AUTHORITIES**

*1 The Public Acts of the General Assembly of North Carolina* (1804) ...... 36, 37

1 W. & M., Ch. 2, § 7, in 3 Eng. Stat. at Large ............................... 22

1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* (1688) .................... 30

1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* (1688) ...................... 32

114 Cong. Rec. 13868 ....................................................................... 14

114 Cong. Rec. 14773 ....................................................................... 14

114 Cong. Rec. 16286 ....................................................................... 14

114 Cong. Rec. 16299 ....................................................................... 14

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971) ............

............................................................................................... 25, 38

3 Joseph Story, *Commentaries on the Constitution of the United States* (1833)

............................................................................................... 25

*4 Journals of the Continental Congress 1774-1789* (1906) .............................. 36

*5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* (1886) ......................................................................... 36, 37

*7 Records of the Colony of Rhode Island and Providence Plantations in New England* (1862)........................................................................................ 36, 37

*9 The Statutes at Large; Being A Collection of All the Laws of Virginia* (1821) ...................................................................................................... 36, 37

*9 The Statutes at Large of Pennsylvania from 1682 to 1801* (1903).......... 36, 37

*Act of Apr. 1650, Proceedings and Acts of the General Assembly of Maryland, January 1637/8–September 1664* (William Hand Browne ed. 1883) ............. 23

*Act of Mar. 4, 1680, The Colonial Laws of Massachusetts* (1890) ................... 23

*Act of Oct. 22, 1763, 6 The Statutes at Large of Pennsylvania from 1682 to 1801* (James T. Mitchell et al. eds. 1899) .................................................... 23

*Act X, Aug. 1633, 1 The Statutes at Large: Being a Collection of all the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* (William Waller Hening ed. 1823) (Hening's Statutes).................................... 23

*Act XVII, Mar. 1657-1658,* 1 Hening's Statutes................................................ 23

*Act XXIII, Mar. 1642-1643,* 1 Hening's Statutes ............................................. 23

*Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776* (1777) .......................................................... 36, 37

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998) ...................................................................................................... 24, 29

Ann Fairfax Withington & Jack Schwartz, *The Political Trial of Anne Hutchinson*, 51 New Eng. Q. 226 (1978).......................................................... 33

*Articles and Ordinances of December 1656, tit. 6, New Netherland Laws* ..... 23

*Duke of York's Laws, 1665-1675, 1 The Colonial Laws of New York from the Year 1664 to the Revolution* (1894) .................................................................. 23

Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635 (1937) ................................................................................................................ 33

James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381 (1988) ................................................................. 33

Joseph Blocher & Catie Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders*, *in* NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Blocher, J. et al. eds.) (forthcoming).......................... 35

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249 (2020) .................... 33

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* (1994) ....................................................................................... 23

Note, *The Meaning(s) of "The People" in the Constitution*, 126 Harv. L. Rev. 1078 (2013) ...................................................................................................... 26

N.C. Declaration of Rights of 1776 § XVII, *in* THE COMPLETE BILL OF RIGHTS: THE DRAFTS, DEBATES, SOURCES, AND ORIGINS (Neil Cogan ed., 2d ed., 2014) .................................................................................................... 37

*Ordinance of Feb. 23, 1645, New Netherland Laws*........................................ 23

*Order of Aug. 4, 1675, Records of the Colony of New Plymouth in New England* (1856) ............................................................................................................... 23

*Order of Jan. 22, 1676-1677, 2 Records of the Colony of Rhode Island and Providence Plantations in New England* (John Russell Bartlett ed. 1857).... 23

*Order of May 17, 1737, 1 Records of the Governor and Company of the Massachusetts Bay in New England* (1853) .................................................... 23

*Ordinance of Mar. 31, 1639, Laws and Ordinances of New Netherland, 1638–1674* (E. B. O'Callaghan ed 1868) ................................................................. 23

Pa. Declaration of Rights of 1776 § XIII, *in* THE COMPLETE BILL OF RIGHTS: THE DRAFTS, DEBATES, SOURCES, AND ORIGINS (Neil Cogan ed., 2d ed., 2014) .................................................................................................... 37

Pub. L. No. 90–351................................................................................... 12, 13

Pub. L. No. 90–618......................................................................................... 12

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 (2007) ....................................................................... 24, 25

Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (2006) ....................................................... 34

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004)................................ 24

*The Code of 1650, Being a Compilation of the Earliest Laws and Orders of the General Court of Connecticut* (Silas Andrus ed. 1822) .................................... 23

*The Public Records of the Colony of Connecticut From May, 1775 to June, 1776* (1890) ....................................................................................................... 36

U.S. Citizenship and Immigration Services, Early American Immigration Policies, https://www.uscis.gov/about-us/our-history/explore-agency-history/overview-of-agency-history/early-american-immigration-policies (July 30, 2020) ..................................................................................... 39, 40

## JURISDICTIONAL STATEMENT

Defendant-Appellee Heriberto Carbajal-Flores was charged with a single count of unlawfully possessing a firearm, in violation of 18 U.S.C. § 922(g)(5)(A). R. 1.[1] In an order entered March 8, 2024, the district court dismissed that count after concluding that, as applied to Carbajal-Flores, Section 922(g)(5)(A) is unconstitutional under the Second Amendment. RSA at 1-8. On April 4, 2024, the government timely filed a notice of appeal from the district court's order. R. 102.

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction pursuant to 18 U.S.C. § 3731 and 28 U.S.C. § 1291.

## ISSUE PRESENTED FOR REVIEW

Whether 18 U.S.C. § 922(g)(5)(A), which prohibits an alien who is illegally or unlawfully in the United States from possessing a firearm, violates the Second Amendment.

## STATEMENT OF THE CASE

### *Offense Conduct*

According to the government's evidence, on June 1, 2020, during an evening of civil unrest in Chicago, officers monitoring a police observation

---

[1] Citations to the Original Electronic Record on Appeal are to "R.," followed by the document number. Citations to the required short appendix are to "RSA," followed by the page number. The government has also prepared and filed a separate two-volume appendix that contains the historical and secondary sources cited in this brief.

device (POD) camera saw Carbajal-Flores on the street in the city's Little Village neighborhood. R. 46 (Government's Response to Defendant's Motion to Dismiss) at 2. As captured in the real-time footage, at about 11:06 p.m., Carbajal-Flores took aim and fired seven shots at a passing car. *Id.* at 3–4; R. 46-1 (POD camera footage) at 11:06:00–11:06:09. Officers were dispatched to the scene, but by the time they arrived, Carbajal-Flores had left. R. 46-1 at 11:10:32. Soon thereafter, the POD camera captured Carbajal-Flores at the same intersection, where he removed a gun from his pocket and attempted to shoot at another passing car; this time, however, the gun jammed. *Id.* at 11:38:00–11:41:45; R. 46 at 5. Officers again responded to the scene, detained Carbajal-Flores, and recovered a loaded semi-automatic pistol from his pants pocket. R. 46 at 6.

Carbajal-Flores is a noncitizen who is unlawfully present in the United States. R. 46 at 7. In a *Mirandized* interview, defendant admitted to law enforcement officers that he knew he had no legal status in the United States at the time of the offense. *Id.* Carbajal-Flores has no prior felony convictions,

but his criminal record includes multiple Illinois misdemeanor offenses. R. 11 at 3–9 (Sealed Pretrial Report).[2]

### *Indictment and Previous Motions to Dismiss the Indictment*

On September 10, 2020, a federal grand jury returned an indictment charging Carbajal-Flores with a single count of possession of a firearm while illegally or unlawfully in the United States, in violation of 18 U.S.C. § 922(g)(5)(A). R. 1.

On May 3, 2021, Carbajal-Flores filed a motion to dismiss the indictment, challenging the constitutionality of Section 922(g)(5)(A), in part, pursuant to *District of Columbia v. Heller*, 554 U.S. 570 (2008). R. 28 at 6-10. In his motion, Carbajal-Flores claimed that he fired the gun "to defend his community as a member of the Neighborhood Watch." *Id.* at 3. Carbajal-Flores supplemented his arguments in an amended motion to dismiss filed on May 25, 2021. R. 32, 32-1. Subsequently, Carbajal-Flores moved to dismiss his

---

[2] Carbajal-Flores's criminal history includes the following misdemeanor convictions, all in the Circuit Court of Cook County, Illinois: (1) an April 27, 2009 misdemeanor conviction for reckless conduct for which he was sentenced to three months of court supervision; (2) a September 30, 2011 misdemeanor conviction for reckless conduct for which he was sentenced to two days' imprisonment; (3) a December 7, 2011 misdemeanor conviction for obstructing identification for which he was sentenced to one year of conditional discharge; (4) an October 4, 2012 conviction for driving on a suspended license, for which he was sentenced to ten days' imprisonment; (5) a July 12, 2016 misdemeanor conviction for possessing 2.5 to 10 grams of cannabis, for which he was sentenced to 12 months of conditional discharge. R. 11 at 3–9.

motion and amended motion without prejudice to engage in discussions with the government. R. 35.

In November 2021, Carbajal-Flores filed a renewed motion, raising the same Second Amendment challenge, among other challenges. R. 43, 43-1. In his motion, Carbajal-Flores admitted that, on the night of his arrest, he possessed a gun and fired it multiple times. R. 43 at 3. Carbajal-Flores repeated his contention that he did so "to defend his community" during the unrest, and claimed that police had told him and others, "if you have anything, you should get it," which he interpreted as suggesting that he should arm himself. R. 43 at 3, 5.

In its response to Carbajal-Flores's motion, the government included a detailed recitation of his conduct the night of his arrest and included as an exhibit POD video footage capturing Carbajal-Flores, without any apparent provocation, firing a gun seven times at a passing car. R. 46, 46-1. *See* still photo pictured below and included in R. 46 at 4:



The government also explained that, contrary to Carbajal-Flores's assertions that he was a member of the local Neighborhood Watch group, Carbajal-Flores

did not even live near the location of the shooting. R. 46 at 2-7, 46-1; *see also* R. 90 at 26 n.11. The district court denied Carbajal-Flores's renewed motion. R. 57.

On August 15, 2022, after the Supreme Court issued its decision in *New York Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), Carbajal-Flores again moved to dismiss the indictment on Second Amendment grounds. R. 64. In its response, the government argued, among other things, that the noncitizens unlawfully in the United States were not among "the people" protected by the Second Amendment, that the Supreme Court's decision in *Bruen* undermined this Court's contrary conclusion in *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015), R. 68 at 7, and that the constitutionality of Section 922(g)(5)(A) was supported by the nation's historical tradition of firearms regulation, R. 68 at 3–19.

The district court denied Carbajal's renewed motion, adhering to its view that Section 922(g)(5)(A) is constitutional. R. 74. The court rejected the government's contention that *Bruen* provided reason to revisit the Seventh Circuit's determination that noncitizens are among "the people" protected by the Second Amendment. *Id.* at 3-5. But the court found that history and tradition nevertheless supported Section 922(g)(5)'s constitutionality. *Id.* at 5-6. The court deemed "particularly instructive" an Eleventh Circuit decision which canvassed English and Founding-era laws to conclude that the right to

5

keep and bear arms was limited to citizens. *Id.* at 5-6 (discussing *United States v. Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022)). Accordingly, the court "join[ed] the Eleventh Circuit (and others) in concluding that the historical precedent from before, during, and after the founding shows a tradition of regulating noncitizens' right to keep and bear arms comparable to § 922(g)(5)." R. 74 at 6 (citing cases).

### *Order Granting Carbajal-Flores's Third Motion to Dismiss*

On August 11, 2023, after this Court issued its opinion in *Atkinson v. Garland*, 70 F.4th 1018, 1020, 1023–24 (7th Cir. 2023) (remanding a pre-*Bruen* challenge to 18 U.S.C. § 922(g)(1) to the district court "to undertake the *Bruen* analysis in the first instance"), Carbajal-Flores filed a third motion to dismiss, arguing that Section 922(g)(5)(A) violated the Second Amendment, facially and as applied to him. In support of this motion, Carbajal-Flores relied on *Atkinson* and the Third Circuit's decision in *Range v. Garland*, 69 F.4th 96 (3d Cir. 2023), *cert. granted, judgment vacated sub nom. Garland v. Range*, No. 23-374, 2024 WL 3259661 (July 2, 2024). R. 83. The government responded on October 16, 2023. R. 90.

While Carbajal-Flores's motion was pending, the district court issued an order in a separate case concluding that Section 922(g)(1)'s prohibition on the possession of firearms by a person previously convicted of a felony was unconstitutional as applied to the defendant in that case. *See United States v.*

Case: 24-1534     Document: 12     Filed: 07/29/2024     Pages: 72

*Griffin*, --- F. Supp. 3d ----, No. 21-CR-00693, 2023 WL 8281564 (N.D. Ill. Nov. 30, 2023), appeal docketed No. 23-3330 (7th Cir.). In *Griffin*, the district court concluded that Section 922(g)(1) was facially constitutional because, historically, "legislatures categorically disarmed individuals who they feared would disregard the law and disturb the social order." 2023 WL 8281564, at *7. However, the court held the historical record supported disarmament only of individuals "who demonstrate the risk of violence," and thus persons "determined to be non-violent" could successfully challenge the statute on an as-applied basis. *Id.* at *9. The court then found that Griffin's criminal history did not "demonstrate a risk of violence" because none of his prior felonies were for "a crime involving the use of a weapon" and because his instant offense did not involve an "arrest in the commission of a violent act." *Id.*

On March 8, 2024, the district court granted Carbajal-Flores's third motion to dismiss, which it construed as a motion for reconsideration. RSA at 1–8. The court concluded that Section 922(g)(5)(A), though facially constitutional, was unconstitutional as applied to Carbajal-Flores. *Id.* at 7–8. First, the district court concluded that the plain text of the Second Amendment covered Carbajal-Flores's conduct, a conclusion the district court had already reached in its prior opinion denying Carbajal-Flores's second motion to dismiss. *Id.* at 5–6. The district court rejected the government's argument that the right to keep and bear arms does not extend to undocumented noncitizens,

but agreed with the government that the historical record supported the categorical disarmament of certain individuals, including those covered by Section 922(g)(5)(A). *Id.*

The district court incorporated by reference the reasoning set forth in its decisions in *Griffin* and subsequent cases involving challenges to Section 922(g)(1), opining that it could apply "its reasoning from a Section 922(g)(1) case in a Section 922(g)(5) case," given that the government had made identical arguments in both contexts. RSA at 6 n.1. Applying its analysis of the constitutionality of Section 922(g)(1), the court found that history supported the conclusion that the constitutionality of Section 922(g)(5)(A) could turn on individualized assessments, and that the government's historical analogues supported only the disarmament of individuals who demonstrate a risk of violence. *See* RSA at 6–7; *see also Griffin*, 2023 WL 8281564 at *8–*9. Specifically, the court concluded that the exceptions to British loyalty oath laws necessarily required "an individualized assessment" to determine if the former loyalist could regain his right to bear arms, and this fact provided a basis for conducting an individualized assessment under Section 922(g)(5)(A). RSA at 7.

The court's individualized assessment with respect to Carbajal-Flores focused on three factors: (1) Carbajal-Flores's criminal history, (2) the circumstances of his arrest, and (3) his subsequent conduct while on pretrial

release. *Id.*[3] First, the court found it important that, while Carbajal-Flores was unlawfully present in the country, he had "never been convicted of a felony, a violent crime, or a crime involving the use of a weapon." *Id.* Second, the court emphasized, with respect to the charged offense, that Carbajal-Flores "contend[ed] that he received and used the handgun solely for self-protection and protection of property during a time of documented civil unrest." *Id.* The court also characterized the arrest of Carbajal-Flores as "non-violent." *Id.* Finally, the court noted that while Carbajal-Flores was on pretrial release, he had "consistently adhered to and fulfilled all of the stipulated conditions of his release, is gainfully employed, and has no new arrests or outstanding warrants." *Id.* For these reasons, the court found that Section 922(g)(5)(A) was unconstitutional under the Second Amendment, as applied to Carbajal-Flores, and dismissed the indictment.

## SUMMARY OF ARGUMENT

As the district court determined, under the Second Amendment, Section 922(g)(5)(A) is constitutional on its face. By its plain text, the Second Amendment does not protect the right of a person who is not a citizen and who is illegally or unlawfully present in the United States to keep and bear arms.

---

[3] The opinion stated: "The Court finds that Carbajal-Flores' criminal record, containing no improper use of a weapon, as well as the non-violent circumstances of his arrest do not support a finding that he poses a risk to public safety such that he cannot be trusted to use a weapon responsibly and should be deprived of his Second Amendment right to bear arms in self-defense." RSA at 7.

"The people" who enjoy that right have never been understood to include individuals who are outside of the political community. Instead, as history shows, and as the Supreme Court has stated time and again, the Second Amendment's protections extend only to "citizens."

Section 922(g)(5)(A) is constitutional under this nation's historical tradition of firearms regulation as well. First, there is abundant precedent before, during, and after the American Revolution for disarming individuals who were not members of the political community. Second, there is a historical tradition of disarming untrustworthy adherents of the law. Standing alone and in combination, these regulatory regimes and historical traditions are "relevantly similar" to Section 922(g)(5)(A).

The district court erred in determining that Section 922(g)(5)(A) is unconstitutional as applied to Carbajal-Flores. This Court has never upheld an as-applied challenge to Section 922(g). And even assuming that Section 922(g)(5)(A) were subject to such challenges, none could be sustained in this case. Contrary to the district court's premise, the nation's historical tradition of firearms regulation supports the conclusions that the legislature may make categorical judgments and that disarmament need not rest on individual assessments of danger. The district court's contrary determination is legally unsupported and unworkable.

Moreover, in conducting its individualized assessment, the district court's analysis was deeply flawed. The court found that the circumstances of Carbajal-Flores's arrest did "not support a finding that he poses a risk to public safety," based in part on his contention that he "received and used the handgun solely for self-protection and protection of property during a time of documented civil unrest." The court made no attempt to reconcile its view with the video evidence showing Carbajal-Flores firing his gun at passing traffic on a city roadway, or even to acknowledge the video's existence. Similarly, the court unreasonably focused on the fact that Carbajal-Flores had "never been convicted of a felony, a violent crime, or a crime involving the use of a weapon," and had complied with the terms of his pretrial release, while downplaying his unlawful presence in the United States, as well as his multiple misdemeanor convictions.

In sum, the district court erred in finding Section 922(g)(5)(A) unconstitutional as applied to Carbajal-Flores, and this Court should vacate the judgment and remand for further proceedings.

## STANDARD OF REVIEW

This Court reviews a challenge to a criminal statute's constitutionality *de novo*. *United States v. Protho*, 41 F.4th 812, 827 (7th Cir. 2022).

Unless a criminal law is invalid in every possible application or there are First Amendment or vagueness concerns, a court should not strike the statute

on its face and should instead assess its constitutionality only as applied to the defendant before it. *United States v. Stevens*, 559 U.S. 460, 472-73 (2010); *United States v. Holden*, 70 F.4th 1015, 1017 (7th Cir. 2023); *United States v. Cook*, 970 F.3d 866, 873 (7th Cir. 2020). Facial challenges can succeed only if defendant can "establish that no set of circumstances exists under which the [statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

## ARGUMENT

### I.  Statutory Background

In 1968, Congress passed the Omnibus Crime Control and Safe Streets Act, with the purpose "[t]o assist State and local governments in reducing the incidence of crime, to increase the effectiveness, fairness, and coordination of law enforcement and criminal justice systems at all levels of government, and for other purposes." Pub. L. No. 90–351, 82 Stat. 197 (1968), *as amended by the Gun Control Act of 1968*, Pub. L. No. 90–618, 82 Stat. 1231 (1968). The Omnibus Act "was enacted in response to the precipitous rise in political assassinations, riots, and other violent crimes involving firearms, that occurred in this country in the 1960's." *Lewis v. United States*, 445 U.S. 55, 63 (1980). "[C]oncerned with the widespread traffic in firearms and with their general availability to those whose possession thereof was contrary to the public interest," Congress "determined that the ease with which firearms could be obtained contributed significantly to the prevalence of lawlessness and

violent crime in the United States." *Huddleston v. United States*, 415 U.S. 814, 824 (1974); *United States v. Jackson*, 69 F.4th 495, 504–05 (8th Cir. 2023), *cert. granted, judgment vacated*, No. 23-6170, 2024 WL 3259675 (U.S. July 2, 2024) (Congress found that "only through adequate Federal control over interstate and foreign commerce in these weapons" could "this grave problem be properly dealt with") (quoting Pub. L. No. 90-351, § 901(a)(3), 82 Stat. 225, 225). Through its 1968 legislation, "Congress sought . . . to keep guns out of the hands of those who have demonstrated that 'they may not be trusted to possess a firearm without becoming a threat to society.'" *Lewis*, 445 U.S. at 63 (quoting *Scarborough v. United States*, 431 U.S. 563, 572 (1977)). Its "principal purpose . . . was to curb crime by keeping firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." *Huddleston*, 415 U.S. at 824 (internal citation and quotation marks omitted). Title VII of the Gun Control Act of 1968 added Section 922(g)(5)(A), which prohibited an alien who is illegally or unlawfully in the

United States from possessing a firearm in or affecting commerce. 18 U.S.C.

§ 922(g)(5)(A).[4]

## II.    Analysis

### A.    Section 922(g)(5)(A) is Facially Constitutional Under the Second Amendment

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller*, the Supreme Court held that the Second Amendment guarantees the right of "citizens" to keep and bear arms for self-defense. 554 U.S. at 635. The Court cautioned, however, that the right to keep and bear arms "is not unlimited" and the right remains subject to "presumptively lawful regulatory measures."

---

[4] Title VII of the Gun Control Act of 1968, which included Section 922(g)(5)(A), was "hastily passed, with little discussion, no hearings and no report." *United States v. Bass*, 404 U.S. 336, 344 (1971); *see also id.* at 344 n.11. In introducing the amendment, Senator Long of Louisiana explained that "it makes good sense that we should see to it that citizens, as far as Federal law is concerned, can have weapons for self-defense." 114 Cong. Rec. 13868. Speaking on 18 U.S.C. § 922(g)(7), the subsection of Section 922(g) preventing those who have renounced their citizenship from possessing firearms, Senator Long expressed that he who renounces his citizenship "has voluntarily given up certain rights that belong to an American citizen, which would include the right to bear arms." *Id.* He continued, regarding Section 922(g)(5), "[i]f he is an alien who is illegally in the United States… he should not be trusted to carry firearms." *Id.* Almost a week later, Senator Long again spoke to the Senate, emphasizing that the amendment was proposed in order to prevent future assassinations, citing the killings of John F. Kennedy, killed by a veteran dishonorably discharged who had renounced his citizenship, and Martin Luther King, killed by a felon. 114 Cong. Rec. 14773. There was a call for a vote, and it passed without modification, both in the Senate and the House. *Id.*; 114 Cong. Rec. 16286, 16299.

*Id.* at 626, 627 n.26; *see also United States v. Rahimi*, 602 U.S. ---, 144 S. Ct. 1889, 1897 (June 21, 2024) ("'Like most rights,' though, 'the right secured by the Second Amendment is not unlimited.'") (quoting *Heller*, 554 U.S. at 626).

In *Bruen*, the Supreme Court again considered the meaning of the Second Amendment. 597 U.S. at 1. The Court directed lower courts to first, consider whether "the Second Amendment's plain text covers an individual's conduct," and if it does, then "the Constitution presumptively protects that conduct." *Id.* at 17. Second, "the government must then justify its regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 24. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (internal quotation marks omitted).

Recently, the Supreme Court clarified that *Bruen* and its other Second Amendment precedents were not meant to require "a law trapped in amber." *Rahimi*, 144 S. Ct. at 1897. Instead, the Court stated, the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897–98. The Court explained that, when assessing whether a law complies with the Second Amendment, courts should consider "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition" by ascertaining "whether the new law is 'relevantly

similar' to laws that our tradition is understood to permit." *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29).

Under this standard, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id*. at 1898. But even "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster,'" so long as the law "comport[s] with the principles underlying the Second Amendment." *Id*. (quoting *Bruen*, 597 U.S. at 30). As Justice Barrett explained in her concurrence, "imposing a test that demands overly specific analogues has serious problems," including "forc[ing] 21st-century regulations to follow late-18th-century policy choices," and "assum[ing] that founding-era legislatures maximally exercised their power to regulate." *Id*. at 1925 (Barrett, J., concurring).

Section 922(g)(5)(A) remains a permissible restriction on firearms possession, as the Seventh Circuit found in its pre-*Bruen* decision: *Meza-Rodriguez*, 798 F.3d at 669–73 (recognizing under intermediate scrutiny that Section 922(g)(5) is a permissible firearms restriction on an "alien" "who is unlawfully or illegally within the United States.") Post-*Bruen*, the Sixth and Eighth Circuits have found that Section 922(g)(5)(A) remains constitutional. *See United States v. Sitladeen*, 64 F.4th 978 (8th Cir. 2023) (holding

16

Section 922(g)(5)(A) constitutional because undocumented noncitizen was not part of "the people" and therefore had no Second Amendment right to possess a firearm); *United States v. Rangel-Tapia*, No. 23-1220, 2024 WL 966385 (6th Cir. Mar. 6, 2024) (finding no plain error in an as-applied challenge to Section 922(g)(5)(A) where no circuit court has declared Section 922(g)(5)(A) unconstitutional either before or after *Bruen*).

As discussed below, under *Bruen*'s first line of inquiry, undocumented noncitizens do not fall within the textual purview of the Second Amendment, and even if they did, Section 922(g)(5)(A) would still be constitutionally permissible under *Bruen*'s second line of inquiry, because the statute is consistent with the historical regulation of firearms.

### 1.    The Possession of Firearms by Undocumented Noncitizens is Not Protected Under the Plain Text of the Second Amendment

By its terms, the Second Amendment protects the right of "the people" to keep and bear arms. U.S. Const. amend. II. In *Heller*, the Supreme Court explained that "the term ['the people'] unambiguously refers to . . . members of the political community." 554 U.S. at 580. The Court has observed elsewhere that "citizenship" is a required part of "membership in the political community" and that "[a]liens are by definition . . . outside of this community." *Cabell v. Chavez-Salido*, 454 U.S. 432, 438–40 (1982). Accordingly, after analyzing the phrase "right of the people," the Court in *Heller* determined that "the Second

17

Amendment right is exercised individually and belongs to . . . *Americans*." 554 U.S. at 581 (emphasis added). The rest of the opinion likewise reflects the Court's understanding that the right to keep and bear arms does not belong to noncitizens. *See id.* at 595 ("right of citizens"); *id.* at 603 ("an individual citizen's right"); *id.* at 608 (right "enjoyed by the citizen"); *id.* at 625 ("weapons not typically possessed by . . . citizens"); *id.* ("possession of firearms by . . . citizens"); *id.* at 635 ("citizens").

Likewise, in *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010), the Supreme Court repeatedly used the word citizen in this context. *See* 561 U.S. at 768 ("citizens must be permitted to use handguns for the core lawful purpose of self-defense"); *id.* at 770 ("right of the citizens to keep and bear arms"); *id.* at 773 ("right of all citizens to keep and bear arms"); *id.* at 774 ("right of all citizens to keep and bear arms"); *id.* at 776 ("blacks, as citizens, have equal right to protection, and to keep and bear arms for self-defense").

Then, in *Bruen*, the Supreme Court repeatedly interpreted the phrase "the people" as limited to protecting the rights of "Americans," or "citizens." *See Bruen*, 597 U.S. at 70 ("The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions.") (citing *Heller*, 554 U.S. at 581); *see also id.* at 8–9 (explaining that in *Heller*, the Court "recognized that the Second and Fourteenth Amendments protect the right of an ordinary … citizen to possess

18

a handgun in the home for self-defense"); *id.* at 26 ("The Second Amendment . . . surely elevates above all other interests the right of . . . citizens to use arms"); *id.* at 29 (describing historical inquiry called for under *Bruen* as a consideration of "how and why the regulations burden a . . . citizen's right to armed self-defense"); *id.* at 31–32 ("It is undisputed that petitioners . . . —two ordinary, . . . adult citizens—are part of 'the people' whom the Second Amendment protects."); *id.* at 38 ("citizens"); *id.* at 71 (characterizing the right to bear arms as belonging to "citizens"); *id.* at 78 (Alito, J., concurring) ("*Heller* correctly recognized that the Second Amendment codifies the right of ordinary … Americans to protect themselves from lethal violence by possessing and, if necessary, using a gun.").

In *Rahimi*, the Supreme Court again referred to the right to bear arms as a right of "citizens." 144 S. Ct. at 1897 ("In *Heller*, this Court held that the right applied to ordinary citizens within the home."); *see also id.* at 1902 ("[O]ur Nation's tradition of firearm regulation distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not"); *id.* at 1903 (explaining that *Heller* and *Bruen* used the term "responsible" to describe "the class of ordinary citizens who undoubtedly enjoy the Second Amendment right," but clarifying that *Heller* and *Bruen* "said nothing about the status of citizens who were not 'responsible'"); *id.* at 1907 (referring to "an arms-bearing citizenry") (Gorsuch, J., concurring); *id.* at 1933

(assuming, based on prior Second Amendment precedent, that Rahimi was a member of the political community because the Second Amendment right is "guaranteed to all Americans") (internal quotations omitted) (Thomas, J., dissenting).

Carbajal-Flores, of course, is not an American citizen. Under *Bruen*'s definition of the Second Amendment's plain text—and as numerous other federal courts of appeal have recognized—Carbajal-Flores's possession of a firearm is therefore constitutionally unprotected. *See, e.g., Sitladeen*, 64 F.4th at 985 ("unlawfully present aliens are not within the class of persons to which the phrase 'the people' refers"); *Jimenez-Shilon*, 34 F.4th at 1043–47 (assuming, without deciding, that Jimenez is among "the people" protected by the Second Amendment and after conducting an historical analysis, finding Section 922(g)(5)(A) constitutional); *United States v. Perez*, 6 F.4th 448, 456 (2nd Cir. 2021) (rejecting Second Amendment challenge to Section 922(g)(5)(A)); *United States v. Carpio-Leon*, 701 F.3d 974, 978 (4th Cir. 2012) (noting *Heller*'s use of the term "Americans" frequently connects arms-bearing and "citizenship"); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1168 (10th Cir. 2012) ("although the [*Heller*] Court did not face the question before us, it is not exactly reading between the lines to note how frequently the opinion connected arms-bearing and citizenship . . ."); *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011) ("Whatever else the term means or includes,

the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States."); *cf. United States v. Singh*, 979 F.3d 697, 724 (9th Cir. 2020) (rejecting challenge to Section 922(g)(5)(B) and noting that "those unlawfully present . . . are neither citizens nor members of the political community").

To be sure, in *Meza-Rodriguez*, 798 F.3d at 672, a Seventh Circuit panel majority commented that it saw "no principled way to carve out the Second Amendment and say that the unauthorized (or maybe all noncitizens) are excluded." And it expressed reluctance to place excessive weight on *Heller*'s "passing references" to "law-abiding citizens" and "members of the political community."[5] *Id.* at 669. Because *Meza-Rodriguez* was decided before *Bruen*, it was necessarily decided without the benefit of *Bruen's* repeated use of "Americans" and "citizens" to describe the scope of the Second Amendment, as detailed above. *See Atkinson*, 70 F.4th at 1023 (noting that *Meza-Rodriguez's*

---

[5] *Meza-Rodriguez's* conclusion also rested on the flawed premise that the term "the people" means the same in the Second Amendment as in the Fourth Amendment (which protects noncitizens). 798 F.3d at 670–71. But many other constitutional provisions use the term "the people" to exclude noncitizens. For example, noncitizens are not among "the people" who adopted the Constitution, *see* U.S. Const. Pmbl.; or "the people" who elect members of Congress, *see* U.S. Const. Art. I, § 2, Cl. 1; Amend. XVII, Cls. 1–2; or "the people" who reserved powers not delegated to the government, *see* U.S. Const. Amend. X. In addition, the Supreme Court has held that an "[e]xcludable alien is not entitled to First Amendment rights [of petition and assembly], because 'he does not become one of the people to whom these things are secured by our Constitution by an attempt to enter forbidden by law.'" *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (quoting *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904)).

analysis of the term "the people" predated the Supreme Court's decision in *Bruen*).

Recently, the Supreme Court in *Rahimi* frequently described the right to bear arms as belonging to citizens. *See Rahimi*, 144 S. Ct. at 1897, 1902, 1903, 1907, 1933. The Court's repeated references to citizens in *Bruen* and *Rahimi* cannot fairly characterized as "passing references"; they should instead be afforded the weight that a deliberate choice of language deserves in order to conclude that the Second Amendment's use of the phrase "the people" excludes unlawful noncitizens like Carbajal-Flores. *See also United States v. Gay*, 98 F.4th 843, 846 (7th Cir. Apr. 12, 2024) (taking account of the Supreme Court's use of terms such as "law-abiding, responsible citizens" to describe persons with rights protected the Second Amendment).

This limited meaning of "the people" in the Second Amendment finds support in the historical record. Under the English Bill of Rights, the right to keep and bear arms was not "available to the whole population" but was instead expressly limited to "'Subjects.'" *Heller*, 554 U.S. at 593 (quoting English Bill of Rights 1689, 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441); *see id.* ("By the time of the founding, the right to have arms had become fundamental for English *subjects*.") (emphasis added). "[T]he right to own guns in eighteenth-century England was statutorily restricted to the landed gentry," and under "English common law[,] . . . 'aliens [were] incapacitated to hold

lands.'" *Jimenez-Shilon*, 34 F.4th at 1046 (quoting *Bayard v. Singleton*, 1 N.C. 5, 9 (1787)).

"The English view carried across the Atlantic, where it was well understood that the right to bear arms 'did not extend to all New World residents.'" *Jimenez-Shilon*, 34 F.4th at 1047 (quoting Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 140 (1994)). Colonial-era statutes did not extend the right to bear arms to those who were, at the time, not considered part of the political community. Most colonies prohibited the sale of arms to Native Americans, who were traditionally not regarded as citizens because of their membership in sovereign tribes. *See Elk v. Wilkins*, 112 U.S. 94 (1884).[6] Virginia also prohibited Catholics from owning

---

[6] *See The Code of 1650, Being a Compilation of the Earliest Laws and Orders of the General Court of Connecticut* 54-56 (Silas Andrus ed. 1822); *Act of Apr. 1650, Proceedings and Acts of the General Assembly of Maryland, January 1637/8– September 166*4, at 307 (William Hand Browne ed. 1883); *Order of May 17, 1737, 1 Records of the Governor and Company of the Massachusetts Bay in New England* 196 (1853); *Order of Aug. 4, 1675, Records of the Colony of New Plymouth in New England* 173 (1856); *Act of Mar. 4, 1680, The Colonial Laws of Massachusetts* 285 (1890); *Ordinance of Mar. 31, 1639, Laws and Ordinances of New Netherland, 1638–1674*, at 18-19 (E. B. O'Callaghan ed 1868) (New Netherland Laws); *Ordinance of Feb. 23, 1645, New Netherland Laws* 47; *Articles and Ordinances of December 1656, tit. 6, New Netherland Laws* 278; *Duke of York's Laws, 1665-1675, 1 The Colonial Laws of New York from the Year 1664 to the Revolution* 40-41 (1894); *Act of Oct. 22, 1763, 6 The Statutes at Large of Pennsylvania from 1682 to 1801*, at 319-320 (James T. Mitchell et al. eds. 1899); *Order of Jan. 22, 1676-1677, 2 Records of the Colony of Rhode Island and Providence Plantations in New England* 561 (John Russell Bartlett ed. 1857); *Act X, Aug. 1633, 1 The Statutes at Large: Being a Collection of all the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 219 (William Waller Hening ed. 1823) (Hening's Statutes); *Act XXIII, Mar. 1642-1643, 1 Hening's Statutes* 255-256; *Act XVII, Mar. 1657-1658, 1 Hening's Statutes* 441.

arms unless they swore "allegiance to the Hanoverian dynasty and to the Protestant succession," Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 (2007).[7] Indeed, while "[a]lien men" in colonial America "could speak, print, worship, enter into contracts, hold personal property in their own name, sue and be sued, and exercise sundry other civil rights," they "typically could not vote, hold public office, or serve on juries" and did not have "the right to bear arms" because these "were rights of members of the polity." Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998); *see also Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment). During the American Revolution, colonial governments disarmed those who refused to "swear an oath of allegiance to the state or the United States." Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004);

---

[7] Although some of the categorical prohibitions to which the government cites clearly are abhorrent and "would be impermissible today under other constitutional provisions." as the court in *Jackson* recognized, "they remain relevant in determining the historical understanding of the right to keep and bear arms." 69 F.4th at 503. Several other judges and courts have reasoned likewise. *See, e.g., Range*, 69 F.4th at 122 n.50 (Krause, J., dissenting) (rejecting these "bigoted and unconstitutional laws" but citing them to demonstrate the "tradition of categorical, status-based disarmaments"); *Atkinson*, 70 F.4th at 1035–36 (Wood, J., dissenting) ("Though some of those laws would no longer pass muster under the Equal Protection Clause, they reveal conclusively the scope of governmental power that was understood to exist at the time the Second Amendment was adopted.")

*see id.* at 506 nn. 128–29 (compiling statutes); *see also* Churchill, *supra*, 25 L. & Hist. Rev. at 159 ("[T]he new state governments . . . framed their police power to disarm around a test of allegiance."). And during the ratification debates, the New Hampshire ratification convention proposed an amendment stating that "Congress shall never disarm any *Citizen* unless such as are or have been in Actual Rebellion," while delegates urged the Massachusetts convention to propose a similar amendment guaranteeing "peaceable *citizens*" the right to keep arms. 2 Bernard Schwartz, *The Bill of Rights: A Documentary History*, at 681, 760–61 (1971) (emphasis added); *see Heller*, 554 U.S. at 603–04 (describing ratification conventions' proposals as "Second Amendment precursors").

The Bill of Rights codified the principle that membership in the political community is a prerequisite for the right to bear arms. *See McDonald*, 561 U.S. at 769–70 ("The right of *the citizens* to keep and bear arms has been justly considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them." (quoting 3 Joseph Story, Commentaries on the Constitution of the United States § 1890, p. 746 (1833)) (emphasis added)). Indeed, "Framing-era sources 'refer to arms-bearing as a *citizen's* right' that was closely associated with national fealty and membership

in the body politic." *Jimenez-Shilon*, 34 F.4th at 1048 (collecting sources and quoting Note, *The Meaning(s) of "The People" in the Constitution*, 126 Harv. L. Rev. 1078, 1093 (2013)). Accordingly, "many early state constitutions . . . expressly limited the right to keep and bear arms to 'citizens.'" *Id.* at 1049 (collecting Alabama, Connecticut, Kentucky, Maine, Mississippi, and Pennsylvania constitutions[8]); *Perez*, 6 F.4th at 463 & n.6 (Menashi, J., concurring in the judgment) (discussing the same constitutions); *see also Rahimi*, 144 S. Ct. at 1913 (Kavanaugh, J., concurring) ("Our interpretation [of the Second Amendment] is confirmed by analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment") (quoting *Heller*, 554 U.S. at 600–01).

Additionally, the Second Amendment expressly references "a well organized militia." U.S. Const. amend. II. "[T]he conception of the militia at the time of the Second Amendment's ratification was the body of all *citizens* capable of military service." *Heller*, 554 U.S. at 628 (emphasis added). *See Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment) (explaining the history that "non-citizens . . . were neither expected, nor usually allowed, to participate in the militia" (quotation marks omitted)); *Jimenez-Shilon*, 34

---

[8] PA. CONST. art. IX, § 21 (1790); KY. CONST. art. XII, cl. 23 (1792); MISS. CONST. art. I, § 23 (1817); CONN. CONST. art. I, § 17 (1818); ALA. CONST. art. I, § 23 (1819); ME. CONST. art. I, § 16 (1819).

F.4th at 1047–48 (describing history of "disarmament of groups associated with foreign elements," including "on the ground of alienage" (quotation marks omitted)). There was no suggestion that any states were viewed at the time as lacking the authority to exclude noncitizens from the right to bear arms. *See Bruen*, 597 U.S. at 30 (where there were "no disputes regarding the lawfulness of [certain] prohibitions," one "can assume it settled" that those prohibitions are "consistent with the Second Amendment").

Set against this historical background, Carbajal-Flores cannot reasonably contend that he is within the class of persons to whom the Second Amendment's protection applies. Carbajal-Flores is a noncitizen who was present in the United States unlawfully at the time he was found in possession of a firearm which he used to shoot at two passing cars on a public street. Because the Second Amendment does not reach undocumented noncitizens like Carbajal-Flores, his challenge fails.

## 2. Section 922(g)(5)(A) Is Consistent With This Nation's Historical Tradition of Firearms Regulation and Thus Constitutional Under the Second Amendment.

Even if the Second Amendment's plain text applies to undocumented noncitizens like Carbajal-Flores, Section 922(g)(5)(A) still passes constitutional muster under *Bruen* because the statute is consistent with our nation's historical tradition of firearm regulation.

In *Bruen*, the Supreme Court explained that where a regulation infringes on presumptively protected conduct, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. In *Rahimi*, the Court clarified the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." 144 S. Ct. at 1898. In particular, *Rahimi* explained that *Bruen*'s historical inquiry requires courts to consider "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition" by ascertaining "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id.* at 1898 (quoting *Bruen*, 597 U.S. at 29) (emphasis added). "[C]entral to this inquiry" is "[w]hy and how the regulation burdens the right." *Id.*; *see also Bruen*, 597 U.S. at 29 ("*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense"). But even "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster,'" so long as the law "comport[s] with the principles underlying the Second Amendment." *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 30); *see also id.* at 1925 (Barrett, J., concurring) (noting that "[t]o be *consistent* with historical limits, a challenged regulation need not be an updated model of a historical counterpart" and that "a test that demands overly specific

analogues has serious problems"). Using this approach, the historical tradition affirms the constitutionality of Section 922(g)(5)(A).

Two historical markers carry particular salience with respect to noncitizens who are present in the United States unlawfully. First, there is abundant precedent before, during, and after the American Revolution for disarming individuals who were not members of the political community. *See supra,* at 22–27; *see also Perez*, 6 F.4th at 462 n.4 (Menashi, J., concurring in the judgment) ("[A]rms bearing and suffrage were intimately linked two hundred years ago and have remained so." (citing Amar, *supra*, at 48 n.*)). In particular, laws barring Native Americans, Catholics, and Loyalists from bearing arms demonstrate that the right to bear arms was understood to be limited to those within the political community.

Historical traditions also permitted the categorical disarmament of individuals who could not be trusted to adhere to the law. That historical tradition bears directly on the constitutionality of Section 922(g)(5)(A), as that statute prohibits individuals from possessing firearms where those individuals have failed to adhere to the rule of law in entering and residing in the United States.

***England.*** The tradition of disarming untrustworthy adherents to the law began (in relevant part) in early England. In 1689, for example, the English government passed a law disarming Catholics who refused to make

declarations renouncing their faith and, in so refusing, conveyed to the sovereign their unwillingness to adhere to English law. 1 W. & M., Sess. 1, c. 15, in 6, *The Statutes of the Realm* 71–73 (1688). This "Act for the better secureing the Government by disarming Papists and reputed Papists" provided that a Catholic could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person)." *Id.*; *see also Jackson*, 69 F.4th at 502. Enacted shortly after the Glorious Revolution of 1688—when Protestant King William and Queen Mary succeeded Catholic King James II—the statute reflected the new government's perception that Catholics who refused to renounce their faith (and thus their allegiance to the Pope) could not be trusted to obey English law. *Range*, 69 F.4th at 121–22 (Krause, J., dissenting); *see also Jackson*, 69 F.4th at 502. This prohibition was not based on a theory that all Catholics were, in fact, dangerous; rather, the categorical disarmament was based on concerns with a group's propensity to disobey the sovereign and the risk that presented to the social order. *Range*, 69 F.4th at 121–22 (Krause, J., dissenting); *Kanter v. Barr*, 919 F.3d 437, 457 (7th Cir. 2019) (Barrett, J., dissenting) (relying on sources concluding that "[the English] Parliament disarmed Catholics because the Protestant majority found them 'untrustworthy'" and therefore posed a threat).

Such untrustworthiness as a reason for categorical disarmament has other roots in English history. For instance, "[f]ollowing the tumult of the English Civil War, the restored Stuart monarchs disarmed nonconformist (*i.e.*, non-Anglican) Protestants," even though such nonconformists included pacifist denominations like the Quakers. *Range*, 69 F.4th at 120–21 (Krause, J., dissenting) (collecting sources). Like the Catholics before them, such groups "often refused to take mandatory oaths acknowledging the King's sovereign authority over matters of religion" and, as a result, "Anglicans accused nonconformists of believing their faith exempted them from obedience to the law." *Id.* at 121. Their commitment to non-violence did not spare their guns. *See Jackson*, 69 F.4th at 504 ("Not all persons disarmed under historical precedents—not all Protestants or Catholics in England, not all Native Americans, not all Catholics in Maryland, not all early Americans who declined to swear an oath of loyalty—were violent or dangerous persons" and yet they were disarmed nonetheless); *Range*, 69 F.4th at 124–26 (Krause, J., dissenting) (noting that colonial- and Revolutionary-war-era laws disarmed "sizable numbers of pacifists" such as the Quakers, Moravians, and Mennonites, "not . . . because they were dangerous, but rather because their refusal to swear allegiance demonstrated that they would not submit to communal judgments in law when it conflicted with personal conviction") (collecting sources).

Finally, the 1689 English Bill of Rights—the Second Amendment's predecessor—"enshrined basic civil liberties" but also Parliament's right to limit them. *Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting); *see also Bruen*, 597 U.S. at 44–45 (cleaned up); *Heller*, 554 U.S. at 593. It specified that "*Protestants* may have Arms for their Defence suitable to their Conditions *and as allowed by Law*." 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688) (emphases added); *see also Jackson*, 69 F.4th at 502; *Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting). "Englishmen had never before claimed the right of the individual to arms." *Bruen*, 597 U.S. at 44–45 (quotation marks and citation omitted). And yet when they first formally claimed that right, the English ensured that the Parliament retained the power—which it in fact exercised—to arm one class of the population and to disarm another based on concerns that the members of that latter class would not abide by the law. *See Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting).

**Colonial America.** The American colonies also disarmed classes of people "whom the authorities believed could not be trusted to obey the law." *See Range*, 69 F.4th at 122 (Krause, J., dissenting); *see also id.* at 122–24 & nn.50-70 (collecting sources). Examples include the Virginia Company's 1624 disarmament of Richard Barnes, who disrespected authorities through "opprobrious" and "base and detracting speeches concerning the Governor," *id.* at 122; Massachusetts' disarmament in the 1630s of supporters of an

outspoken preacher "not because those supporters had demonstrated a propensity for violence," but because "authorities concluded their conduct evinced a willingness to disobey the law," *id.* at 123;[9] Virginia's disarmament in the 1640s of "nonconformist Protestants . . . due to their rejection of the King's sovereign power over religion," *id.*; and the colonies' disarmament (in 1696 and during the Seven Years' War of 1756-1763) of Catholics and Moravians, "a group of nonconformist Protestants from modern-day Germany," *id.* at 123–24.[10]

Decisions to disarm these groups were "not in response to violence"; indeed, Moravians "were—as they are today—committed pacifists who owned weapons for hunting instead of fighting." *Id.* at 124 (internal citation omitted). The groups instead were disarmed based on their apparent "willingness to disobey the law"; seeming "opposition to the king"; and "perceived unwillingness to adhere to the King's sovereign dictates." *Id.* at 123–24 (cleaned up). Moreover, "[t]hose restrictions are telling because they were imposed at a time when, before the advent of the English Bill of Rights, the

---

[9] *See also* Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 637-38, 644, 648 (1937)); Ann Fairfax Withington & Jack Schwartz, *The Political Trial of Anne Hutchinson*, 51 New Eng. Q. 226, 226 (1978); James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381, 391 (1988).
[10] *See also* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 263 (2020).

charters of Virginia and Massachusetts provided unprecedented protections for colonists' firearm rights." *Id.* at 122 (internal citation omitted).

As noted above (*supra*, n.7), undoubtedly, today the categorical disarmament of religious minorities would be understood as abhorrent, reprehensible, and a violation of the Equal Protection Clause—as would the categorical disarmament of Blacks and Native Americans, another practice pervasive in our country's historical tradition that is clearly contrary to its fundamental values.[11] But, considered solely for the limited purpose of the historical inquiry required by *Bruen*, these laws nonetheless "reveal conclusively the scope of governmental power that was understood to exist at the time the Second Amendment was adopted." *Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting); *see also Jackson*, 69 F.4th at 503; *Range*, 69 F.4th at 122 n.50 (Krause, J., dissenting); *United States v. Agee*, No. 21-CR-350, 2023 WL 6443924, at *8 (N.D. Ill. Oct. 3, 2023) (noting that "the right to equal protection . . . was not interpreted as applying to federal laws until the mid-20th century, well after the ratification of the Second Amendment").

---

[11] *See*, *e.g.*, *Atkinson*, 70 F.4th at 1035 & n.2 (Wood, J., dissenting) (citing "laws that disarmed persons found guilty of treason and members of native tribes"); Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28–29 (2006) ("Laws disarming groups such as slaves, freed blacks, Indians, and those of mixed-race ancestry were common.").

"[O]ne can accept that the Framers denied firearms to groups they thought to be particularly dangerous (or unvirtuous, or irresponsible) without sharing their conclusion about which groups qualify as such." *See* Joseph Blocher & Catie Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders* at 12, *in* NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Blocher, J. et al. eds.) (forthcoming).[12] Blocher and Carberry continue:

> The historical approach resolves that gap through analogical reasoning: by suggesting that our modern prohibition is based on a principle that the Framers endorsed, even if they did not apply it to [a particular group]. But to fully understand the scope of the regulatory authority the Framers thought they had, one must actually consider the gun laws that they *did* pass, even if we would reject those laws (perhaps for other constitutional reasons) today.

*Id.* at 12–13.

**Revolutionary War.** Throughout the Revolutionary War, legislatures continued to pass disarmament laws targeting those who failed to demonstrate loyalty to the emerging American government.

A 1775 Connecticut law provided that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights

---

[12] Available at ssrn.com/abstract=3702696 or dx.doi.org/10.2139/ssrn.3702696 (last visited July 2, 2024) as well as in the government's appendix.

and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 193 (1890) (1775 Conn. Law). In 1776, the Continental Congress recommended that colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. *4 Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). At least six colonies enacted legislation in this vein. *See Jackson*, 69 F.4th at 503 (pointing to Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey); *see also Atkinson*, 70 F.4th at 1034 (Wood, J., dissenting) ("During the American Revolution, several states passed laws providing for the confiscation of weapons owned by persons who refused to swear an oath of allegiance to the state or to the United States.").[13]

A common feature of these laws was to require oaths of loyalty to the government and to strip anyone who failed or refused to take the oath of the right to bear arms. *See, e.g.*, 1776 Mass. Law at 479–81; 1776 R.I. Law at 566–

---

[13] *See also 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay*, at 479–84 (1886) ("1776 Mass. Law"); *7 Records of the Colony of Rhode Island and Providence Plantations in New England*, at 566–68 (1862) ("1776 R.I. Law"); *1 The Public Acts of the General Assembly of North Carolina*, at 226–32 (1804) (1777 N.C. law); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777); *9 The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112–13 (1903) ("1777 Pa. Law"); *9 The Statutes at Large; Being A Collection of All the Laws of Virginia*, at 282 (1821) ("1777 Va. Law").

67; 1777 N.C. Law at 229–31; 1777 Pa. law; at 111–13; 1777 Va. Law at 281–82. Many of these laws provided that failing or refusing to take the oath resulted in forfeiture of a bundle of additional political rights, including the rights to vote, serve on juries, and hold public office, *ibid.*, further reinforcing the longstanding connection between these political rights and arms-bearing. *Supra,* at 24. North Carolina's and Pennsylvania's laws are particularly informative because the year before they were enacted, these states adopted constitutional provisions protecting the individual right to bear arms. *Heller*, 554 U.S. at 601; *see* N.C. Declaration of Rights of 1776 § XVII, *in* THE COMPLETE BILL OF RIGHTS: THE DRAFTS, DEBATES, SOURCES, AND ORIGINS 277–78 (Neil Cogan ed., 2d ed., 2014); Pa. Declaration of Rights of 1776 § XIII, *in* THE COMPLETE BILL OF RIGHTS*, supra*, at 278.

***Ratification Debates.*** The history behind the Second Amendment's adoption provides additional persuasive evidence that the Founders understood the right to keep and bear arms as compatible with legislative authority to disarm groups who could not be trusted to follow the law.

This evidence includes the Pennsylvania Antifederalists' proposed constitutional amendment which explicitly recognized that criminal activity and the concomitant risk of public injury provided grounds for disarmament: "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals." *Medina v.*

37

*Whitaker*, 913 F.3d 152, 158–59 (D.D.C. 2019) (explaining the proposal reflected that "criminals . . . were proper subjects of disarmament") (quoting The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to their Constituents, *reprinted in* Schwartz, *supra* at 665). At the Massachusetts convention, Samuel Adams similarly proposed an amendment providing that the Constitution shall "never [be] construed . . . to prevent the people of the United States, who are *peaceable citizens*, from keeping their own arms." *Schwartz*, *supra* at 675, 681 (emphasis added). And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." *Id.* at 758, 761.

Even if Section 922(g)(5)(A) is not expressly derivative of the historic exclusions described above (and the government maintains that it is), the statute is still sufficiently analogous to early gun restrictions to support a conclusion that the disarmament of undocumented noncitizens is part of this country's historical tradition and is therefore constitutional under the Second Amendment. While immigration is hardly a new phenomenon, illegal immigration is essentially a phenomenon that began in the late 19th century. *See United States v. Muñoz-De La O*, 586 F. Supp. 3d 1032, 1036 (E.D. Wash. 2022), *aff'd*, No. 22-30100, 2024 WL 1873006 (9th Cir. Apr. 30, 2024) (E.D. Wash. Feb. 18, 2022) ("The federal government first forayed into the realm of

immigration legislation during the 1870s. One decade later, the 1882 Chinese Exclusion Act prohibited Chinese laborers from entering the United States for ten years.") (citing Supreme Court cases that upheld the exclusion law on the basis that illegal immigrants could be removed at any time); *see also* U.S. Citizenship and Immigration Services, Early American Immigration Policies, https://www.uscis.gov/about-us/our-history/explore-agency-history/overview-of-agency-history/early-american-immigration-policies (July 30, 2020) ("Americans encouraged relatively free and open immigration during the 18th and early 19th centuries, and rarely questioned that policy until the late 1800s.") (last visited July 28, 2024). The colonial restrictions on firearms possession provide context showing that the categorical disarmament of undocumented noncitizens comports with historical tradition. As *Rahimi* counsels, "[t]he law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer'" or a 'historical twin.'" *Rahimi,* 144 S. Ct. at 1898; *see also Bruen*, 597 U.S. at 30. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

Section 922(g)(5)(A) fits comfortably within these historical traditions. *See, e.g., Meza-Rodriguez*, 798 F.3d at 673. Noncitizens without lawful status have, by definition, "already violated a law of this country" by entering and remaining in the United States illegally. *United States v. Toner*, 728 F.2d 115,

39

128 (2d Cir. 1984). Further, noncitizens without lawful status may be less likely to comply with the identification and recordkeeping requirements associated with purchasing firearms from licensed dealers, because they often live "largely outside the formal system of registration, employment, and identification" and can be "harder to trace and more likely to assume a false identity." *Huitron-Guizar*, 678 F.3d at 1170. Noncitizens without lawful status also "have an interest in eluding law enforcement," creating a risk that they could misuse firearms against immigration authorities attempting to apprehend them. *Meza-Rodriguez*, 798 F.3d at 673; *cf.* 18 U.S.C. § 922(g)(2) (disarming fugitives). Congress could thus reasonably conclude that the noncitizens who fall within § 922(g)(5)(A) should be disarmed.

3.   **Section 922(g)(5)(A) Is Sufficiently Similar to Historical Traditions of Disarming Individuals Outside of the Political Community and Disarming Individuals Who Are Untrustworthy Adherents to the Law.**

The laws summarized above satisfy *Bruen*'s directive that, when the constitutional analysis cannot end with the Second Amendment's plain text, courts must identify "historical precursors" "analogous enough" to a modern regulation before that modern regulation can "pass constitutional muster." 597 U.S. at 30. Simply put: The plain text of the Second Amendment aside, § 922(g)(5)(A) is constitutional on its face because the statute is sufficiently

analogous to historical traditions of categorically disarming individuals outside of the political community and untrustworthy adherents to the law.

*Bruen* did not provide courts with "an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment." *Id.* at 29. Still, it directed courts to treat as "*central* considerations," "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* (cleaned up); *see also id.* ("*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense"). *Bruen* further explained that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 30. "The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 30).

Here, § 922(g)(5)(A) can be understood as addressing a "general societal problem that has persisted since the 18th century" in that the statute categorically disarms individuals who lacked membership in the political community or who were unwilling to comply with the law. *See Atkinson*, 70 F.4th at 1023. Compared to those historical regulations, Section 922(g)(5)(A) imposes an identical burden on the right to armed self-defense. That burden is also "comparably justified." *Id.* at 1021. At the time of the founding,

41

disarmament was considered necessary to protect against the danger to the "civic community" posed by those refusing to abide by its legal and social norms. *Range v. Att'y Gen. United States,* 53 F.4th 262, 275–79 (3d Cir. 2022), *reh'g en banc granted, opinion vacated sub nom. Range v. Att'y Gen. United States of Am.*, 56 F.4th 992 (3d Cir. 2023), a*nd on reh'g en banc sub nom. Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023), *cert. granted, judgment vacated sub nom. Garland v. Range*, No. 23-374, 2024 WL 3259661 (July 2, 2024). Section 922(g)(5)(A) is similarly justified by an unlawfully present non-citizen's lack of membership in the political community and the challenges presented by their possession of firearms.

Moreover, the burden here is not necessarily permanent because the characteristics that trigger disarmament—being both a noncitizen and unlawfully in this country—are not permanent conditions. Section 922(g)(5)(A) only limits its prohibition on firearms possession to undocumented noncitizens; other noncitizens may lawfully possess firearms under certain circumstances. *See* 18 U.S.C. § 922(y)(2) (exception to (g)(5)(B) allowing certain noncitizens present under a nonimmigrant visa to possess firearms). And there is even a process for certain noncitizens to obtain a waiver from the firearm prohibition from the Attorney General. *See* 18 U.S.C. § 922(y)(3).

At the same time, Section 922(g)(5)(A) also addresses "unprecedented societal concerns" that, under *Bruen*, warrant a "more nuanced approach." 597

U.S. at 27. As stated earlier, Congress enacted the statute to address proliferation of gun violence, including a "precipitous rise in political assassinations, riots, and other violent crimes involving firearms," and the enormous consequences of those crimes. *See Lewis*, 445 U.S. at 63. While the Founders in 1791 were motivated to keep the firearms of their time away from those who could not be trusted to use them lawfully and safely, by the 1960s, Congress was facing "the widespread traffic in  firearms," "their general availability," and the "ease with which firearms could be obtained"—all of which contributed "significantly to the prevalence of lawlessness and violent crime in the United States." *Huddleston*, 415 U.S. at 824. In other words, when Section 922(g)(5)(A) was enacted, the prevalence and technological advances of firearms presented a danger with which the Founders simply did not have to contend. *See United States v. Gates*, No. 22-CR-397, 2023 WL 5748362, at *8 (N.D. Ill. Sept. 6, 2023) (upholding constitutionality of Section 922(g)(1) after observing that "[m]odern firearms can fire multiple rounds without reloading, whereas most guns available in 1791 'could not fire more than one shot without being reloaded'" and "[m]odern firearms manufacturers can produce firearms at greater volumes than those in 1791") (quoting *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 410 (7th Cir. 2015)). *See also United States v. Thompson*, No. 21-CR-00284, Dkt. 58 at 3 (N.D. Ill. Feb. 21, 2024) ("The

twentieth-century problem of gun violence is different in scale and kind from the perceived risk to the social order from firearms at the founding.").

One final consideration merits mention in this inquiry. Courts traditionally afford Congress significant deference in matters relating to citizenship and immigration. "[T]he responsibility for regulating the relationship between the United States and our alien visitors"— determinations about which noncitizens should be allowed to enter and remain in the United States and the terms and conditions imposed upon such noncitizens while they are here—is "committed to the political branches" of government. *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). In exercising that power, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Id.* at 80. And because Congress's "power over aliens is of a political character," its exercise of that power is "subject only to narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101–02 n.21 (1976); *see Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953) (holding that congressional power over noncitizens is "largely immune from judicial control"). Congress was entitled to determine that noncitizens who are unlawfully present in the United States, and are therefore potentially subject to removal, should not be permitted to possess firearms while they are here. That consideration further confirms what the historical record shows: Section 922(g)(5)(A) reflects a lawful regulatory measure.

44

**B.    Section 922(g)(5)(A) Is Constitutional As Applied to Carbajal-Flores.**

The district court erred when it found Section 922(g)(5)(A) unconstitutional as applied to Carbajal-Flores. The Seventh Circuit has repeatedly rejected as-applied Second Amendment challenges, but even if Section 922(g)(5) were subject to as-applied challenges, the district court's analysis could not support one in this case where while unlawfully in the United States, Carbajal-Flores fired seven shots at a passing car on a city street without any provocation, and attempted to fire shots at a second car.

First, the Seventh Circuit has never actually upheld an "as applied" Second Amendment challenge to Section 922(g) and has, in fact, "repeatedly rejected as-applied Second Amendment challenges" to that statute. *See Kanter*, 919 F.3d at 443. Certainly, this Court in *Kanter* noted that it had "left room for as-applied challenges" to Section 922(g). *Id.*; *see also Gay*, 98 F.4th at 846 (assuming, without deciding, that a criminal defendant could bring an as-applied challenge to a Section 922(g)(1) conviction). But, to date, this Court has never upheld such a challenge.

Contrary to the district court's premise, the historical tradition supports the legislature's ability to disarm *categories* of individuals—and disarmament need not be based on individualized assessments of dangerousness. *See Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting) ("since the founding,

governments have been understood to have the power to single out categories of persons who will face total disarmament"); *Jackson*, 69 F.4th at 503–04 ("Legislatures historically prohibited possession by categories of persons . . . ."); *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting) (disarmament "is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons"); *United States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011) (pre-*Bruen*, explaining that "the Second Amendment permits categorical regulation of gun possession by classes of persons . . . rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis"). The relevant question, in other words, is whether the status at issue indicates under the *Bruen* analysis that the person cannot be

trusted to use a gun responsibly, not whether each individual can be trusted to do so.[14]

The district court's reliance on British loyalty oath laws to reach a contrary conclusion is misplaced. Those who refused to take a loyalty oath were categorically disarmed; only after an individual took the loyalty oath could he be permitted to bear arms. The process of regaining the right to bear arms by taking the oath thus was in the general nature of a pardon or expungement petition. This demonstrates that disarmament was not permanent; it does not demonstrate that individual assessments were required. Accordingly, these historic analogues provide no basis for limiting the application of Section 922(g)(5)(A) based on individual assessments of dangerousness.

---

[14] Individualized assessments could also yield wildly disparate results. *See, e.g., Atkinson*, 70 F.4th at 1027 (Wood, J., dissenting) (suggesting that enabling individuals to seek to establish a case-specific exemption from a generally applicable criminal law would create "an arbitrary patchwork of decisions—as far from the rule of law as one could image"); *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) (individualized exemptions would "obviously present serious problems of administration, consistency and fair warning"). And in the criminal context, in particular, the opportunity for pre-trial fact-finding is limited by Federal Rule of Criminal Procedure 12, which makes such as-applied challenges difficult to administer and resolve before trial if individualized facts, at least those relevant to the crime itself (like a Section 922(g)(5) offense), are relevant. *See, e.g., United States v. Pope*, 613 F.3d 1255 (10th Cir. 2010) (Gorsuch, J.) (concluding that as-applied Second Amendment challenge to Section 922(g)(9) could not be brought pre-trial because the defendant "contends the statute is unconstitutional only in light of the 'facts surrounding the commission of the alleged offense'—the very facts a court may not consider before trial" (citation omitted)); Fed. R. Crim. P. 12(b)(3) (limiting pretrial motions to motions that "can be determined without a trial on the merits").

Second, even if Section 922(g)(5)(A) were subject to as-applied challenges, the district court's analysis could not support such a challenge in this case. In finding the statute unconstitutional as applied to Carbajal-Flores, the court—without pertinent authority or even explanation—found dispositive the fact that he had not been convicted of a "felony, a violent crime, or a crime involving the use of a weapon." RSA at 7. Carbajal-Flores was not charged with being a felon in possession of a firearm; he was charged with knowingly possessing a firearm while unlawfully in the United States. The court failed to take into account the salient facts that Carbajal-Flores was not a citizen, and that he was a person who had violated—and was continuing to violate—the law by unlawfully residing in the United States. Similarly, the Court ignored Carbajal-Flores's record of non-violent misdemeanor offenses, which provided further evidence that he could not be trusted to adhere to the law, and thus posed a risk to the public.

The district court improperly considered the facts surrounding the instant offense and Carbajal-Flores's conduct while on pretrial release, both of which are irrelevant to Carbajal-Flores's status as an undocumented noncitizen, and neither of which establish that Carbajal-Flores poses no risk to the public. The district court further erred in concluding the circumstances of Carbajal-Flores's arrest were "non-violent," when he had, without any provocation, fired shots at a passing car on a city street during a time of unrest,

and attempted to fire shots at a second car. Carbajal-Flores's conduct was captured on video, and he admitted that he fired seven "warning shots" at a passing car. R. 28 at 3. The court's conclusion that Carbajal-Flores's conduct did not show that he "pose[d] a risk to public safety," RSA at 7, cannot be squared with the undisputed evidence of Carbajal-Flores's actual conduct. And, more generally, consideration of the circumstances of Carbajal-Flores's arrest and his conduct on pretrial release as means for assessing the defendant's likely dangerousness at the time of his charged firearm possession raises potential vagueness and notice concerns.

Even assuming that Section 922(g)(5)(A) is subject to as-applied challenges, Carbajal-Flores's challenge fails. He was undisputedly unlawfully in the country at the time of his arrest. He has several prior misdemeanor convictions which further demonstrate his failure to abide by the law. He did not contest Section 922(g)(5)(A)'s constitutionality through a declaratory judgment action—and instead, he is alleged to have "violated the law in secret and tried to avoid detection." *See Gay*, 98 F.4th at 847. And the possession with which Carbajal-Flores is charged involves his firing of seven shots at a passing car without provocation on a city street, and attempting to do the same thing shortly thereafter. Carbajal-Flores "poses a clear threat of physical violence to another," *Rahimi*, 144 S. Ct. at 1901, and there is no question that he is among

the class of individuals constitutionally prohibited from possessing firearms under Section 922(g)(5)(A). Therefore, any as-applied challenge fails.

## CONCLUSION

For all the foregoing reasons, the government respectfully requests that this Court vacate the district court's order dismissing the indictment and remand for further proceedings.

<div style="margin-left: 40%">

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

DEBRA RIGGS BONAMICI
Assistant United States Attorney
Criminal Division Counsel

/s/ *Margaret A. Steindorf*
MARGARET A. STEINDORF
Assistant United States Attorney

</div>

## RULE 32 CERTIFICATION

I hereby certify that:

1. This brief complies with the type volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) because it contains 11,995 words.

2. This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and Circuit Rule 32(b), because it has been prepared using the Microsoft Office Word proportionally-spaced typeface of Century Schoolbook with 13-point font in the text and 12-point font in the footnotes.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:    /s/ *Margaret Steindorf*
MARGARET STEINDORF
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois
(312) 353-3540

In the

# UNITED STATES COURT OF APPEALS

for the Seventh Circuit

## No. 24-1534

UNITED STATES OF AMERICA,

**Plaintiff-Appellant,**

v.

HERIBERTO CARBAJAL-FLORES,

**Defendant-Appellee.**

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 20 CR 613 — Sharon Johnson Coleman, *Judge*.

# SHORT APPENDIX
# OF THE UNITED STATES

MORRIS PASQUAL
Acting United States Attorney
 for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois  60604
(312) 353-5300

DEBRA RIGGS BONAMICI
Assistant United States Attorney
Criminal Division Counsel

MARGARET STEINDORF
Assistant United States Attorney

## TABLE OF CONTENTS

Memorandum Opinion and Order from March 8, 2024,
    *United States v. Carbajal-Flores*, No. 20-CR-00613 (R. 101) ......G. App 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 20-cr-00613 |
| | ) | |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| HERIBERTO CARBAJAL-FLORES, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Heriberto Carbajal-Flores ("Carbajal-Flores") is charged with possession of a firearm while illegally or unlawfully in the United States, in violation of 18 U.S.C. § 922(g)(5). On April 13, 2022, the Court denied Carbajal-Flores' first motion to dismiss the indictment [57]. On December 19, 2022, this Court denied Carbajal-Flores' second motion to dismiss the indictment [74] on Second Amendment grounds in light of recent Supreme Court case *New York State Rifle & Pistol Ass'n., Inc. v. Bruen*, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022). Before the Court is Carbajal-Flores' renewed motion to dismiss [83] in light of the Third Circuit's recent decision in *Range v. Garland*, 69 F.4th 96 (3d Cir. 2023), and the Seventh Circuit's decision in *Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023). For the reasons below, this Court grants the motion to dismiss.

**Background**

The Court presumes familiarity with its April 13, 2022 order denying Carbajal-Flores' first motion to dismiss. As relevant here, on June 1, 2020, Carbajal-Flores possessed a handgun in the Little Village neighborhood of Chicago, Illinois.

Carbajal-Flores contends that he received and used the handgun for self-protection and protection of property. Because of Carbajal-Flores' citizenship status, he was charged in violation of 18 U.S.C. § 922(g)(5), which prohibits any noncitizen who is not legally authorized to be in the

G. App. 1

United States from "possess[ing] in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

Carbajal-Flores's criminal record reflects no felony convictions [11].  On February 26, 2024, Pre-Trial Services issues a Pre-Trial Release Status Update on Carbajal Flores [99]. The report found that Carbajal-Flores has consistently adhered to and fulfilled all the stipulated conditions of his release.  Pretrial Services has conducted numerous employment visits at various sites, and Carbajal-Flores consistently provides the necessary documentation to verify his income when requested.  A criminal record check conducted through the National Crime Information Center reflects no new arrests or outstanding warrants.

**Legal Standard**

Federal Rule of Criminal Procedure 12(b)(1) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Rule 12 authorizes defendants to challenge the lawfulness of a prosecution on purely legal, as opposed to factual, grounds. *See United States v. Coscia*, 866 F.3d 782, 790 (7th Cir. 2017) (considering defendant's contention that the indictment must be dismissed because the statute under which it is brought is unconstitutionally vague).  A court may decide all questions of law raised in a motion to dismiss, including the constitutionality and interpretation of a federal statute. *See United States v. Sorich*, 523 F.3d 702, 706 (7th Cir. 2008).

**Discussion**

*A.  Motion for Reconsideration*

As an initial matter, the Court addresses whether it is proper to reconsider its prior ruling. Although Carbajal-Flores has styled his motion as a "renewed" motion to dismiss the indictment,

the motion is, in effect, a motion for reconsideration of an issue already decided by this Court: whether § 922(g)(5) is constitutional under the Second Amendment.

Although the Rules of Criminal Procedure do not authorize or even mention motions to reconsider, *United States v. Rollins,* 607 F.3d 500, 502 (7th Cir. 2010) (the rules of criminal procedure "lack a counterpart to the motions authorized by Fed. R. Civ. P. 50(b), 52(b), or 59"), the United States Supreme Court has held that motions to reconsider may be filed in criminal cases in district courts. *See United States v. Healy,* 376 U.S. 75, 77, 84 S.Ct. 553, 11 L.Ed.2d 527 (1964); *see also Rollins,* 607 F.3d at 502 ("[Motions to reconsider] are ordinary elements of federal practice that exist in criminal prosecutions despite their omission from the Rules of Criminal Procedure."); *United States v. Kalinowski,* 890 F.2d 878, 881 (7th Cir. 1989). Therefore, motions to reconsider may be filed in criminal actions or cases. *See Rollins,* 607 F.3d at 503 (citing *United States v. Dieter,* 429 U.S. 6, 8, 97 S.Ct. 18, 50 L.Ed.2d 8 (1976)). Motions for reconsideration are utilized for very limited purposes: to correct manifest errors of law or fact, present newly discovered evidence, or to address an intervening and substantial change in the controlling law occurring after the submission of the issues to the court. *See United States v. Linder*, No. 12 CR 22, 2013 WL 505214, at *2 (N.D. Ill. Feb. 12, 2013) (Kendall, J.) (citing *Cosgrove v. Bartolotta,* 150 F.3d 729, 732 (7th Cir. 1988)).

Carbajal-Flores asserts that the Third Circuit's recent decision in *Range v. Garland*, 69 F.4th 96 (3d Cir. 2023), and the Seventh Circuit's decision in *Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023) signify a change in law warranting dismissal of the indictment. The government argues that Carbajal-Flores' motion for consideration must fail because neither of the two cases upon which Carbajal-Flores relies adversely affects this Court's earlier decision to uphold Section 922(g)(5) as constitutional. While this Court agrees that *Range* is not binding on this Court, the Seventh Circuit's holding in *Atkinson* warrants discussion.

G. App. 3

In *Atkinson*, the Seventh Circuit clarified the analysis demanded by *Bruen*'s text-and-history test in considering whether Section 922(g)(1) is constitutional. As guidance, the Seventh Circuit proposed a set of "interrelated and non-exhaustive questions [that] may help focus the proper analysis:"

1. Does [Section 922(g)(1)] address a "general societal problem that has persisted since the 18th century?" *Bruen*, 142 S. Ct. at 2131. If this problem existed during a relevant historical period, did earlier generations address it with similar or "materially different means?" *Id.*

2. What does history tell us about disarming those convicted of crimes generally and of felonies in particular? Among other sources, the parties could look to commentary from the Founders, proposals emerging from the states' constitutional ratifying conventions, any actual practices of disarming felons or criminals more generally around the time of the Founding, and treatment of felons outside of the gun context (to the extent this treatment is probative of the Founders' views of the Second Amendment). When considering historical regulations and practices, the key question is whether those regulations and practices are comparable in substance to the restriction[s] imposed by [Section 922(g)(1)]. To answer the question, . . . the parties should consider how the breadth, severity, and the underlying rationale of the historical examples stack up against [Section 922(g)(1)].

3. Are there broader historical analogues to [Section 922(g)(1)] during the periods that *Bruen* emphasized, including, but not limited to, laws disarming "dangerous" groups other than felons? The parties should not stop at compiling lists of historical firearms regulations and practices. The proper inquiry, as we have explained, should focus on how the substance of the historical examples compares to [Section 922(g)(1)].

4. If the [parties'] historical inquiry identifies analogous laws, do those laws supply enough of a historical tradition (as opposed to isolated instances of regulation) to support [Section 922(g)(1)]? On this front, the parties should provide details about the enforcement, impact, or judicial scrutiny of these laws, to the extent possible.

5. If history supports [Defendant's] call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony? And what evidence can a court consider in assessing whether a particular felony conviction was violent? For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements? *Bruen*

4

G. App. 4

shows that these distinctions should also have firm historical support. *See* 142 S. Ct. at 2132–33 (explaining that the court must assess whether modern and historical regulations are "relevantly similar," including in terms of how and why the regulations burden gun rights).

*Atkinson*, 70 F.4th at 1023–24.

While the Seventh Circuit offered these questions in the context of Section 922(g)(1), nothing in *Atkinson* requires that these clarifying questions be asked only in the context of Section 922(g)(1) or prevents these questions of being asked when analyzing the historical tradition under *Bruen* in other statutes. Questions 1 and 4 are general enough to be asked on any statue. Questions 2, 3, and 5 may ask specific questions in the context of 922(g)(1), but the concepts of the questions can also easily be applied to other statues. Indeed, it would likely cause more confusion to fail to apply *Atkinson* when assessing other statutes given the decision's goal of clarifying *Bruen's* historical tradition analysis. Finally, other courts in this circuit have applied *Atkinson* to 922(g)(5). *See United States v. Gonzalez-Flores*, No. 23-CR-30021, 2023 WL 5501218, at *1 (C.D. Ill. Aug. 24, 2023). Thus, the Court will reconsider its prior ruling in light of *Atkinson*.

### B. *Second Amendment*

In *Bruen*, the Supreme Court established a framework for analyzing whether a challenged firearm regulation violates the Second Amendment. First, *Bruen* instructs courts to determine whether the Second Amendment's plain text covers an individual's conduct. If it does, the conduct is "presumptively protect[ed]," and the government bears the burden of demonstrating that the challenged regulation "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30.

This Court previously held that (1) Carbajal-Flores' conduct is covered by the plain text of the Second Amendment. *See United States v. Carbajal-Flores*, No. 20-CR-00613, 2022 WL 17752395, at *3 (N.D. Ill. Dec. 19, 2022) (Coleman, J.). Nothing has occurred that would cause the Court to

G. App. 5

depart from its prior ruling. Although the Second Amendment's plain text presumptively protects firearms possession by undocumented persons, that does not end the analysis. Under *Bruen*, if the government can show that the felon dispossession statute is part of this country's historical tradition of firearm regulation, then the statute survives. 142 S. Ct. at 2126, 2130. Thus, the Court will re-analyze the historical tradition with *Atkinson*'s guidance.

The government argues that the historical record establishes that legislatures categorically disarmed (1) individuals who were not members of the political community and (2) individuals who threatened the social order through their untrustworthy adherence to the rule of law. This Court recently issued opinions guided by *Atkinson* on identical Section 922(g)(1) challenges that discussed the government's position regarding the "untrustworthy adherents to the law" historical analogue. *See United States of America v. Dionte Vaughns*, No. 22-CR-00636, 2023 WL 8258575 (N.D. Ill. Nov. 29, 2023) (Coleman, J.); *United States of America v. Tyriiq Washington*, No. 23-CR-00274, 2023 WL 8258654 (N.D. Ill. Nov. 29, 2023) (Coleman, J.); *United States of America v. Darrell Griffin*, No. 21-CR-00693, 2023 WL 8281564 (N.D. Ill. Nov. 30, 2023) (Coleman, J.). Because the government's arguments are identical in this case, this Court adopts and incorporates the reasoning of those opinions as to the finding that Section 922(g)(5) is facially constitutional.[1]

The Court now turns to Carbajal-Flores' as-applied challenge to Section 922(g)(5)'s constitutionality. This Court found that the British loyalist example in the "untrustworthy adherents to the law" historical analogue contained an exception allowing British loyalists to sign loyalty oaths. *Griffin*, 2023 WL 8281564, at *8-9. This exception necessarily requires an individualized assessment to determine if the former British loyalist is so "untrustworthy" or "dangerous" that they should be barred from possessing a weapon. *Id.* The Court also determined that based on the government's

---

[1] It stands to reason that this Court can apply its reasoning from a Section 922(g)(1) case in a Section 922(g)(5) case where the government makes identical arguments in both.

G. App. 6

historical analogue, where exceptions were made that allowed formerly "untrustworthy" British loyalists to possess weapons, the individuals who fell within the exception were determined to be non-violent during their individual assessments, permitting them to carry firearms. *Id.* While the analysis in *Griffin* was in the context of felons in possession of firearms, the Court finds that the identical government arguments and analogies are equally applicable to noncitizens unlawfully present in the country. Thus, to the extent the exception shows that some British loyalists were permitted to carry firearms despite the general prohibition, the Court interprets this history as supporting an individualized assessment for Section 922(g)(5) as this Court previously found with Section 922(g)(1). *Id.*

The government argues that Carbajal-Flores is a noncitizen who is unlawfully present in this country. The Court notes, however, that Carbajal-Flores has never been convicted of a felony, a violent crime, or a crime involving the use of a weapon. Even in the present case, Carbajal-Flores contends that he received and used the handgun solely for self-protection and protection of property during a time of documented civil unrest in the Spring of 2020. Additionally, Pretrial Service has confirmed that Carbajal-Flores has consistently adhered to and fulfilled all the stipulated conditions of his release, is gainfully employed, and has no new arrests or outstanding warrants. The Court finds that Carbajal-Flores' criminal record, containing no improper use of a weapon, as well as the non-violent circumstances of his arrest do not support a finding that he poses a risk to public safety such that he cannot be trusted to use a weapon responsibly and should be deprived of his Second Amendment right to bear arms in self-defense. Thus, this Court finds that, as applied to Carbajal-Flores, Section 922(g)(5) is unconstitutional.

**Conclusion**

The noncitizen possession statute, 18 U.S.C. § 922(g)(5), violates the Second Amendment as applied to Carbajal-Flores. Thus, the Court grants Carbajal-Flores' motion to dismiss [83].

G. App. 7

**IT IS SO ORDERED.**

Date: 3/8/2024                    Entered: _____

                                 SHARON JOHNSON COLEMAN
                                 United States District Judge

8

**TABLE OF AUTHORITIES**

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(D)**

Pursuant to Circuit Rule 30(d), I, Margaret Steindorf, counsel for Plaintiff-Appellant, UNITED STATES OF AMERICA, state that the appendix included with this brief on appeal incorporates the materials required under Circuit Rule 30(a) and (b).

/s/ *Margaret Steindorf*
MARGARET STEINDORF
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois
(312) 353-3540

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2024, I electronically filed the foregoing Brief and Short Appendix of the United States with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted.

By:      /s/ *Margaret Steindorf*
MARGARET STEINDORF
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois
(312) 353-3540