No. 24-1534

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

UNITED STATES of America,
*Plaintiff-Appellant,*
v.
Heriberto CARBAJAL-FLORES,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of Illinois
Case No. 1:20-cr-00613

**Brief of Amici Curiae States of Kansas, Indiana, Tennessee, Alabama, Arkansas, Iowa, Kentucky, Louisiana, Nebraska, Ohio, and South Dakota, in support of Plaintiff-Appellant and reversal.**

Kris W. Kobach
*Attorney General*
Anthony J. Powell
*Solicitor General*
Abhishek Kambli
*Deputy Attorney General*
James Rodriguez
*Assistant Attorney General*

Office of the Attorney General
State of Kansas
120 S.W. 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Phone: (785) 368-8539
Anthony.Powell@ag.ks.gov
Abhishek.Kambli@ag.ks.gov
Jay.Rodriguez@ag.ks.gov

Theodore E. Rokita
*Attorney General*
James A. Barta
*Solicitor General*

Office of the Attorney General
State of Indiana
302 W. Washington Street
Indianapolis, Indiana 46204
Phone: (317) 232-0709
James.Barta@atg.in.gov

Jonathan Skrmetti
*Attorney General*
J. Matthew Rice
*Solicitor General*
Matthew D. Cloutier
*Assistant Solicitor General*

Office of the Attorney General
State of Tennessee
PO Box 20207
Nashville, Tennessee 37202
Phone: (615) 741-3491
Matt.Rice@ag.tn.gov
Matt.Cloutier@ag.tn.gov
*Counsel for Amici*

# TABLE OF CONTENTS

Table of Authorities ....................................................................... 3

Interests of Amici Curiae ............................................................. 5

I.    States and law-abiding citizens have a significant interest in § 922(g)(5)(A)'s enforcement .............................................. 7

A. Illegal crossings and crime are rampant ...................... 7

B. Preventing law enforcement from disarming foreign criminals who enter the United States illegally will exacerbate the crisis 10

C. Section 922(g)(5)(A)  is particularly important in light of failed federal enforcement efforts ........................................... 14

II.   Illegal aliens have limited rights ..................................... 16

III.  Section 922(g)(5)(A)'s limitation of firearm possession to lawful residents has deep historical roots ................................... 20

A. History dictates the scope of constitutionally permissible restrictions on firearms ............................................... 21

B. Governments historically limited firearm possession based on compliance with legal requirements and civic commitments ..... 23

C. Section 922(g)(5)(A)'s limitation of firearm possession to lawful residents follows directly from these historical regulations ....... 28

Certificate of Compliance ........................................................ 33

Certificate of Service ............................................................... 33

# TABLE OF AUTHORITIES

## Cases

*Arizona v. United States*, 567 U.S. 387 (2012)..........................................16

*Avelar v. State*, 2024 WL 2734410 (Ind. Ct. App. May 28, 2024)...........13

*Biden v. Texas*, 597 U.S. 785 (2022).........................................................15

*Dep't of State v. Muñoz*, 144 S.Ct. 1812 (2024).......................................20

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................22, 23

*Fitzpatrick v. Sessions*, 847 F.3d 913 (7th Cir. 2017).............................17

*Florida v. United States*, 660 F. Supp. 3d 1239 (N.D. Fla. 2023)...........15

*Fletcher v. Haas*, 851 F. Supp. 2d 287 (D. Mass. 2012).........................20

*Fossella v. Adams*, 225 A.D.3d 98 (N.Y.S. App. Div. 2024)....................17

*INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984)..................................18, 19

*Knauff v. Shaughnessy*, 338 U.S. 537 (1950)..........................................19

*Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953) .................................18

*McDonald v. Chicago*, 561 U.S. 742 (2010) ...........................................22

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022)...22

*People v. Deacons*, 16 N.E. 676 (N.Y. 1888) ...........................................27

*Range v. Att'y Gen.*, 53 F.4th 262 (3d Cir. 2022) ...................................24

*Smith v. United States*, 508 U.S. 223 (1993) ..........................................11

*State v. Hogan*, 58 N.E. 572 (Ohio 1900) ...............................................28

*Texas v. U.S. Dep't of Homeland Security*, 2023 WL 8285223 (S.D. Tex.
     Nov. 29, 2023) .......................................................................................15

*United States v. Abbott*, 90 F.4th 870 (5th Cir. 2024) ............................16

*United States v. Escobar-Temal*, 3:22-CR-00393, 2023 WL 4112762
     (M.D. Tenn. June 21, 2023) ..................................................................26

*United States v. Gomez Perez*, No. 22-3577, 2023 WL 8433556 (8th Cir.
     Dec. 5, 2023)..........................................................................................14

*United States v. Gordon-Nikkar*, 518 F.2d 972 (5th Cir. 1975) .............18

*United States v. Leveille*, 659 F. Supp. 3d 1279 (D.N.M. 2023) .............31

*United States v. Perez*, No. 19-CR-313 (ECT/TNL), 2022 WL 2526194
     (D. Minn. May 3, 2022).........................................................................14

*United States v. Rahimi*, 144 S. Ct. 1889 (2024) ..................22, 29, 30, 31

*United States v. Sing-Ledezma*, No. EP-23-CR-823(1)-KC, 2023 WL
8587869 (W.D. Tex. Dec. 11, 2023) ....................................................14
*United States v. Sitladeen,* 64 F.4th 978 (8th Cir. 2023) ........................14
*United States v. Texas*, 599 U.S. 670 (2023) ...........................................16

**Statutes**

1 Wm. & Mary c. 2, § 7, in 3 Eng. Stat. at Large 417 (1689) ................24
18 U.S.C. § 611 ........................................................................................17
18 U.S.C. § 922(g)(5)(A) .............................................................. 5, 7, 29, 32
1878 N.H. Laws 612, ch. 270 § 2 .............................................................27
1878 Vt. Laws 30, ch. 14 § 3....................................................................27
1879 R.I. Laws 110, ch. 806 § 3................................................................27
1880 Mass. Laws 232, ch. 257, § 4 ..........................................................27
1880 Ohio Rev. St. 1654, ch. 8 § 6995......................................................27
1987 Iowa Laws 1981, ch. 5 § 5135..........................................................27
28 U.S.C. § 924(a)(8)................................................................................16
8 U.S.C. § 1182(a)(3)(D) ..........................................................................20
8 U.S.C. § 1227(a)(2)(C)...........................................................................16
8 U.S.C. § 1448(a) ...................................................................................30
Act of June 13, 1777, § 1 (1777), 9 The Statutes at Large of
Pennsylvania from 1652–1801 (William Stanley Ray ed., 1903) ........26
Act of May 3, 1890, ch. 43, §§ 2, 4, 1890 Iowa Acts 68, 68–69 ..............28

**Other Authorities**

A Digest of the Statute Law of the State of Pennsylvania from The Year
1700 To 1894 (Frank F. Brightly, 12th ed. 1894) ..........................27, 28
Caroline Robbins, *Selden's Pills: State Oaths in England*, 35
Huntington Lib. Q. 303 (1972) ........................................................25
Frederick B. Jonassen, *"So Help Me?": Religious Expression and
Artifacts in the Oath of Office and the Courtroom Oath*, 12 Cardozo
Pub. L., Pol'y & Ethics J. 303 (2014)................................................25
Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-
American Right* (1994)......................................................................24

## INTERESTS OF AMICI CURIAE

Amici are the States of Kansas, Indiana, Tennessee, Alabama, Arkansas, Iowa, Kentucky, Louisiana, Nebraska, Ohio, and South Dakota. During the current border crisis, the States have an interest in the continued enforcement of 18 U.S.C. § 922(g)(5)(A), which prohibits the possession of firearms by illegal aliens.  This law protects citizens and other lawfully present individuals within the States from crimes committed by illegal aliens and in connection with illegal immigration. States further have a sovereign interest in regulating their own political communities by discouraging additional illegal immigration and facilitating the removal of especially dangerous individuals unlawfully present in the United States.

Accordingly, Amici States file this brief under Federal Rule of Appellate Procedure 29(a)(2).

## INTRODUCTION

Section 922(g)(5)(A) criminalizes the possession of firearms by illegal aliens. This Court should reject the district court's holding that the law is unconstitutional.  States have a significant interest in the enforcement of § 922(g)(5)(A)'s prohibition of firearm possession by

illegal aliens. This country is currently experiencing an illegal immigration crisis. Among the millions of aliens who have illegally crossed into the country since 2021 are large numbers of individuals with criminal records, gang affiliations, and active associations with criminal cartels. Giving these criminals carte blanche to carry firearms will put law enforcement and citizens at greater risk. In the absence of federal immigration enforcement, States rely on enforcement of § 922(g)(5)(A) to protect the public and remove dangerous aliens.

Section 922(g)(5)(A) resembles other statutes limiting the rights of illegal aliens. The politically accountable branches of government have substantial discretion to limit the privileges of aliens consistent with national security and domestic policy. Criminalizing possession of firearms by illegal aliens is consistent with that determination.

Finally, Section 922(g)(5)(A) is consistent with the history and tradition of firearms regulations dating back to the pre-colonial era in England. Any individual who lacked sufficient ties to the state and who was not prepared to conform their conduct to their legal obligations could lawfully be deprived of their right to bear arms.

## I.   States and law-abiding citizens have a significant interest in § 922(g)(5)(A)'s enforcement

Section 922(g)(5)(A)is a valuable tool for protecting our Nation's citizens. Cartel members and other criminals penetrate the U.S. border daily, often engaging in narcotics and human trafficking. These criminals do not hesitate to use violence. Declaring that persons who cross the border illegally have a constitutional right to arm themselves will only exacerbate the problem. Although state and local law enforcement have a limited ability to make arrests for violations of federal immigration law, they can partner with federal law enforcement officers to make arrests for violations of § 922(g)(5)(A) to protect their communities.

### A.   Illegal crossings and crime are rampant

Voices on all sides recognize our Nation faces an immigration crisis. *Statement from President Joe Biden on the Bipartisan Senate Border Security Negotiations* (Jan. 26, 2024), https://perma.cc/K9S8-TLZV. Since 2021, U.S. Customs and Border Protection has reported more than 10.3 million encounters with persons who illegally crossed into the United States. U.S. Customs & Border Protection, *Nationwide Encounters*, https://perma.cc/4PHA-4CNU (last visited July 24, 2024).

7

More than 2.4 million of those encounters occurred during the first half of 2024 alone. *Id.* The border is porous enough that, in early 2023, then-U.S. Border Patrol Chief Raul Ortiz testified that his agency does not have "operational control" of the southern border. Priscilla Alvarez, *Border chief disputes DHS has 'operational control' of the entire US southern border*, CNN (Mar. 15, 2023), https://perma.cc/FXR4-Y8D6.

Americans have reason to be concerned about illegal entries into this country. Since 2021, U.S. Border Patrol officers have arrested more than 52,000 noncitizens with criminal convictions or outstanding criminal warrants. U.S. Customs & Border Protection, *Criminal Noncitizen Statistics*, https://perma.cc/7YNJ-83V3 (last visited July 30, 2024). More than 2,142 of those arrested had gang affiliations and more than 380 were on the federal government's terrorist watchlist. U.S. Customs & Border Protection, *CBP Enforcement Statistics*, https://perma.cc/Q5TY-KR66 (last visited July 30, 2024). Texas, a State that shares a 1,254-mile border with Mexico, has made tens of thousands more criminal arrests at or near the southern border—nearly all for felonies. Office of the Texas Governor, *Operation Lone Star Arrests Violent Criminals, Human Smugglers* (Apr. 12, 2024),

https://perma.cc/78AD-6UGZ. And an unknown number of criminals have managed to elude capture by federal and state authorities.

"[P]owerful criminal organizations on both sides of the border present serious law enforcement problems" as well. *Hernandez v. Mesa*, 589 U.S. 93, 108 n.7 (2020). Cartels that specialize in drug manufacturing and trafficking, arms trafficking, money laundering, migrant smuggling, sex trafficking, and bribery, "dictate the flow of nearly all illicit drugs into the United States." *National Drug Threat Assessment 2024,* Drug Enforcement Administration 1-2 https://perma.cc/TZ4Y-L6PG (last visited July 25, 2024). In 2023, federal officers seized an average of 2,339 pounds of drugs daily, including an estimated 78 pounds of fentanyl. *On a Typical Day in Fiscal Year 2023, CBP...,* U.S. Customs and Border Protection, https://perma.cc/HG87-GWWC (last modified June 21, 2024). On an annual basis, that is "enough fentanyl to kill the entire U.S. population." Adam Shaw & Griff Jenkins *Border Patrol seized enough fentanyl to kill entire US population this fiscal year* Fox News (Sept. 27, 2023), https://perma.cc/F85E-NGEV. Cross-border human trafficking is also a billion-dollar industry. Miriam Jordan, *Smuggling Migrants at*

*the Border Now a Billion-Dollar Business*, The New York Times (July 25, 2022) https://perma.cc/S54S-24XU.

This crisis does not just affect border States. After crossing illegally, "many noncitizens proceed to interior States." U.S. Dep't of Homeland Security, *Explanation of the Decision to Terminate the Migrant Protection Protocols* 26 (Oct. 29, 2021), https://perma.cc/X3W9-UPL8. And too often, crime follows. *See*, *e.g.*, Jennifer Bisram, *Venezuelan migrant accused of shooting 2 NYPD officers arraigned, reveals how guns are smuggled into shelters,* CBS News (June 27, 2024) https://perma.cc/P6PK-EEMH. That gives all States an interest in what happens at the border.

### B. Preventing law enforcement from disarming foreign criminals who enter the United States illegally will exacerbate the crisis

Declaring that illegal aliens—including those involved in drug smuggling, human trafficking, and other organized criminal activity— have a right to carry guns in violation of § 922(g)(5)(A) will only exacerbate the current crisis. It is not hard to imagine that criminals will benefit and States suffer from a rule under which anyone can step over the border and claim a right to carry a firearm. "[D]rugs and guns

are a dangerous combination." *Smith v. United States*, 508 U.S. 223, 240 (1993). And many criminals illegally crossing the U.S. border are especially prone to violence.

As U.S. Border Patrol recently warned, "[s]muggling organizations are becoming desperate and escalating their level of violence." Press Release, Smugglers fire at Border Patrol agent disrupting smuggling attempt, U.S. Customs and Border Protection, (Aug. 25, 2023) https://perma.cc/5MAR-E8HZ. The Sinaloa Cartel is "one of the most violent" criminal organizations "in the world," and "violent" dealers working with it and other Mexican cartels now "kill thousands of Americans every week with fentanyl and with weapons." National Drug Threat Assessment 2024, *supra*, at 4, 16, 51. As the National Sherriff's Association put it, cartels are "directly responsible" for "unprecedented violence" in cities and counties across our nation. National Sherriff's Association, *Nation's Sheriffs Call for the Eradication of Drug Cartels, Starting with the Sinaloa and Jalisco New Generation Cartels* (Feb. 9, 2023), https://perma.cc/BR8F-MBAV.

Stories of criminals who have illegally crossed the border and used guns possessed in violation of § 922(g)(5)(A) to harm law enforcement

officers and citizens abound. *See, e.g.*, Stephen Sorace, *Illegal immigrant from Venezuela shoots 2 NYC police officers during foot chase in Queens, authorities say,* Fox News (June 3, 2024) https://perma.cc/YT2V-A5A6 (19-year-old Venezuelan man who had entered the country illegally shot two officers); Julie Jacobo*, Man suspected of killing California police officer Ronil Singh charged with murder,* ABC News (Jan. 2, 2019) https://perma.cc/2ZU8-ANBF (illegal alien shot police officer during traffic stop). Just recently, an illegal alien killed two Texans at a Chick-fil-A after opening fire in the restaurant. *See* S.E. Jenkins & Julia Falcon, *2 fatally shot inside Chick-fil-A in Irving; suspect in police custody*, CBS News (June 28, 2024), https://perma.cc/9KPA-AZMS. Another illegal alien released from custody later shot a toddler in Maryland. *See* Jasmine Hilton, *Suspect in Md. toddler's killing had been released despite ICE detainer,* Washington Post (Feb. 28, 2024), https://perma.cc/F2NV-23J7. And in Indiana, a man who entered the country illegally murdered a Hoosier with a handgun for a $2,000 fee. *See Avelar v. State*, 2024 WL 2734410, at *1 (Ind. Ct. App. May 28, 2024).

Section 922(g)(5)(A)  is a valuable tool for protecting U.S. citizens and for disrupting trafficking operations. For example, in 2019, the Saint Paul police searched an auto shop tied to a drug-trafficking operation and found a stockpile of guns, high-capacity magazines, and bulletproof vests. *See United States v. Perez*, No. 19-CR-313 (ECT/TNL), 2022 WL 2526194, at *3 (D. Minn. May 3, 2022). The man responsible was an illegal alien who is now serving a 90-month sentence for violating § 922(g)(5)(A). *See United States v. Gomez Perez*, No. 22-3577, 2023 WL 8433556, at *1 (8th Cir. Dec. 5, 2023). In another incident, two Canadians wanted for murder and fentanyl trafficking were found to be in possession of sixty-seven firearms and more than a dozen high-capacity pistol magazines. *See United States v. Sitladeen,* 64 F.4th 978, 982 (8th Cir. 2023). Both men were convicted under § 922(g)(5)(A). Press Release, U.S. Att'y Office of District of Minnesota*, Canadian Citizen Sentenced to 68 Months in Prison for Aiding and Abetting Illegal Possession of Firearms* (Dec. 14, 2021), https://perma.cc/XHS5-PW8R. And in El Paso, police arrested a Mexican citizen with an outstanding homicide warrant in Mexico after finding him in possession of two handguns (one with a destroyed serial number), ammunition, and a

narcotic-tainted car. *See United States v. Sing-Ledezma*, No. EP-23-CR-823(1)-KC, 2023 WL 8587869, at *1 (W.D. Tex. Dec. 11, 2023). He, too, was convicted on charges brought under § 922(g)(5)(A). *Id.*

### C.   Section 922(g)(5) is particularly important in light of failed federal enforcement efforts

Empowering law enforcement to arrest foreign criminals who enter this country illegally and obtain weapons in violation of § 922(g)(5)(A) is particularly important given the federal government's "obviously derelict" efforts to enforce federal immigration laws. *Texas v. U.S. Dep't of Homeland Security*, 2023 WL 8285223, at *14 (S.D. Tex. Nov. 29, 2023). Over the last few years, the federal government has paroled illegal aliens into the United States en masse, ending protocols that required aliens to wait outside the country while their asylum applications were processed, *see Biden v. Texas*, 597 U.S. 785, 791–93 (2022), and created a variety of new programs for the mass release of aliens into this country, *see e.g.*, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans,* U.S. Citizenship and Immigration Services, https://perma.cc/3LSS-EM64 (last updated Apr. 1, 2024) (authorizing parole for 30,000 persons a month from certain countries). These actions have been "akin to posting a flashing 'Come In, We're

Open' Sign on the southern border." *Florida v. United States*, 660 F. Supp. 3d 1239, 1253 (N.D. Fla. 2023).

"[M]any of the consequences" of the federal government's failure to enforce federal immigration laws fall on States, which must now contend with ever-increasing levels of "serious crime." *Arizona v. United States*, 567 U.S. 387, 397 (2012). Yet the States' ability to redress the border crisis is hampered by the Supreme Court's holding that state laws designed to combat the problems caused by illegal immigration are preempted by federal law. *See id.* at 400–10. The Supreme Court has rejected on standing grounds state efforts to hold the federal government accountable for its failure to enforce federal immigration laws. *See United States v. Texas*, 599 U.S. 670, 673–74 (2023). And the legality of state efforts to secure the border by blocking illegal entry remains in limbo. *See United States v. Abbott*, --- F.4th ---, 2024 WL 3580743, *1 (5th Cir. 2024) (en banc) (vacating a preliminary injunction against Texas's installation of a floating barrier on the Rio Grande and remanding).

While this situation persists, enforcement of § 922(g)(5)(A) is all the more critical because it provides an additional deterrent to foreign

15

criminals who enter this country illegally and seek to harm U.S. citizens. *See* 28 U.S.C. § 924(a)(8) (providing for up to 15 years' imprisonment), and, upon conviction, a basis for deporting them; *see also* 8 U.S.C. § 1227(a)(2)(C). And § 922(g)(5)(A) is the type of general federal criminal law under which state and local law enforcement can make arrests without running afoul of current Supreme Court precedent regarding the enforcement of immigration-specific statutes. *Cf. Arizona*, 567 U.S. at 41 ("authority of state officers to make arrests for federal crimes is, absent federal statutory instruction, a matter of state law"). Without § 922(g)(5)(A), States' ability to safeguard their citizens from harm will be further impaired.

## II.    Illegal aliens have limited constitutional rights

Although illegal aliens enjoy certain constitutional rights under circuit precedent, *see, e.g.*, *Bosede v. Mukasey*, 512 F.3d 946, 952 (7th Cir. 2008) (holding that all immigrants, "no matter their immigration status, are entitled to due process"), they do not enjoy the full panoply. *See United States v. Huitron-Guizar*, 678 F.3d 1164, 1166 (10th Cir. 2012) (collecting cases discussing the "ascending scale of constitutional rights" for aliens in the United States). The federal government has

traditionally limited the constitutional rights and privileges of aliens in many contexts, and limiting the ability of illegal aliens to possess firearms fits comfortably within this history.

*First*, even lawfully present aliens do not enjoy the core rights of citizens. For example, aliens generally may not vote in federal elections. 18 U.S.C. § 611; *see also Fitzpatrick v. Sessions*, 847 F.3d 913 (7th Cir. 2017) ("Aliens are forbidden to vote in federal elections."). And, in some States, aliens are prohibited from voting in state elections. *See,e.g.*, *Fossella v. Adams*, 225 A.D.3d 98, 119 (N.Y.S. App. Div. 2024) (holding that local law allowing noncitizens to vote in local elections violated Article IX of the New York Constitution). Jury service is similarly restricted to U.S. citizens. 28 U.S.C. 1865(b)(1); *see also United States v. Gordon-Nikkar*, 518 F.2d 972, 976 (5th Cir. 1975) ("There is no corresponding basis for assuming that resident aliens, who owe allegiance not to any state or to the federal government, but are subjects of a foreign power, have so assimilated our societal and political mores that an equal reliance could be placed on their performing as well as citizens the duties of jurors in our judicial

system."). And only U.S. citizens can run for president. *See* U.S. Const., Art. II, § 1, cl. 5.

*Second*, when an alien is not lawfully present, his constitutional rights are even more limited. *See Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) ("The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders."). For example, courts have limited the application of the exclusionary rule in certain cases involving aliens, requiring a heightened standard for alleging they have been subject to unreasonable searches and seizures. *See, e.g.*, *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1050 (1984) (applying exclusionary rule only when the unreasonableness of a search or seizure can be characterized as "egregious.").

Since illegal aliens are breaking U.S. immigration law, the exclusionary rule is generally inappropriate for deportation proceedings of illegal aliens.

> [R]elease within our borders would immediately subject him
> to criminal penalties. His release would clearly frustrate the

> express public policy against an alien's unregistered presence in this country. Even the objective of deterring Fourth Amendment violations should not require such a result. The constable's blunder may allow the criminal to go free, but we have never suggested that it allows the criminal to continue in the commission of an ongoing crime. When the crime in question involves unlawful presence in this country, the criminal may go free, but he should not go free within our borders.

*Id.*

Illegal aliens have limited due process rights to contest the government's decision to deny their entry to the United States. "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Dep't of State v. Muñoz*, 144 S. Ct. 1812, 1824 (2024) (quoting *Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)). And on the basis of their weak connection to the country, they have limited rights to enter the United States even when married to a U.S. citizen. *See id.* at 1821; *see also Knauff*, 338 U.S. at 547 (upholding exclusion of spouse on security grounds).

Federal law follows suit, prohibiting illegal aliens from engaging in many activities which a citizen (and lawfully present alien) may engage in as of right. "The aim of these restrictions is a general public good: maintaining public order and society's institutions from

denigration by non-members." *Fletcher v. Haas*, 851 F. Supp. 2d 287, 296 (D. Mass. 2012) (citing *Harisiades v. Shaughnessy*, 342 U.S. 580, 591-92 (1952)). Beyond the limits on firearms possession in 18 U.S.C. § 922(g)(5)(A), illegal aliens face limits of their First Amendment rights. For example, even lawfully present aliens may be deported when their speech and associations undermine American society or politics. *See, e.g.*, *Harisiades*, 243 U.S. at 592 (upholding statute authorizing deportation of lawful permanent residents who joined Communist party).[1]  Section 922(g)(5)(A) is thus in line with sensible restrictions on the rights of illegal aliens in other contexts.

### III.  Section 922(g)(5)(A)'s limitation of firearm possession to lawful residents has deep historical roots

Preventing illegal aliens from possessing firearms is consistent with other restrictions on rights in the Second Amendment context and beyond. As the federal government has argued, illegal aliens do not fall within the scope of "the people" as that term is used in the Second Amendment. Dkt. 12 at p. 17. But, even if this Court disagrees, Section

---

[1] *See also* 8 U.S.C. § 1182(a)(3)(D) (expressly prohibiting admission of aliens affiliated with communist or totalitarian regimes); *Kleindienst v. Mandel*, 408 U.S. 753 (1972) (upholding denial of admission of immigrant with ties to communism).

922(g)(5)(A)  survives under *Bruen*'s historical inquiry. Section

922(g)(5)(A)  follows the Nation's historical tradition of firearms

regulation. The line drawn by the statute—with illegal aliens on one

side and lawful residents on the other—aligns closely with founding-era

practices requiring oaths of allegiance as a precondition to firearm

possession, as well as other similar practices.

### A.     History dictates the scope of constitutionally permissible restrictions on firearms

The right to bear arms, the Supreme Court has made clear, "is

among the 'fundamental rights necessary to our system of ordered

liberty.'" *United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024) (quoting

*McDonald v. Chicago*, 561 U.S. 742, 778 (2010)). Still, "[l]ike most

rights," it "is not unlimited." *Id.* (quoting *District of Columbia v. Heller*,

554 U.S. 570, 626 (2008)). Governments can place some restrictions on

the right to bear arms. But "[w]hen the Second Amendment's plain text

covers an individual's conduct, the Constitution presumptively protects

that conduct." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597

U.S. 1, 17 (2022). To justify a regulation in those circumstances, the

government "must demonstrate that the regulation is consistent with

this Nation's historical tradition of firearm regulation." *Id.*; *Rahimi*, 144

21

S. Ct. at 1897 (reiterating that "if a challenged regulation fits within" the Nation's "historical tradition of firearm regulation," it is lawful under the Second Amendment").

When conducting this history-and-tradition inquiry, courts "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29). But courts need not find "a 'dead ringer' or a 'historical twin.'" *Id.* (quoting *Bruen*, 597 U.S. at 30). "Why and how the regulation burdens the right are central to th[e] inquiry." *Id.* When "laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* That said, "[e]ven when a law regulates arms-bearing for a permissible reason, . . . it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Id.*

**B.    Governments historically limited firearm possession based on compliance with legal requirements and civic commitments**

Historical regulations from three eras—pre-colonial England, colonial America, and the Reconstruction period—all demonstrate that governments have consistently limited firearm possession to those individuals who are likely to comply with their communal legal obligations and abide by the norms of their civic communities.

*First*, English disarmament of nonconformists. The English Bill of Rights "has long been understood to be the predecessor to our Second Amendment." *Heller*, 554 U.S. at 593. Like the Second Amendment, it did not confer unlimited rights to keep and bear arms. Rather, it guaranteed that right only to Protestants, 1 Wm. & Mary c. 2, § 7, in 3 Eng. Stat. at Large 417 (1689) ("Protestants . . . may have Arms for their Defence suitable to their Conditions, and as allowed by Law."), and permitted the "disarm[ament] [of] individuals whose conduct indicated a disrespect for the sovereign and its dictates." *Range v. Att'y Gen.*, 53 F.4th 262, 274 (3d Cir. 2022) (per curiam), *vacated upon reh'g en banc.*, 56 F.4th 992 (3d Cir. 2023), *vacated sub nom. Garland v. Range*, --- S. Ct. ---, 2024 WL 3259661 (Mem.); *see also* Joyce Lee

Malcolm*, To Keep and Bear Arms: The Origins of an Anglo-American Right* 45 (1994) (describing how Charles II "totally disarmed . . . religious dissenters").

These individuals, broadly referred to as "nonconformists," "refused to participate in the Church of England, an institution headed by the King as a matter of English law." *Range*, 53 F.4th at 274. And many "refused to take oaths recognizing the King's sovereign authority over matters of religion." *Id.* at 274–75 (citing Frederick B. Jonassen, *"So Help Me?": Religious Expression and Artifacts in the Oath of Office and the Courtroom Oath*, 12 Cardozo Pub. L., Pol'y & Ethics J. 303, 322 (2014) (describing Charles II's reinstatement of the Oath of Supremacy); Caroline Robbins, *Selden's Pills: State Oaths in England*, 1558–1714, 35 Huntington Lib. Q. 303, 314–15 (1972) (discussing nonconformists' refusal to take oaths)). These nonconformists, then, were disarmed not because of any individualized finding of violence or risk, but because "their religious status was viewed as a proxy for disobedience to the Crown's sovereign authority and disrespect for the law, placing them outside the civic community of law-abiding citizens." *Range*, 53 F.4th at 275.

*Second*, early American loyalty-oath requirements. Several of the early states and colonies continued the English tradition and drew loyalty-based lines when it came to firearm possession. Pennsylvania, for example, disarmed individuals—even those with no history of violent behavior—who were unwilling to pledge allegiance and abide by the State's legal norms. Just after declaring independence, the Pennsylvania legislature enacted a law requiring all white male inhabitants over the age of 18 to swear to "be faithful and bear true allegiance to the commonwealth of Pennsylvania as a free and independent state." Act of June 13, 1777, § 1 (1777), 9 The Statutes at Large of Pennsylvania from 1652–1801 110, 111 (William Stanley Ray ed., 1903). The law further provided that anyone who would not take the oath "shall be disarmed" by the local authorities.[2] *Id.* at 112–13, § 3.

These early American oath requirements sought to limit firearm

---

[2] Pennsylvania was not subject to the Bill of Rights when it passed this law, *see generally Barron v. Baltimore*, 32 U.S. 243, 247–49 (1833), but that fact doesn't render the comparison improper. Rather, the law remains properly comparable to Section 922(g)(5)(A) because, when it was enacted, Pennsylvania's Constitution had its own Second Amendment analogue. *See* Pa. Declaration of Rights, § 13 ("That the people have a right to bear arms for the defence of themselves and the state.").

access to trusted members of their communities. They did this in two ways. First, they attempted to distinguish between those were likely to comply with their communal obligations, and those who were less likely to do so. *See United States v. Escobar-Temal*, 3:22-CR-00393, 2023 WL 4112762, at *5 (M.D. Tenn. June 21, 2023); *see also Range*, 53 F.4th at 278 ("Refusal of some, such as Quakers, to swear allegiance demonstrated that they would not submit to communal judgments embodied in law."). Second, and relatedly, these requirements sought to draw a line between those who abide by the norms of their civic communities and those who do not. *Escobar-Temal*, 2023 WL 4112762, at *5; *see also Range*, 53 F.4th at 278 ("by disarming individuals whose refusal to take these oaths evinced not necessarily a propensity for violence, but rather a disrespect for the rule of law and the norms of the civic community.").[3]

   *Finally*, Reconstruction-era disarmament of transient individuals. "A slew of states" prohibited transient, unsettled individuals—then referred to as "tramps"—from "carrying firearms or dangerous

---

[3] Clearly, under the First Amendment, this particular religious justification for disarmament would not be permitted—Amici do not intend to suggest otherwise.

weapons." *Range v. Att'y Gen.*, 69 F.4th 96, 112 (3d Cir. 2023) (Ambro, J., concurring); *see, e.g.*, 1878 N.H. Laws 612, ch. 270 § 2; 1878 Vt. Laws 30, ch. 14 § 3; 1879 R.I. Laws 110, ch. 806 § 3; 1880 Ohio Rev. St. 1654, ch. 8 § 6995; 1880 Mass. Laws 232, ch. 257, § 4; 1987 Iowa Laws 1981, ch. 5 § 5135. Return once again to Pennsylvania, which passed a statute providing that:

> Any person going about from place to place begging, asking or subsisting upon charity, and for the purpose of acquiring money or living, and who shall have no fixed place of residence, or lawful occupation in the county or city in which he shall be arrested, shall be taken and deemed to be a tramp.

1 A Digest of the Statute Law of the State of Pennsylvania from The Year 1700 To 1894, 541 (Frank F. Brightly, 12th ed. 1894); *see also People v. Deacons*, 16 N.E. 676, 679 (N.Y. 1888) (observing that "tramps" included those "who rove about from place to place, begging, and all vagrants living without visible means of support who stroll over the country without lawful occasion"); Act of May 3, 1890, ch. 43, §§ 2, 4, 1890 Iowa Acts 68, 68–69 (defining "tramps" as males "sixteen years of age or over, who [are] physically able to" work, but not making any good-faith effort to find work, and "wandering about having no visible calling or business to maintain [themselves]").

These Reconstruction-era laws reveal a longstanding trend of regulations limiting firearm possession and ownership to those who are lawfully present—indeed, lawfully *residing and working*—in the regulator's jurisdiction. Once again, these laws were not premised solely on dangerousness. *Cf. State v. Hogan*, 58 N.E. 572, 575–76 (Ohio 1900) (concluding that a law disarming "tramps" was consistent with the right to keep and bear arms but acknowledging that not all so-called "tramps" were alike); 1 A Digest of the Statute Law of the State of Pennsylvania from The Year 1700 To 1894, 541 (Frank F. Brightly, 12th ed. 1894) (drawing lines based on characteristics other than dangerousness or violence). Instead, they can be understood to rest at least in part on the notion that individuals who hadn't meaningfully demonstrated ties, commitment, and contributions to their communities were not entitled to all the privileges afforded to those who had.

**C.    Section 922(g)(5)(A)'s limitation of firearm possession to lawful residents follows directly from these historical regulations**

Section 922(g)(5)(A)  is thus the latest in a long tradition of laws limiting firearm possession based on compliance with communal obligations and commitment to abiding civic norms. It is, in other

words, "relevantly similar" to those historical regulations. *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29). Consider "[w]hy and how" Section 922(g)(5)(A) burdens the right to bear arms. *Id.* Start with "why." Section 922(g)(5)(A), like the various pre- and post-founding laws discussed above, reflects a governmental judgment that individuals who have not sufficiently demonstrated their commitment to their communities—either by renouncing hostile allegiances, swearing to uphold their new communities' laws, or establishing residences—should not be able to freely possess firearms.

Turn next to "how" Section 922(g)(5)(A) burdens the right to bear arms. Neither Section 922(g)(5)(A), nor any of the laws discussed above, "broadly restrict[s] arms used by the public generally." *Id.* at 1902. Rather, all these laws prohibit firearm possession only for those individuals judged to be outside their relevant communities due to their failure to abide by their legal obligations and comply with communal norms. That prohibition is also not necessarily permanent. Unlawfully present aliens have a path to naturalization that ends with an oath to, among other things, "support the Constitution of the United States" and "renounce" all other loyalties. 8 U.S.C. § 1448(a). An individual who

29

follows this path and takes this oath—just like those who renounced their nonconformist allegiances, swore an oath to their new governments, and took up residence in a community—would be entitled to the normal protections afforded by the Second Amendment.

The bottom line: the Nation's "tradition of firearm regulation," *Rahimi*, 144 S. Ct. at 1902, allows the government to disarm individuals who have not taken the steps necessary to become members of their communities. And Section 922(g)(5)(A) "fits neatly within [that] tradition." *Id.* at 1901. As one court recently concluded, "the historical restrictions on individuals who did not swear an oath of allegiance or otherwise might be considered national outsiders is sufficiently similar to § 922(g)(5)(A) to support the law as it exists today." *United States v. Leveille*, 659 F. Supp. 3d 1279, 1281 (D.N.M. 2023). Like those historical restrictions, the court continued, "[t]oday's immigration system functions as an attempt to define the nation's members and nonmembers." *Id.* Section 922(g)(5)(A), to be sure, is not "identical to the[] founding-era regimes" discussed above, "but it does not need to be." *Rahimi* 144 S. Ct. at 1901. It is enough that it "is consistent with the principles that underpin our regulatory tradition." *Id.* at 1898

(citing *Bruen*, 597 U.S. at 26–31).

## CONCLUSION

The federal government, through its own inaction at the border, has created a crisis where millions of illegal aliens have flooded into the country.  And many of them are dangerous.  Section 922(g)(5)(A) is one of the few effective tools that can be utilized to prevent dangerous illegal aliens from committing crimes with firearms. It is consistent with the limits on the rights and privileges of aliens, which courts have frequently upheld. And its prohibition of firearm possession by illegal aliens is consistent with the long history of restricting possession of weapons by individuals who are not law-abiding and who lack strong ties to the community. The court should hold that § 922(g)(5)(A) is constitutional.

Dated: August 5, 2024                    Respectfully submitted,

*/s/ Abishek Kambli*
Abhishek Kambli
*Deputy Attorney General*
*State of Kansas*

### *Additional State Signatories*

STEVE MARSHALL
Attorney General
*State of Alabama*

TIM GRIFFIN
Attorney General
*State of Arkansas*

BRENNA BIRD
Attorney General
*State of Iowa*

RUSSEL COLEMAN
Attorney General
*State of Kentucky*

LIZ MURRILL
Attorney General
*State of Louisiana*

MICHAEL T. HILGERS
Attorney General
*State of Nebraska*

DAVE YOST
Attorney General
*State of Ohio*

MARTY J. JACKLEY
Attorney General
*State of South Dakota*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the word limit of Fed. R. App. P. 29(b) (Circ. R. 29) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

This document contains 5,198 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

This document has been prepared in a proportionally spaced typeface using Microsoft Word version 2019 in size 14 Century Schoolbook font.

Date: August 5, 2024.

*/s/ Abhishek Kambli*

Abhishek Kambli

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Abhishek Kambli*

Abhishek Kambli