No. 24-1534

---

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

USA,

Plaintiff-Appellant,

v.

Heriberto Carbjal Flores,
Defendant-Appellee.

---

Appeal From The United States District Court
For the Northern District of Illinois,
Case No. 20 CR 613

The Honorable Judge Sharon Johnson Coleman

---

BRIEF OF

Defendant-Appellee Heriberto Carbjal Flores

---

Jacob S. Briskman, Attorney at Law PC
Jacob Briskman
Attorney for the
Defendant-Appellee,
Heriberto  Carbjal Flores

2624 W. Fullerton Ave,
Chicago, IL 60647
Ph. 312-945-6207
jacob.briskman@gmail.com

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1534

Short Caption: USA v. Heriberto Carbajal-Flores

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Heriberto Carbajal-Flores

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Jacob S. Briskman, Attorney at Law PC

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: Jacob S Briskman      Date: 11/12/2024

Attorney's Printed Name: Jacob S Briskman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑  **No** ☐

Address: 2624 W Fullerton Ave.

Chicago IL 60647

Phone Number: 3129456207      Fax Number: 7734422117

E-Mail Address: jacob.briskman@gmail.com

rev. 12/19 AK

## TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ……………...……………….…………….i

TABLE OF CONTENTS …………………………………………………………….………...ii

TABLE OF AUTHORITIES …………………………………………………………….iii-vii

ISSUES PRESENTED FOR REVIEW …………...……………………………………………...1

STATEMENT OF THE CASE ….....…………………………………………………...1-2

SUMMARY OF THE ARGUMENT ……………………………………………….…………3-4

ARGUMENT ………………………………………………………………………………5-41

   I.    THIS COURT CAN AND SHOULD AFFIRM THE LOWER COURT'S HOLDING WITHOUT REACHING THE MERITS OF THE CASE. ………………………………5

   II.    LEGAL BACKGROUND. …………………………………………………………...10

   III.    18 U.S.C. § 922(G)(5) IS A FACIALLY UNCONSTITUTIONAL FIREARMS BAN...13

        A.  Undocumented Individuals Are In Fact Part Of "The People" Protected By The Plain Text Of The Second Amendment Right To Self Defense. ………...………14

        B.  The Government Fails To Show That A Comparatively Similar Firearms Restriction Exists As Analogous to 18 U.S.C. § 922(g)(5). ……………………21

        C.  The Government Fails To Show That 18 U.S.C. § 922(g)(5) Constitutes A Sufficient Historical Tradition. ……………………………………………26

   IV.    18 U.S.C. § 922(G)(5) IS UNCONSTITUTIONAL AS APPLIED DIRECTLY TO MR. CARBAJAL-FLORES. ………………………………………………………36

CONCLUSION ………………………………………………………………………42

CERTIFICATE OF COMPLIANCE ………………………………………………...42-43

CERTIFICATE OF ELECTRONIC SERVICE ………..…………………………..………...43

## TABLE OF AUTHORITIES

**United States Constitutional Provisions**

U.S. CONST. Amend. I............................................................................................15, 16

U.S. CONST. Amend. II ……………………………………………………….........*passim*

U.S. CONST. Amend. IV........................................................................................15

U.S. CONST. Amend. VI........................................................................................9

U.S. CONST. Amend. IX........................................................................................15

**Federal Statutes**

8 U.S.C. § 1101(a)(43)(E)(ii)....................................................................................32

8 U.S.C. § 1227(a)(2)(A)(iii).....................................................................................32

18 U.S.C. § 922(g)(1)...........................................................................................*passim*

18 U.S.C. § 922(g)(5)..................................………………………………..…...*passim*

18 U.S.C. § 922(g)(8)...........................................................................27, 29, 30, 37

18 U.S.C. § 922(y)(2)...........................................................................................24

F.R.A.P. Rule 10(e)..............................................................................................8

F.R.A.P. Rule 30...............................................................................................5, 6, 8

F.R.E. 201 ……………………………………………………………………...........5, 8

7th Cir. R. 30(a) ……………………………………………………………….........7, 8

7th Cir. R. 30(b) ……………………………………………………………….........6, 7

7th Cir. R. 30(d) ……………………………………………………………….........7

**Cases**

*Atkinson v. Garland*, 70 F.4th 1018, 1021-22, 1023-24, 1034 (7th Cir. 2023)......................*passim*

*Berwick Grain Co. v. Illinois Dep't of Agriculture*, 116 F.3d 231, 234 (7th Cir. 1997)..................5

*Brown v. Watters*, 599 F.3d 602, 604 n.1 (7th Cir. 2010)..................................................5

*Cutter v. Wilkinson*, 544 U.S. 708, 781 n.7 (2005) ........................................................5

*Delatorre v. United States*, 847 F.3d 837, 844 (7th Cir. 2017)........................................5

*District of Columbia v. Heller*, 554 U.S. 570, 579-580, 594-95, 599-600, 602, 625, 632 (2008)............................................................................................................*passim*

*Dred Scott v. Sandford*, 60 U.S. 393, 404-05 (1857)....................................................16

*Galbraith v. United States*, 313 F.3d 1001, 1007 (7th Cir. 2002)..................................8

*Gallo v. Mayo Clinic Health Sys. – Franciscan Med. Ctr., Inc.*, 907 F.3d 961, 964-65 (7th Cir. 2018) ..........................................................................................................5

*Huddleston v. United States*, 415 U.S. 814, 824 (1974)................................................32

*Jaworski v. Master Hand Contractors*, 882 F.3d 686, 690 (7th Cir. 2018)…..……………....6, 7, 9

*Kanter v. Barr*, 919 F.3d 437, 442-43, 451, 462-63 (7th Cir. 2019)......................................*passim*

*Konigsberg v. State Bar of Cal.*. 366 U.S. 36, 50 n.10, 81 S. Ct. 997, 6 L. Ed. 2d 105 (1961))....10

*McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) ............................................8

*Mortell v. Mortell*, 887 F.2d 1322, 1327 (7th Cir. 1989) ............................................7

*New York State Rifle & Pistol Ass'n., Inc. v. Bruen*. 142 S. Ct. 2111, 2119, 2122, 2126-2127, 2129-34, 2136, 2138-56, 2157 (2022)…………………………….……………………….....*passim*

*Pabst Brewing Co. v. Corrao*, 161 F.3d 434, 437 n.1 (7th Cir. 1998)............................6

*Range v. Attorney General United States*, 69 F.4th 96, 120-22 (3d Cir. 2023)…...............22, 23, 35

*Thomas v. Bell*, 373 F.3d 688, 690-91 (6th Cir. 2004)....................................................5

*United States v. Agee*, 2023 U.S. Dist. LEXIS 177970, 2023 WL 6443924 (N.D. Ill. Oct. 3, 2023)................................................................................................................22-23

*United States v. Boliaux*, 915 F.3d 493, 497 (7th Cir. 2019)......................................6, 9

*United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012)........................................20

*United States v. Dingwall*, 6 F.4th 744, 762 (7th Cir. 2021)................................................5

*United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011)................................................20

*United States v. Gates*, 2023 U.S. Dist. LEXIS 157274, 2023 WL 5748362 (N.D. Ill. Sept. 6, 2023) ................................................23

*United States v. Gonzalez-Florez*, No. 23-CR-30021 (C.D. Ill. Aug. 24, 2023)...........................12

*United States v. Griffin*, No. 21-CR-00693, 704 F. Supp. 3d 851, 854, 859, 862 (N.D. Ill. Nov. 30, 2023)................................................23, 26, 38, 39

*United States v. Hultron-Guizar*, 678 F.3d 1164 (10th Cir. 2012)................................................19

*United States v. Johnson*, 2023 U.S. Dist. LEXIS 171452, 2023 WL 6276526 (N.D. Ill. Sept. 26, 2023) ................................................23

*United States v. Meza-Rodriguez*, 798 F.3d 664, 668-70, 672 (7th Cir. 2015).....................*passim*

*United States v. Perez*, 6 F.4th 448 (2d Cir. 2021), *cert. denied*, 142 S.Ct. 1133 (2022)...............19

*United States v. Portillo Munoz,* 643 F.3d 437 (5th Cir. 2011)................................................20

*United States v. Prince*, 1:22-CR-00240 (N.D. Ill. Nov. 2, 2023)................................................12

*United States v. Rahimi*, 144 S. Ct. 1889, 1896, 1897-98, 1900, 1901-02, 1909-10 (2024)................................................*passim*

*United States v. Rahimi*, 61 F.4th 443, 460 (5th Cir. 2023), *rev'd by United States v. Rahimi*, 144 S. Ct. 1889, 1903 (2024)................................................30

*United States v. Singh*, 979 F.3d 697, 724 (9th Cir. 2020) ................................................20

*United States v. Smith*, 953 F.2d 1060, 1067-68 (7th Cir. 1992) ................................................7, 9

*United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019)................................................19

*United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011), *cert denied*, 565 U.S. 1271, 132 S. Ct. 1766 (2012))................................................37

*United States v. Verdugo-Urquidez*, 494 U.S. 259, 265, 266 (1990)................................15, 19, 25

*United States v. White*, 472 F.3d 458, 465 (7th Cir. 2006)................................................7

*United States v. Williams*, 616 F.3d 385, 691, 693 (7th Cir. 2010) ……………………...………36

**Other Authorities**

1 Wm. & Mary, Sess. 1, ch. 15, in 6 Statutes of the Realm 71 at 72 (1688).......................................34

2 Records of the Colony of 34 Rhode Island and Providence Plantations 561 (1857)...........34, 35

2 Samuel Johnson, *A Dictionary of the English Language* 306 (1766), *available at* http://tinyurl.com/795erjwf.........................................................................................20

2 The Statutes at Large of Pennsylvania from 1682 to 1801, at 235 (1896) (1706 Pa. Law)........34

6 The Statutes at Large of Pennsylvania from 1682 to 1801, at 319-20 (1899) (1763 Pa. Law) ……………………………………………………………………………………………35

Akhil Reed Amar, *Intratextualism*, 112 Harv. L. Rev. 747, 761 (1999)...............................16
Annie Sweeney & Jeremy Gorner, *Chicago's violent weekend renews search for answers in a tense city, points again to entrenched problems*, The Chicago Tribune, June 23, 2020, https://www.chicagotribune.com/news/criminal-justice/ct-chicago-weekend-violence-analysis-20200623-bucz3ynr3cazemol4663fhtqy-story.html …………………………………………1

Antonin Scalia & Bryan Garner, Reading Law at 170 (2012)..............................................15

C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Policy 695, 724 (2009)..........................................................................................................35

Ben Kesslen, *Curfews go into effect in cities around the country as George Floyd protests continue*, NBC News (May 30, 2020), *available at* https://www.nbcnews.com/news/us-news/curfews-go-effect-cities-around-country-george-floyd-protests-continue-n1219801............................................................................................40

*Chicago Violence: 104 Shot, 14 Fatally, in Deadly Father's Day Weekend Across the City*, NBC Chicago, June 20, 2020, https://www.nbcchicago.com/news/local/chicago-weekend-shootings-2-dead-at-least-21-wounded-in-gun-violence-thus-far/2292837/ ......................................................................1

Eugene Volokh, *The Commonplace Second Amendment*, 73 N.Y.U. L. Rev. 793, 802 (1998)......15

Emery Battis, *Saints and Sectaries: Anne Hutchinson and the Antinomian Controversy in the Massachusetts Bay Colony* 212 (1962)...............................................................................34

*Frequently Asked Questions (FAQs) About Foreign Born*, United States Census Bureau, *available at* https://www.census.gov/topics/population/foreign-born/about/faq.html#:~:text=The%20U.S.%20Census%20Bureau%20collects,the%20total%20foreign%2Dborn%20population (last revised on Dec. 16, 2021)..........................................................................................................25

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 267-69 (2020)............................................................35

Laurence Benenson, *Fact Sheet: Deferred Action for Childhood Arrivals (DACA)*, National Immigration Forum, available at https://immigrationforum.org/article/fact-sheet-on-deferred-action-for-childhood-arrivals-daca/#:~:text=A%20Dreamer%20is%20an%20undocumented,about%20800%20Dreamers%20were%20protected (May 21, 2024)............................................................25

Lisa Chavarria, *4 Children Killed During Violent Father's Day Weekend in Chicago*, NBC Chicago, Pub. & Updated June 22, 2020, 4 Children Killed During Violent Father's Day Weekend in Chicago – NBC Chicago ............................................................1

 N. Bailey, An Universal Etymological English Dictionary 601-02 (1770)......................................20

Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 174 (3d ed. 2022))............................................................23

Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351....................................31

*Overview of Types of Immigration Status*, Immigration and the State Courts Initiative, available at https://www.sji.gov/wp/wp-content/uploads/Immigration-Status-4-1-13.pdf..............................24

Pratheepan Gulasekaram, *"The People" of the Second Amendment: Citizenship and the Right to Bear Arms*, 85 N.Y.U. L. Rev. 1530-31, 1532, 1534 (2010)......................................15, 16, 31

Pratheepan Gulasekaram, *The Second Amendment's "People" Problem*, Vanderbilt L. Rev. 76, 1446, 1490 (2023), https://cdn.vanderbilt.edu/vu-wordpress-0/wp-content/uploads/sites/278/2023/10/06173913/The-Second-Amendments-People-Problem.pdf……………………....................................................31, 32

The Dream Act: An Overview: The Dream Act, DACA, and Other Policies Designed to Protect Dreamers, American Immigration Counsel, available at www.americanimmigrationcouncil.org/research/dream-act-overview (May 8, 2024)......................2

Thomas Dyche & William Pardon, *A New General English Dictionary* (14th ed. 1771), *available at* https://tinyurl.com/uk4b4fxd#; *see* N. Bailey, *An Universal Etymological English Dictionary* 601-02 (1770)............................................................20

*Why Don't Immigrants Apply for Citizenship? There Is No Line for Many Undocumented Immigrants, Pub. Oct. 7, 2021, Why Don't They Just Get In Line? There Is No Line for Many Unauthorized Immigrants*, available at www.americanimmigrationcouncil.org//research/why-don't-they-just-get-line#:~:text=No%20"line"%20is%20available%20for,new%20pathway%20to%20legal%20status. …………………..37

## ISSUE PRESENTED FOR REVIEW

Whether summary affirmance of a district court's dismissal of a criminal charge is appropriate where the Government's Appendix does not include all required materials, but does include an erroneous certification, and a substantial amount of extraneous evidence that was not presented to the district court below?

Whether the district court erred when it held that 18 U.S.C. § 922(g)(5), which permanently prohibits any undocumented person present in the United States from possessing a firearm, violates the Second Amendment of the United States Constitution because the statute is inconsistent with the Nation's history and tradition of firearms regulations? And, whether the district court erred when it held that 18 U.S.C. § 922(g)(5) was unconstitutional as applied to Mr. Carbajal-Flores specifically?

## STATEMENT OF THE CASE

The underlying events of this case occurred on June 1, 2020, in the Little Village neighborhood of Chicago, Illinois. R. 7; Exhibit A, p. 1. That particular weekend was Father's Day Weekend, and the streets of Chicago had been overtaken by civil unrest following the death of George Floyd at the hands of a Minneapolis, Minnesota police officer. In fact, the media reported that weekend as being one of the deadliest Father's Day weekends on record in Chicago.[1]

---

[1] *See* Annie Sweeney & Jeremy Gorner, *Chicago's violent weekend renews search for answers in a tense city, points again to entrenched problems*, The Chicago Tribune, June 23, 2020, https://www.chicagotribune.com/news/criminal-justice/ct-chicago-weekend-violence-analysis-20200623-bucz3ynr3rcazemol4663fhtqy-story.html; *Chicago Violence: 104 Shot, 14 Fatally, in Deadly Father's Day Weekend Across the City*, NBC Chicago, June 20, 2020, https://www.nbcchicago.com/news/local/chicago-weekend-shootings-2-dead-at-least-21-wounded-in-gun-violence-thus-far/2292837/; *see also* Lisa Chavarria, *4 Children Killed During Violent Father's Day Weekend in Chicago*, NBC Chicago, Pub. & Updated June 22, 2020, 4 Children Killed During Violent Father's Day Weekend in Chicago – NBC Chicago (reporting on four children being shot and killed over the weekend, with the youngest being only three years old).

Having been brought to the United States in 2002 at only ten years old, by his mother to escape an abusive father, Defendant-Appellee Herberto Carbajal-Flores (hereinafter, "Mr. Carbajal-Flores") lived and grew up in the Chicago area. See Exhibit A, p. 1. It was, and is, the home he knows, and has only known.[2] Seeing that he was a part of the neighborhood watch on the date in question, and despite the thug-ish picture painted by the Government, Mr. Carbajal-Flores took up arms, much like many of his neighbors, seeking only to protect his community from the violence that plagued the city that Father's Day weekend in 2020. R. 7; Exhibit A, p. 1. Ultimately, Mr. Carbajal-Flores was arrested on June 1, 2020, by officers of the Chicago Police Department, after he was captured on video surveillance possessing a firearm during that day of chaos. R. 7-8; Dckt. #1 (Indictment). During the entirety of his prosecution, Mr. Carbajal-Flores has never denied discharging the firearm, however, he contends that it was meant as a warning shot toward individuals he believed were armed and returning to the area after they had just used a sledgehammer to break into the corner store. Exhibit A ("Between 9:30 p.m. and 10:40 p.m., Defendant witnessed approximately four vehicles drive past the shop and contends that one yelled threats, another pointed guns at the [neighborhood] watch, and two sped off from in front of the shop."). Mr. Carbajal-Flores was thereafter charged with possession of a firearm by an undocumented immigrant, in violation of 18 U.S.C. § 922(g)(5). R. 7-8; Dckt. #1 (Indictment).

---

[2] Mr. Carbajal-Flores is what has been coined a "DREAMer." "DREAMer" is the nomenclature used to refer to someone brought to the United States by their parents when they were a child who could have benefitted from the Development, Relief and Education for Alien Minors (DREAM) Act. *See The Dream Act: An Overview: The Dream Act, DACA, and Other Policies Designed to Protect Dreamers*, American Immigration Counsel, *available at* The Dream Act: An Overview | American Immigration Council (May 8, 2024). After having lived in the United States for over 20 years, attending school for 12 years with all of his "citizen" friends, and now having a family of his own to provide for and protect in the same area where he grew up, Mr. Carbajal-Flores was nevertheless considered "illegal." R. 7-8. Notably, Mr. Carbajal-Flores' wife and children are all United States citizens. And now, as of July 26, 2024, Mr. Carbajal-Flores' adjusted his immigration status to that of a lawful permanent resident. Exhibit C.

## SUMMARY OF THE ARGUMENT

This Circuit should affirm the lower court's holding without even deciding the merits of the case. Specifically, the Government has failed to abide by the governing rules of this Circuit, as their brief is both under- and over-inclusive. Overall, the Government's brief, and accompanying Appendix, are not designed to aid this Circuit with what occurred in the district court below, but rather to provide the Government with a proverbial second bite at the apple. Such actions should be rebuked, and the Government should be sanctioned.

Should this Circuit choose to hear this matter on its merits, 18 U.S.C. § 922(g)(5) is unconstitutional both facially and as applied to Mr. Carbajal-Flores specifically for the following reasons:

Section 922(g)(5) is a facially unconstitutional firearms ban on undocumented individuals within the United States for a few reasons. First, undocumented persons are in fact protected under the Second Amendment's right of self defense. Second, the Government cannot show that a comparatively similar firearms restriction exists. Specifically, section 922(g)(5) is not comparatively similar to prior firearm bans on individuals deemed outside the political community, or untrustworthy adherents of the law because, while many of those laws only banned the sell of firearms to such individuals, rather than possession, the purpose sought by those laws—to reduce danger to the civic community posed by those refusing to abide by its legal and social norms--is an out-of-date purpose as it applies to undocumented individuals in today's socio-political environment. Additionally, despite the Government arguing otherwise, and unlike the comparisons it offers, section 922(g)(5) is in fact a permanent ban. Third and finally, section 922(g)(5) fails as the regulation is not consistent with this Nation's firearm regulations traditions. In fact, despite the Government's contentions otherwise, such individuals

are in fact members of the political community within the Nation and, aside from an immigration status alone, most undocumented individuals are trustworthy adherents of the law that participate and contribute to society.

Should this Court find however that 18 U.S.C. § 922(g)(5) is a facially constitutional ban on firearm possession by undocumented individuals, this honorable Court should nevertheless agree with the Northern District of Illinois and uphold its ruling that Section 922(g)(5) is unconstitutional as it applies directly to Mr. Carbajal-Flores. This should result for two reasons: First, as-applied challenges under the Second Amendment are available to those targeted under the statute, and precedence of such analysis may be found in the United States Supreme Court, as well as this very Circuit in *Kanter v. Barr*. 919 F.3d 437 (7th Cir. 2019). To deny an as-applied challenge to an otherwise overbroad and permanent firearms regulation would run contrary to tenets of justice. Secondly, such an analysis of the most salient facts of the case brings a fact finder only to observe that Section 922(g)(5) should not in fact apply to Mr. Carbajal-Flores specifically, as his history in the United States and substantial community ties reveal.

For these reasons, this honorable Court should affirm the lower court's holding without deciding the merits of the case. If the Court decides to engage the merits, then this Court should find 18 U.S.C. § 922(g)(5) is unconstitutional as it imposes an impermissibly high burden on the United States' Constitutional Second Amendment right to bear arms. However, should this Court find that 18 U.S.C. § 922(g)(5) is in fact constitutional on its face, this Court should nevertheless find that 18 U.S.C. § 922(g)(5) is unconstitutional as applied directly to Mr. Carbajal Flores, and the dismissal of his indictment should therefore be affirmed.

## **ARGUMENT**

## **I.   THIS COURT CAN AND SHOULD AFFIRM THE LOWER COURT'S HOLDING WITHOUT REACHING THE MERITS OF THE CASE.**

The appendices to the Government's appellate brief are both under- and over-inclusive. They are not designed to help this Court understand what happened in the district court and why; rather, they are designed to give the Government a second bite of the proverbial apple. Violations of Circuit Rule 30 governing appendices are sanctionable, and here, summary affirmance is an appropriate sanction for the Government's multiple violations.

The court is generally limited to considering the record on appeal because it is "a court of review, not first view." *United States v. Dingwall*, 6 F.4th 744, 762 (7th Cir. 2021) (quoting *Cutter v. Wilkinson*, 544 U.S. 708, 781 n.7 (2005)); *Delatorre v. United States*, 847 F.3d 837, 844 (7th Cir. 2017). Exceptions exist, *see* F.R.A.P. Rule 10(e)(2) (parties may supplement the record on appeal with material "omitted from or misstated in the record by error or accident"); F.R.E. 201(b) (judicial notice); *Brown v. Watters*, 599 F.3d 602, 604 n.1 (7th Cir. 2010) (referencing appellate court's "inherent equitable power to supplement the record on appeal, where the interests of justice require[.]") (quoting *Thomas v. Bell*, 373 F.3d 688, 690-91 (6th Cir. 2004)), but are applied narrowly because "[t]he appellate stage of the litigation process is not the place to introduce new evidentiary materials." *Berwick Grain Co. v. Illinois Dep't of Agriculture*, 116 F.3d 231, 234 (7th Cir. 1997); *see also Gallo v. Mayo Clinic Health Sys. – Franciscan Med. Ctr., Inc.*, 907 F.3d 961, 964-65 (7th Cir. 2018) (Rule 10(e) "ensure[s] that the record reflects what really happened in the district court," and does not allow "the losing party to add new material to the record in order to collaterally attack the trial court's judgment.").

The appendix to an appellate brief is an important tool, and its required contents have been chosen to help the court review and understand what happened in the district court and why. *Jaworski v. Master Hand Contractors*, 882 F.3d 686, 690 (7th Cir. 2018). They are "not hard

rules to follow" and contain "very little ambiguity[.]" *Id.* (citing *Pabst Brewing Co. v. Corrao*, 161 F.3d 434, 437 n.1 (7th Cir. 1998)). Accordingly:

> We therefore 'insist on meticulous compliance with rules sensibly designed to make appellate briefs as valuable an aid to the decisional process as they can be.' When these rules are violated, sanctions are appropriate. Summary affirmance is among the constellation of available remedies.

*Id.* (internal citations omitted). In some cases, monetary fines can also be appropriate. *United States v. Boliaux*, 915 F.3d 493, 497 (7th Cir. 2019).

The Government's appendix violates Seventh Circuit Rule 30 in at least four ways. *First*: Cir. R. 30(b) requires that the appendix include "[c]opies of any other opinions, orders, or oral rulings in the case that address the issues sought to be raised." Here, the Government seeks review of the district court's *Memorandum Opinion and Order from March 8, 2024* on Second Amendment grounds. Br. at 1; G. App. at 1-8. That opinion is the third in a series of orders considering the issue, and "presumes familiarity" a prior order. *See* G. App. 1. Accordingly, the orders from April 13, 2022 and December 19, 2022 concerned the same issue the Government seeks to raise and provide required context for the order for which review is sought. Seventh Circuit Rule 30(b) therefore required that they be included in the Appendix, and they are not.

*Second*: The 30(b) appendix "shall also include . . . any pertinent pictures." 7th Cir. R. 30(b)(6). This implies they should be omitted from the main brief. *See id*. Such omissions from the main brief are particularly appropriate where the picture adds nothing, has not been subjected to evidentiary rulings, and appears a naked appeal to emotion. Here, the Government includes a blurry picture of Defendant (allegedly) firing a gun, but does so in the main brief rather than the Appendix. *See* Br. at 4; G. App. at 1-8. If pertinent, then it should have been in the 30(b) appendix; if not, then it should not be included at all. *See* 7th Cir. R. 30(b)(6). Either way, the Government has violated Seventh Circuit Rule 30(b).

*Third*: "The appendix to each appellant's brief shall contain a statement that *all* of the materials required by parts (a) and (b) of this rule are included." 7th Cir. R. 30(d). Here, Government counsel only certifies that "the appendix included with this brief on appeal incorporates the materials required under Circuit Rule 30(a) and (b)." Br. at 71. It does not say "all." *See id.* Had the appendix actually included all required materials, the non-conforming certification would perhaps be *de minimis*. *See United States v. White*, 472 F.3d 458, 465 (7th Cir. 2006) (observing the appellate rules are "not created for the purpose of imposing frivolous requirements on attorneys who are already busy."). *But see Mortell v. Mortell*, 887 F.2d 1322, 1327 (7th Cir. 1989) ("A false certificate under [Circuit Rule 30(d)] is a sufficient reason to affirm without reaching the merits[.]"). But where required materials actually are omitted from the appendix, the non-conforming certification is a significant violation. *United States v. Smith*, 953 F.2d 1060, 1067 (7th Cir. 1992) ("Our clerk cannot readily distinguish cases in which there is an explanation that the appellant neglected to attach from cases in which the district court furnished none. To facilitate gathering together all of the district court's opinions, we added [Circuit Rule 30(d)], which requires counsel to include with the brief a certificate that the appendix contains *all* of the materials required by Rule 30(a) and (b). The clerk rejects any brief lacking this certificate, *the omission of which is a telltale sign that counsel has not read (and therefore has not followed) our rules*.") (emphasis added).

The court is empowered to sanction the Government for these three alone. *See Mortell*, 887 F.2d at 1327; *Jaworski*, 882 F.3d at 690 ("meticulous compliance" is required and when rules are violated, "sanctions are appropriate[,]" including "[s]ummary affirmance[.]").

The Government's *fourth* violation is why the court should do so: The Government's appendices include almost exclusively new evidence, so that the appendix is *not* designed to help

the court review what happened below and why. "A reviewing court on direct appeal is limited to the record of trial and cannot consider any extrinsic evidence[.]" *Galbraith v. United States*, 313 F.3d 1001, 1007 (7th Cir. 2002). Under *Bruen*, the Government bears the burden of providing evidence of the country's history and tradition of gun laws to show that the challenged regulation is consistent with that history and tradition. *New York Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). But nothing in *Bruen* changed the procedures for doing so; evidence must still be brought in the district court and properly made part of the record, where it can be reviewed on appeal. *See id.* at 1-83 (making no change to civil or appellate procedure). It follows that–as in every other type of case–the evidence of the country's "history and tradition" must be presented in the district court and subjected to the usual evidentiary procedures; only then is it a proper part of the record that may be reviewed on appeal. *See id.* at 70 ("The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'") (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion)).

Nevertheless, the Government has filed a so-called "appendix" that includes 481 pages of material not presented to the trial court below. G. App. 9-490. None of this material is properly considered part of the "appendix" because none of it is encompassed by the required contents of the appendix as defined by Rule 30 of the Federal or Seventh Circuit Rules. *See* FRAP Rule 30(a); 7th Cir. R. 30(a); 30(b). *See generally* Br. at 1-50 (nowhere referencing FRAP Rule 10(e), FRE Rule 201, or the court's inherent equitable power). Nor is any of it properly considered part of the record, because none of it played a role in the district court's decision[3]. *See Jaworski*, 882

---

[3] Defendant additionally objects because–having never been subjected to the rigors of the Federal Rules of Evidence–the materials' origination, authenticity, and admissibility has not been established. For example, the purported copy of the "Records of the Colony of New Plymouth" include a watermark stating they were "[g]enerated on 2024-02-07," without saying who did the generating or why. G. App. 60-62. It is not the only document so marked. *See*, *e.g.*, G. App. 63-64; 65-71. Because a full listing of all Defendant's evidentiary objections would be inappropriate here, Defendant reserves all other evidentiary objections, as well.

F.3d at 690 (purpose of the Rule 30 appendix is to facilitate understanding the district court's decision-making).

The Government's improper "appendix" goes directly to the heart of the court's role in this case. *Bruen* placed the burden of proof–and hence, and the burden of production–squarely on the Government. *Bruen*, 597 U.S. at 17. That the Government now feels compelled to produce nearly 500 pages of additional evidence suggests that even they believe they did not meet their burden in the district court–meaning the district court's decision was fundamentally the correct one. So summary affirmance is appropriate.

True, the Court has also suggested that summary affirmance is not an appropriate sanction in criminal cases "where defendants have difficulty monitoring their lawyers' performance–and where dismissal of the appeal or summary affirmance would lead straight to a decision finding that counsel had furnished ineffective assistance, which would authorize a new appeal." *United States v. Boliaux*, 915 F.3d 493, 497 (7th Cir. 2019) (citing *United States v. Smith*, 953 F.2d 1060, 1068 (7th Cir. 1992)). But that reasoning is inapplicable when it is Government counsel that has submitted the non-conforming appendix; the Department of Justice is perfectly able to monitor attorneys' performance, and the right to effective assistance of counsel extends to only "the accused," not the government. *See* U.S. Const. Amend. VI. Instead, the appropriate analogy here is to civil cases because just as "[t]he client then may be able to recover from counsel for malpractice[,]" *Boliaux*, 915 F.3d at 497, the Department may impose appropriate employment-based sanctions on negligent counsel.

Collectively, the appendices to the Government's brief on appeal fail to conform to this court's requirements. That failure is sanctionable, and summary affirmance is an appropriate

sanction under the circumstances. Accordingly, Defendant asks the court to summarily affirm without reaching the merits.

## II.    LEGAL BACKGROUND

The Second Amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. The Second Amendment specifically guarantees the right of "the people" to keep and bear arms for self-defense. In 2022, when considering the constitutionality of a state firearms restriction, the United States Supreme Court announced the need for a new test for analyzing the constitutionality of such restrictions. *See New York Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2127 (2022). First, a court must consider whether the "Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2129-30. If the individual's conduct is protected under the Second Amendment, the burden then shifts to the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2127. Only then, may a court find that the individual's conduct falls outside of the Second Amendment's 'unqualified command.'" *Id*. (citing *Konigsberg v. State Bar of Cal.*. 366 U.S. 36, 50 n.10, 81 S. Ct. 997, 6 L. Ed. 2d 105 (1961)).

This Circuit has further clarified this analysis in *Atkinson v. Garland*, by demanding a text-and-history test when considering whether firearms regulations are constitutional. 70 F.4th 1018, 1022 (7th Cir. 2023). The *Atkinson* Court clarified that the government could potentially defend a modern-day firearms restriction as constitutional through use of analogy, especially those restrictions that were potentially "unimaginable at the founding." *Atkinson*, 70 F.4th at 1021. This Court made it further clear that the analogy had to, at minimum, be "a

well-established and representative historical analogue" as opposed to "only a couple of isolated historical facts and incidents, offering no detail about their application and import." *Id*. at 1021-22. Providing further guidance, this Court has efficiently provided a set of "interrelated and non-exhaustive questions [that] may help focus the proper analysis:

1. Does [Section 922(g)(1)] address a 'general societal problem that has persisted since the 18th century?' *Bruen*, 142 S.Ct. at 2131. If this problem existed during a relevant historical period, did earlier generations address it with similar or 'materially different means?' *Id*.

2. What does history tell us about disarming those convicted of crimes generally and of felonies in particular? Among other sources, the parties could look to commentary from the Founders, proposals emerging from the states' constitutional ratifying conventions, any actual practices of disarming felons or criminals more generally around the time of the Founding, and treatment of felons outside of the gun context (to the extent this treatment is probative of the Founders' view of the Second Amendment). When considering historical regulations and practices, the key question is whether those regulations and practices are comparable in substance to the restriction[s] imposed by [Section 922(g)(1)]. To answer the question, . . . the parties should consider how the breadth, severity, and the underlying rationale of the historical examples stack up against [Section 922(g)(1)].

3. Are there broader historical analogues to [Section 922(g)(1)] during the periods that *Bruen* emphasized, including, but not limited to, laws disarming 'dangerous' groups other than felons? The parties should not stop at compiling lists of historical firearms regulations and practices. The proper inquiry, as we have explained, should focus on how the substance of the historical examples compare to [Section 922(g)(1)].

4. If the [parties'] historical inquiry identifies analogous laws, do those laws supply enough of a historical tradition (as opposed to isolated instances of regulation) to support [Section 922(g)(1)]? On this front, the parties should provide details about the enforcement, impact, or judicial scrutiny of these laws, to the extent possible.

5. If history supports [[Defendant's]] call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony? And what evidence can a court

consider in assessing whether a particular felony conviction was violent? For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements? *Bruen* shows that these distinctions should also have firm historical support. *See* 142 S.Ct. at 2132-33 (explaining that the court must assess whether modern and historical regulations are 'relevantly similar,' including in terms of how and why the regulations burden gun rights).

*Atkinson*, 70 F.4th at 1023-24.

And, as noted by the court below, "[w]hile the Seventh Circuit offered these questions in the context of Section 922(g)(1), nothing in *Atkinson* requires that these clarifying questions be asked only in the context of Section 922(g)(1) or prevents these questions of being asked when analyzing the historical tradition under *Bruen* in other statutes. Questions 1 and 4 are general enough to be asked on any statute. Questions 2, 3, and 5 may ask specific questions in the context of 922(g)(1), but the concepts of the questions can also easily be applied to other statutes. Indeed, it would likely cause more confusion to fail to apply *Atkinson* when assessing other statutes given the decision's goal of clarifying *Bruen*'s historical tradition analysis." *Order dated March 8, 2024* at *5 (citing *United States v. Gonzalez-Florez*, No. 23-CR-30021 (C.D. Ill. Aug. 24, 2023), as another court within the Seventh Circuit that has applied *Atkinson* to 922(g)(5)); *see also United States v. Prince*, 1:22-CR-00240 (N.D. Ill. Nov. 2, 2023) (following *Atkinson*).

Mr. Carbajal-Flores contends that the trial court erred in part and correctly ruled in part. Specifically, Mr. Carbajal-Flores argues that the lower court erred when it determined that 18 U.S.C. § 922(g)(5) was facially constitutional. However, Mr. Carbajal-Flores contends, the lower court did not err when it concluded that section 922(g)(5) was nevertheless unconstitutional as it was applied to Mr. Carbajal-Flores specifically. As such, Mr. Carbajal-Flores seeks that this Circuit affirm in part, and overturn in part, the lower court's ruling in accordance with the following arguments.

**III.    18 U.S.C. § 922(G)(5) IS A FACIALLY UNCONSTITUTIONAL FIREARMS BAN**

Section 922(g)(5) is a facially unconstitutional firearms ban on undocumented individuals within the United States for a few reasons. First, undocumented persons are in fact protected under the Second Amendment's right of self defense. Second, the Government cannot show that a comparatively similar firearms restriction exists. Specifically, section 922(g)(5) is not comparatively similar to prior firearm bans on individuals deemed outside the political community, or untrustworthy adherents of the law because, while many of those laws only banned the sell of firearms to such individuals, rather than possession, the purpose sought by those laws—to reduce danger to the civic community posed by those refusing to abide by its legal and social norms--is an out-of-date purpose as it applies to undocumented individuals collectively in today's socio-political environment. And, despite the Government arguing otherwise, and unlike the comparisons it offers, section 922(g)(5) is in fact a permanent ban. The categorical disarmaments offered by the Government do not support such permanent and complete prohibition on the right to bear arms, as permanent bans are exponentially different, with a much higher burden. Third and finally, section 922(g)(5) fails as the regulation is not consistent with this Nation's firearm regulations traditions. In fact, despite the Government's contentions otherwise, such individuals are in fact members of the political community within the Nation and, aside from an immigration status alone, most undocumented individuals are trustworthy adherents of the law that participate and contribute to society.

**A.  Undocumented Individuals Are In Fact Part of "The People" Protected By The Plain Text Of The Second Amendment Right To Self Defense.**

The Government makes the argument that Mr. Carbajal-Flores is not among "the people" covered by the Second Amendment, as "the people" does not include undocumented individuals since such individuals have historically been excluded from collective rights. GOB at 17-27. Such a theory of the Second Amendment is unsupported by the plain text of the Constitution, and was further rejected in *Heller* and this Circuit's decision in *Meza-Rodriguez*, not to mention its lack of support through historical analysis. *See District of Columbia v. Heller*, 554 U.S. 570 (2008); *United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015).

The Supreme Court changed the landscape of analyzing Second Amendment challenges, when it announced a text and history test in lieu of the prior history and means-end scrutiny approach that had previously dominated federal appellate courts. In its holding, the Court concluded:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Bruen*, 142 S.Ct. at 2129-30 (internal quotation marks omitted). The plain text of the Second Amendment states, ""[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. And, in reading this, the Supreme Court has concluded that the Amendment's plain text grants the right to "keep and bear" arms to all members of our "national community." *Heller*, 554 U.S. at 580, 595.

The idea that "the people" includes at least some individuals in the United States without legal status comes directly from the plain text of the United States Constitution, as well as the Bill of Rights. Such words and phrases used in the Constitution "were used in their normal and

ordinary as distinguished from technical meaning." *Heller*, 554 U.S. at 577 (quotation omitted). In fact, two key terms are relevant within the language of the Constitution–specifically, "citizens" and "people" were distinctly used. The term "citizen" "specifically defines a legal status noted in the Constitution and created by United States immigration and naturalization laws. Pratheepan Gulasekaram, *"The People" of the Second Amendment: Citizenship and the Right to Bear Arms*, 85 N.Y.U. L. Rev. 1532 (2010). In contrast, the term "the people" "seems to refer to people generally," a category much broader than citizens or members of the militia. Eugene Volokh, *The Commonplace Second Amendment*, 73 N.Y.U. L. Rev. 793, 802 (1998).

An analysis of other provisions of the Constitution and Bill of Rights supports this plain-language interpretation of "the people" in the Second Amendment as well. A "word or phrase is presumed to bear the same meaning throughout a text." Antonin Scalia & Bryan Garner, Reading Law at 170 (2012). Rights of "the people" are referenced three other times in the Bill of Rights, specifically, in the First, Fourth and Ninth Amendments. U.S. Const. Amends. I, IV, IX; *see also Heller*, 554 U.S. at 579. And with respect to those neighboring amendments, when considering the constitutional rights afforded to non-citizens *outside* the United States, the Supreme Court has recognized that certain constitutional *protections* for "the people" apply just as much to non-citizens within the country, as it does to citizens. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) ("These cases, however, establish only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with the country.").

Another cannon of textual interpretation supports the conclusion that "the people" encompass more than just citizens. Specifically, the general rule that different terms in the same text should be given different meanings should be applied. Akhil Reed Amar, *Intratextualism*,

112 Harv. L. Rev. 747, 761 (1999); *see, e.g.*, U.S. Const. Art. 1§ 2, art.2 § 1 (requiring the meeting of certain citizenship requirements in order to serve in Congress or as President). The framers of the Constitution and the Bill of Rights undoubtedly knew how to tie constitutional provisions to citizenship, and yet they chose not to limit the Second Amendment's right to bear arms by using limiting language. Such a textual difference should be given meaning.[4]

*Heller*, and now *Bruen*'s, various passing descriptions of Second Amendment right holders do not require a different result. In *Heller* and again in *Bruen*, the Supreme Court described an individual right to bear arms for "law-abiding citizens." *See, e.g., Heller*, 554 U.S. at 625; *Bruen*, 142 S.Ct. at 2156. However, despite this description, the Court has used a variety of terms to describe Second Amendment right holders, including the people, "'all members of the political community,' 'all Americans,' 'citizens,' 'Americans,' and 'law-abiding citizens.'" Gulasekaram, *"The People" of the Second Amendment*, 85 N.Y.U. L. Rev. 1530-31 (quoting *Heller*, 128 S.Ct. at 2790, 2791, 2815 n.24, 2816, 1818).[5] *Heller* also cited *Verdugo-Urquidez*'s broader description of "the people" in the Bill of Rights favorably. *See Heller*. 554 U.S. at 580. This Court should not "place more weight on [*Heller's*] passing references to [citizens] than the Court itself did." *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015).

Moreover, in both *Heller* and *Bruen*, the Supreme Court disclaimed undertaking "an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Bruen*, 142 S.Ct. at 2134 (alteration in original) (quoting *Heller*, 554 U.S. at 626). One of the concurring opinions

---

[4] In fact, the only time that these two terms have not been given distinct meaning is the infamous *Dred Scott* decision, a significant "digression" that was "rectified and overruled by the Fourteenth Amendment." Gulasekaram, *"The People" of the Second Amendment*, 85 N.Y.U. L. Rev. at 1534; *see also Dred Scott v. Sandford*, 60 U.S. 393, 404-05 (1857) (stating that "[t]he words 'people of the United States' and 'citizens' are synonymous terms, and mean the same thing" before holding that African Americans are not included as "citizens" in the Constitution because they were considered "as a subordinate and inferior class of beings").

[5] *Heller* involved a challenge brought by a citizen and did not present the issue of who was within "the people," so it is possible these various references were "colloquial allusion[s] to a general class of persons to whom all civil rights inure." Gulasekaram, *"The People" of the Second Amendment*. 85 N.Y.U. L. Rev. at 1532. *Bruen* similarly involved a challenge brought by "two ordinary, law abiding, adult citizens." 142 S.Ct. at 2134.

in *Bruen* made this point precisely, noting that the Court's opinion "decides nothing about *who* may lawfully possess a firearm." *Bruen*, 142. S.Ct. at 2157 (Alito, J., concurring) (emphasis added). Under *Heller* and *Bruen*, status as a law-abiding citizen is undoubtedly sufficient for Second Amendment protection. But the Supreme Court has not held that such status is necessary. As a matter of plain text, undocumented noncitizens are part of "the people" protected by the Second Amendment.

In *Heller*, the Supreme Court concluded that the Second Amendment "secured an individual right to bear arms for defensive purposes," which was concluded from "the overwhelming weight of other evidence regarding the right to keep and bear arms for defense of the home." *Id*. at 602, 632. Asking whether *collective* rights have historically been determined based on immigration status alone is simply not relevant to the individual right guaranteed by the Second Amendment. *See Kanter v. Barr*, 919 F.3d 437, 462-64 (7th Cir. 2019) (Barrett, J., dissenting) (noting that *Heller* "expressly reject[ed] the argument that the Second Amendment protects a purely civic right"). And even post-*Bruen*, the right still exists, despite the Supreme Court's use of the phrase "law-abiding citizens." *See Bruen*, 142 S.Ct. at 2122 ("[W]e recognize that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."). Contrary to this language, a characterization by the *Bruen* Court of the case's petitioners as "law-abiding citizens" should not control this Circuit's interpretation of "the people" under the Second Amendment, as the lower court noted. The lower Court reasoned that similar arguments to this effect were made, and subsequently rejected, by this Circuit in *Meza-Rodriquez*.

Much like *Heller*, the Seventh Circuit has also defined the term "people" in a broad fashion. *See Meza-Rodriguez*, 798 F.3d at 670. In *Meza-Rodriguez*, this Circuit gave no weight

whatsoever to similar language made by the Supreme Court in *Heller*. *See Heller*, 554 U.S. at 580 (using the phrase "lawabiding citizens"); *Meza-Rodriguez*, 798 F.3d at 669. The lower court here explained, "[t]he *Heller* court did not 'attempt to define the term "people",' so the Seventh Circuit did not restrict the application of the Second Amendment to 'law-abiding citizens.'" *Exhibit B* at *3 (quoting *Heller*, 554 U.S. at 580). And, since *Bruen* also gave no understanding to the meaning behind the term "the people," the lower court correctly opted to not "place more weight on [ ] passing references than the Court itself did" by finding that undocumented noncitizens do not possess a right to bear arms. *Bruen*, 142 S.Ct. at 2134 (holding that it was "undisputed that [the] petitioners . . . are part of "the people" whom the Second Amendment protects"); *See Exhibit B* at *3 (agreeing with *Bruen*).

Specifically, in *Meza-Rodriguez*, this Circuit held that "the people" should not be considered rigidly defined by things like citizenship or civic access, but rather governed by an individual's ties to the community. *Meza-Rodriguez*, 798 F.3d at 670 ("The Second Amendment is not limited to such on-again, off-again protection."). The Court determined that Meza Rodriguez, who was in the United States without authorization and had been charged with unlawful possession of a firearm in violation of section 922(g)(5), had a right, like everyone else, to make a Second Amendment claim. *Id.* This Circuit clearly held that those present in the United States without authorization were not excluded from Second Amendment protections. *Id.* at 670. Aptly stated, this Circuit held that "[n]o language in the Amendment supports such a conclusion, nor, as we have said, does a broader consideration of the Bill of Rights." *Meza Rodriguez*, 798 F.3d at 672. More specifically, the *Meza-Rodriquez* court borrowed language from the Supreme Court case, *United States v. Verdugo-Urquidez*, concluding that ""'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom

rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."' *Meza-Rodriguez*, 798 F.3d at 670 (*quoting United States v. Verdugo-Urquidez*, 494 U.S. at 265). *See also Verdugo-Urquidez*, 494 U.S. at 271 ("aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country.").

And the Seventh Circuit is not alone in concluding that undocumented individuals possess Second Amendment rights. Notably, while the Seventh Circuit has been the only circuit to affirmatively make such a determination, when confronted with the question of Section 922(g)(5)'s constitutionality, four other circuits assumed, without deciding, that the Second Amendment does in fact cover undocumented individuals. *See United States v. Perez*, 6 F.4th 448 (2d Cir. 2021), *cert. denied*, 142 S.Ct. 1133 (2022) ("Assuming without deciding that, even as an undocumented alien, he is entitled to Second Amendment protection, we hold that 18 U.S.C. § 922(g)(5), as applied to Perez, withstands intermediate scrutiny."); *United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019) ("[a]ssuming that unlawful aliens in this country hold some degree of rights under the Second Amendment"); *United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012) ("If the right's 'central component,' as interpreted by *Heller*, is to secure an individual's ability to defend his home, business, or family (which often includes children who are American citizens), why exactly should all aliens who are not lawfully resident be left to the mercies of burglars and assailants?") (citation omitted).[6]

In concert with *Meza-Rodriguez*, and the other favorable judicial readings, historical analysis concurs with such a broad reading. Looking at this Nation's Founding Era, the people

---

[6] *But see United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012), *United States v. Portillo Munoz*, 643 F.3d 437 (5th Cir. 2011), *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011), and *United States v. Singh*, 979 F.3d 697, 724 (9th Cir. 2020) (determining that the Second Amendment does not confer rights to undocumented individuals).

"signifie[d] every person, or the whole collection of inhabitants in a nation or kingdom[.]" Thomas Dyche & William Pardon, *A New General English Dictionary* (14th ed. 1771)[7] (defining the people of the Nation as "the whole Body of Persons who live in a Country[ ] or make up a Nation"); 2 Samuel Johnson, *A Dictionary of the English Language* 306 (1766)[8] (defining "people" as "[a] nation; those who compose the community"). Firearm possession was not in any way tied to citizenship as of the adoption of the Second Amendment, and accordingly, the right of self-defense was given to "all men, without distinction." *Heller*, 554 U.S. at 615 (citation omitted).

This Court should therefore reject the Government's unsupported claims, as the district court did, and hold that the plain text of the Second Amendment presumptively protects undocumented individuals (just like citizens) and their right to bear arms. In fact, both this Nation's history and precedent make clear that the Second Amendment is applicable to all people of the Nation, regardless of their immigration status. The ordinary meaning of "the people," as well as the historical context of the Second Amendment in general, confirm that the district court was in fact correct when it concluded that Mr. Carbajal-Flores was among the people protected by the right.

### B. The Government Fails To Show That A Comparatively Similar Firearms Restriction Exists As Analogous to 18 U.S.C. § 922(g)(5).

The Government argues that Section 922(g)(5) addresses a "general societal problem that has persisted since the 18th Century" of disarming individuals deemed untrustworthy adherents to the rule of law (like felons), and those that are not considered part of the political community. GOB at 41. *Bruen* requires "only that the government identify a well-established and

---

[7] https://tinyurl.com/uk4b4fxd#; *see* N. Bailey, *An Universal Etymological English Dictionary* 601-02 (1770).
[8] https://johnsonsdictionaryonline.com/views/search.php?term=people.

representative historical analogue, not a historical twin" when offering comparatively similar past firearm restrictions. *Bruen*, 142 S. Ct. at 2133. The Government offers firearm bans spanning as far back as English pre-colonial times, where groups such as Native Americans, Catholics, and Loyalists were disarmed for failing to take oaths of loyalty. The Government relies on these certain proffered regulations to show that this Nation's Founders purportedly understood that the Second Amendment supported a broad authority to disarm "untrustworthy" or "disloyal" groups, and those outside the scope of the political community. These proffered restrictions are not historically analogous for various reasons.

***Untrustworthy Adherents of the Law.*** The Government first relies on the worn-old English laws that disarmed religious minorities, in order to find justification in categorically disarming undocumented individuals today as being untrustworthy and not part of the political community. GOB at 41. To begin with, the Government partially relies on Seventeenth Century English law. *See Bruen*, 142 S. Ct. 2119; *Heller*, 554 U.S. at 599 (holding English law as being relevant considering the Second Amendment has "codified a right inherited from our English ancestors."). Relying on a 1689 English law that disarmed Catholics who had refused to renounce their faith, the Government contends that this particular disarmament tradition stemmed from the English government's distrust of Catholics to obey the law during that time period. GOB at 29-32. Further, the Government attempts to provide as comparative the restoration of Stuart monarchs following the English Civil War, that disarmed those deemed nonconforming Protestants, which even included many groups of "pacificist denominations like the Quakers." GOB at 19-20; *Range v. Attorney General United States*, 69 F.4th 96, 120-21 (3d Cir. 2023) (Krause, J. dissenting) (noting that "Anglicans accused nonconformists of believing their faith exempted them from obedience to the law").

Despite the Government's arguments, this Circuit should reject English laws that disarm religious minorities as a historical analogue to Section 922(g)(5). The issue at hand is whether the "alien-in-possession" law and the proffered historical analogues cited by the Government "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Bruen*, 142 S. Ct. at 2133. In this case, the English laws offered by the Government were enacted solely for reasons that would be found as discriminatory and downright impermissible today. As such, this Circuit should find that Section 922(g)(5) does not impose a "comparably justified" burden on the right to self defense as those comparisons offered by the Government. Furthermore, to decline to use such discriminatory laws based on religion as a cornerstone for denying a presumptively protected right of self defense under the Second Amendment would be a reasonable decision.

The Government further relies on historical examples of explicitly discriminatory laws focused on racial and ethnic minorities in an effort to support the constitutionality of Section 922(g)(5). Notably, the Government attempts to argue that "firearm regulations directed toward disarming Native Americans and Black people were pervasive" and that such firearms regulations provide a demonstration of the government's historical "authority to disarm classes of people who were not dependable adherents to the rule of law." GOB at 34. The Government's continuous reliance on what itself even admits as bigoted and racist laws to make its case is notable. *See United States v. Agee*, 2023 U.S. Dist. LEXIS 177970, 2023 WL 6443924 (N.D. Ill. Oct. 3, 2023) (relying on slavery-based and other discriminatory laws against religious minorities to argue that Section 922(g)(1) is unconstitutional); *United States v. Gates*, 2023 U.S. Dist. LEXIS 157274, 2023 WL 5748362 (N.D. Ill. Sept. 6, 2023) (same); *United States v. Johnson*, 2023 U.S. Dist. LEXIS 171452, 2023 WL 6276526 (N.D. Ill. Sept. 26, 2023) (same). Overall,

the Government is attempting to expand on *Bruen*'s test in an effort to make an argument that the denial of any and all constitutional rights during the Founding Era can therefore "justify the denial of some constitutional rights today." *United States v. Griffin*, No. 21-CR-00693, 704 F. Supp. 3d 851, 859 (N.D. Ill. Nov. 30, 2023). This Court should reject the Government's reliance on discriminatory bans towards Native Americans and slaves as historical analogues to Section 922(g)(5) considering the proffered regulations' impermissible premise is not a "comparably justified" burden on the right to self-defense. As such, this Court should therefore find that Section 922(g)(5) is not analogous to the discriminatory regulations proffered regarding slavery and Native Americans.

Attempting to ease away from the discriminatory aspect of the laws it was offering, the Government then turned historical examples of colonial laws disarming "free Christian, white men," "whom the authorities believed could not be trusted to obey the law." GOB at 21; *Range*, 69 F.4th 96 at 122 (Krause, J., dissenting) (citing Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 174 (3d ed. 2022)). Also highlighted by the Government, Revolutionary disarmament laws targeted individuals who failed to demonstrate loyalty to the emerging American government. GOB at 35-37. Notably, loyalty oaths were central to these laws as the government would require an oath of loyalty by its residents in order to be exempt from such bans. Otherwise, the government would strip anyone that failed or refused to take such an oath of loyalty of their right to bear arms. *Atkinson*, 70 F.4th at 1034 (Wood, J. dissenting) ("During the American Revolution, several states passed laws providing for the confiscating of weapons owned by persons who refused to swear an oath of allegiance to the state or to the United States.").

Further, despite the Government's argument, and the lower court's conclusion to the contrary, laws that disarmed British loyalists are similarly not proper historical analogues. While the historical record does reflect a finding that legislatures have categorically disarmed certain groups who were feared as being disregarding of the law and disturbing of the social order, this Court should nevertheless find that a historical rationale does not exist for disarmament based on perceived danger because Section 922(g)(5) is overbroad in its reach as it seeks to label undocumented individuals in 2024 as being perceived as dangerous, despite any relevant evidence of this, aside from their immigration status.

Specifically, unlike the British loyalist dispossession laws, Section 922(g)(5) is a total and permanent ban on firearm ownership, with a near non-existent exception that does not apply to the vast majority of individuals targeted under the statute. *See* 18 U.S.C. § 922(y)(2) (exception to (g)(5) applying only to certain individuals present under a non-immigrant visa). To wit, holders of non-immigrant visas are not even considered to be undocumented, but rather "non-immigrants," as they are here under a legal visa for a limited amount of time. *See Overview of Types of Immigration Status*, Immigration and the State Courts Initiative[9] (Notably, legal permanent residents are not citizens (they cannot vote, for instance), but they are nevertheless not prohibited from possessing a firearm under Section 922(g)(5).). Thus, while British loyalists were able to carry firearms if they opted to sign a loyalty oath, no such exception exists for undocumented individuals residing in the United States. And, it is important to note that this is the case despite many undocumented individuals having a desire to become a citizen (and take the oath) of the United States, if given the opportunity. Just like Mr. Carbajal-Flores, many of those considered to be DREAMers started nearly every day of their early life by pledging their

---

[9] Immigration-Status-4-1-13.pdf (April 1, 2013).

allegiance to the United States of America, in their American classrooms, along with their American classmates.

***Individuals Outside the Political Community***. The Government then relies on laws disarming those who were not considered to be part of the "political community." GOB at 41. To think that, in 2024, undocumented individuals, like Mr. Carbajal-Flores, are not part of the political community would be a severe misstatement, as such individuals are in fact part of such political and socio-political communities in many ways. In fact, undocumented individuals are now included in regular census data nationwide,[10] while over 3.6 million undocumented individuals in the United States (like Mr. Carbajal-Flores) are undocumented DREAMers, an undisputable political community.[11] Even the likes of the Supreme Court and this very Circuit have given political validity to undocumented individuals by its rulings protecting such persons under the First, Second and Fourth Amendments. *See Heller*; 554 U.S. at 580, 595 ("'[T]he people' protected by the Fourth Amendment, and by the First and Second Amendments . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connections with this country to be considered part of that community.") (quoting *Verdugo-Urquidez*, 494 U.S. at 265; *see also Meza-Rodriquez*, 798 F.3d at 670 (holding the term "the people" to not be rigidly defined by citizenship or civic access, but rather governed by a person's ties to the community). And, while it is undisputed that the issues of criminal activity and recidivism are not new in this country, a "straightforward historical inquiry" shows

---

[10] *See Frequently Asked Questions (FAQs) About Foreign Born*, United States Census Bureau, *available at* https://www.census.gov/topics/population/foreign-born/about/faq.html#:~:text=The%20U.S.%20Census%20Bureau%20collects,the%20total%20foreign%2Dborn%20population (finding that undocumented individuals are implicitly included in census estimates of total foreign-born members of the population) (last revised on Dec. 16, 2021).

[11] Notably, roughly 530,000 Dreamers are currently protected pursuant to the Deferred Action for Childhood Arrivals (DACA) program. *See* Laurence Benenson, *Fact Sheet: Deferred Action for Childhood Arrivals (DACA)*, National Immigration Forum, available at Fact Sheet: Deferred Action for Childhood Arrivals (DACA) - National Immigration Forum (May 21, 2024).

that the Government fails to cite any type of "distinctly similar historical regulation addressing that problem." *Bruen*, 142 S. Ct. at 2129.

Despite the lower court's holding to the contrary, because Section 922(g)(5) does not have a suitable exception to its firearm ban, it is therefore incomparable to the British loyalty laws offered by the Government and, accordingly, does not "impose a comparable burden on the right of armed self-defense." *Bruen*, 142 S. Ct. at 2133. Unlike the British loyalty laws, Section 922(g)(5) is a permanent firearms ban, which is not a "comparable burden" when compared to past restrictions with such reasonable exceptions. *Id*. The two are not the same. Furthermore, the Government's argument that Section 922(g)(5) is sufficiently similar to bans on individuals that are not considered part of the political community is not adequate in 2024. Accordingly, the lower court was incorrect in its holding that British loyalist laws offer a comparatively similar firearms restriction as compared to Section 922(g)(5). As shown above, this is not the case. This Court should therefore reverse and remand this portion of the lower court's holding.

### C. The Government Fails To Show That 18 U.S.C. § 922(g)(5) Constitutes A Sufficient Historical Tradition.

Should this Court determine that Section 922(g)(5) was sufficiently analogous to British loyalist laws, it would then need to consider whether such dispossession laws that the Government has offered provide enough of a historical tradition, as opposed to a singular "isolated historical incident." *Griffin*, 704 F.Supp. 3d at 854. And, while history shows that British loyalist dispossession laws were in fact prominent throughout the colonies during the Revolutionary Era, these such laws should not be considered for the reasons set forth above.

Furthermore, a detailed analysis shows that Section 922(g)(5) is severely overbroad as to the individuals it affects. And this broad net that Section 922(g)(5) casts, in effect, places some comparative distance between Section 922(g)(5) and any historical tradition that it is compared

with. Prior to *Bruen*, very few regulations failed the "two-step" test under *Heller*. *See, e.g.*, *Kanter*, 919 F.3d at 442. In fact, firearm challenges under *Heller* often ended with "judicial deference [given] to legislative interest balancing." *Bruen*, 142 S. Ct. at 2131. However, the *Bruen* Court rejected prior legislative deference and opted for a much stricter test where "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms. *Id.* at 2127. As such, the government now "may not simply posit that [a] regulation promotes an important interest." *Id.* at 2126. Now, the Government must produce historical analogues that "impose a comparable burden on the right of armed self-defense" and the burden must therefore be "comparably justified." *Bruen*, 142 S. Ct. at 2133.

Following its holding in *Bruen*, in *United States v. Rahimi*, the Supreme Court again applied the new test focused on text, history and tradition. 144 S. Ct. 1889, 1896, 1897 (2024). In *Rahimi*, the Court considered the constitutionality of 18 U.S.C. § 922(g)(8), a firearms regulation that disarms an individual with a restraining order against them as containing a finding that the person poses a credible threat to the safety of another. *See Rahimi.* 144 S.Ct. at 1897 (analyzing the constitutionality of 18 U.S.C. § 922(g)(8)). Under analysis, the *Rahimi* Court clarified several aspects of the *Bruen* inquiry.

The *Rahimi* Court clarified that the government must use properly supported historical justifications rather than just mere abstract principles when analyzing the constitutionality of firearm restrictions. *Id.* at 1898. The Court noted that such historical justifications can primarily be discerned through a review of the historical regulations themselves. *Id.* In other words, a law must be found to be "relevantly similar" to laws that our tradition is understood to permit. *Id.*

In *Bruen*, for instance, the Supreme Court reviewed various different historical authorities that had been proffered by the government, but nevertheless concluded that "the lack of a distinctly similar historical regulation" addressing a problem that the Founders themselves confronted is, in fact, "relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S.Ct. at 2131. In other words, courts should be careful when assessing evidence concerning the American practice as it evolved, not the English practice left behind. *See Bruen*, 142 S. Ct. at 2136 ("It is one thing for courts to 'reac[h] back to the 14th century' for English practices that 'prevailed up to the "period immediately before and after the framing of the Constitution."' It is quite another to rely on an 'ancient' practice that had become 'obsolete in England at the time of the adoption of the Constitution' and never 'was acted upon or accepted in the colonies.'") (citations omitted).

While considering a federal firearm restriction's constitutionality, the Supreme Court in *Rahimi* considered evidence of a "historical tradition of firearm regulation" in order to determine if the restriction in question "is consistent with the principles that underpin our regulatory tradition." 144 S.Ct. 1889, 1897 (2023). The *Rahimi* Court made it clear "[w]hy and how the regulation burdens the right are central to this inquiry." *Id*. at 1897. Specifically, any restriction that imposes "similar restrictions for similar reasons" would therefore be constitutional, whereas a restriction that has a different reason or has burdened the right to a greater extent would thus be unconstitutional. *Id*.; *see also Bruen*, 142 S.Ct. at 2131-33 (holding that a constitutional firearm restriction must "impose a comparable burden on the right of armed self-defense," and further, be "comparably justified").

The "why" of the analysis looks at a law's specific purpose in achieving the regulatory goal. *Rahimi*, 144 S.Ct. at 1898; *Bruen*, 142 S.Ct. at 2132-33. The "how" on the other hand,

looks at the weight of the law's overall burden, which would include the particular kind of showing that would be needed to trigger a disarmament, the temporary nature of that particular disarmament, and any consequences that would flow from the regulation. *Rahimi*, 144 S.Ct. at 1901-02. Any restriction that is found to have a distinct purpose is considered unconstitutional even if its burden is minor. *See id.*; *see also Bruen*, 142 S.Ct. 2132-33. Similarly, a restriction that applies "for a permissible reason . . . [but] does so to an extent beyond what was done at the founding," is also unconstitutional. *See Rahimi*, 144 S.Ct. at 1898.

The *Rahimi* Court also made it clear that the government has to meet its burden by showing a properly supported historical justification, and not just abstract principles. Historical traditions are discernable mostly through historical regulations themselves. Specifically, a regulation must be found to be "'relevantly similar' to laws that our tradition is understood to permit." *Id*. The Court in *Bruen* made it a point to very carefully review different historical authorities that were offered by the government. *Bruen*, 142 S.Ct. at 2138-56. It made the point to do this yet again, when it carefully reviewed surety laws and going-armed laws as part of its historical traditions analysis. The *Bruen* Court noted that surety laws were "[w]ell entrenched in the common law," while going-armed laws had been authorized in a minimum of ten jurisdictions. *Rahimi*, 144 S.Ct. at 1900-01.

The *Rahimi* Court further clarified when considering Section 922(g)(8), that both of the historical traditions proffered by the government in surety laws and going-armed laws nevertheless favored one very specific characteristic in common. Specifically, the laws were favorable of disarmament only after a level of proof was present that the individual being restricted has "pose[d] a clear threat of physical violence to another" with a firearm. *Id*. at 1901. Further, the Court found that both proffered laws burdened the Second Amendment right to bear

arms in similar ways to that of Section 922(g)(8). The consequences that followed a violation under Section 922(g)(8) applied only after "judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id*. at 1902. This was found to be the same for a violation under Section 922(g)(8), which requires a previously-ordered protective order, and for the same purpose. *Id*. And, much like the historical surety bonds reviewed, Section 922(g)(8) restrictions are only temporary and tied to the very restraining order that triggered it. *Id*.

Ultimately, the *Rahimi* Court determined that the Fifth Circuit had erred when it held that historical surety laws were closely related to Section 922(g)(8), while nevertheless deeming the regulation as facially unconstitutional because it did not require a finding of dangerousness. *See United States v. Rahimi*, 61 F.4th 443, 460 (5th Cir. 2023), *rev'd by Rahimi*, 144 S.Ct. at 1903. The Supreme Court made it clear that this was an incorrect analysis. Specifically, the Court found that both surety and going-armed laws were sufficiently similar to Section 922(g)(8), and this was enough. *Rahimi*, 144 S.Ct. at 1898. And contrary to the Fifth Circuit's holding, the Supreme Court opted to leave the harder questions, such as "dangerousness," for another time. *Id.* Therefore, as a general point, while the Supreme Court in *Rahimi* upheld a firearm restriction with a clear historical analogue, the Court had very little to say about more complex restrictions, such as Section 922(g)(5), where there has been no judicial finding of dangerousness and things such as an unnecessarily broad net of affected individuals, or permanency of the ban, may need to be considered.

In the case of section 922(g)(5), when Congress initially enacted the Omnibus Act, including the predecessor of section 922(g)(5), the law's intended purpose included combatting "the ease with which any person can acquire firearms other than a rifle or shotgun," while

combating Congress' problem of the Nation becoming "a dumping ground of the castoff surplus military weapons of other nations," which were "largely worthless for sporting purposes . . . [but] contributed greatly to lawlessness." Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351. As such, it is clear to see that Congress' broad focus was clearly on reducing firearm violence generally by specifically reducing access to certain firearms–not merely a ban on possession by various classes of individuals.

As for restrictions on undocumented individuals, Congress clearly intended for the language of the restriction to be broad in its reach. By 1968, Congress' focus was on public safety in general. *See* Pratheepan Gulasekaram, *The Second Amendment's "People" Problem*, Vanderbilt L. Rev. 76, 1490 (2023)[12] ("In 1968, in the wake of the assassinations of Martin Luther King, Jr. and Robert F. Kennedy, as well as significant urban unrest, Congress passed two public safety-minded pieces of federal legislation: the Omnibus Crime Control and Safe Streets Act of 1968 and the Gun Control Act of 1968."). Focusing specifically on matters of loyalty by non-citizen residents of the United States, Congress sought to reduce the availability of guns in general during that time, by disarming a large group within the Nation. *See* Gulasekaram, *The Second Amendment's "People" Problem*, Vanderbilt L. Rev. 76 at 1446

> ("[Historical background to the regulation] shows that federal regulation of noncitizen possession galvanized in the mid-twentieth century as the product of a lobbying and legislative campaign that framed noncitizens as existential threats in the lead up to World War II through the Cold War. That campaign successfully substituted immigration regulation for gun regulation. Given the motivations for such regulations and their relatively recent vintage, [it must be] conclude[d] that [such laws] cannot provide a basis for upholding federal prohibitions on noncitizen possession under *Bruen*'s methodology.").

---

[12]https://cdn.vanderbilt.edu/vu-wordpress-0/wp-content/uploads/sites/278/2023/10/06173913/The-Second-Amendments-People-Problem.pdf.

Congress' focus was clearly on reducing gun crime generally by reducing people's access to guns generally. And, these bans came regardless of whether or not the targeted individuals showed a history of violence or misuse of firearms in general.

Section 922(g)(5), as the most modern version on firearm restrictions on undocumented individuals, permanently prohibits possession of a firearm by an undocumented individual in *all* circumstances. *See* 18 U.S.C. § 922(g)(5). As such, the statutory language does not require any specific finding as to the immigration status and the facts thereof, the facts surrounding the possession, the criminal background of the targeted individual, any violent proclivities shown by the individual, or the danger that may or may not have been present. Furthermore, it does not include any type of exception for self defense measures at all, and a resulting consequence of such a violation may even result in deportation by the targeted individual.[13]

As the preceding description makes clear, section 922(g)(5)'s broad sweep is intentional, and should be looked at in a vacuum and with regard to all other firearm prohibition laws enacted at that time. In 1968, Congress' focus was overwhelmingly focused on reducing overall firearm availability in general by disarming large swaths of the Nation. *See Huddleston v. United States*, 415 U.S. 814, 824 (1974) (explaining that both the Omnibus Act & Gun Control Acts of 1968 were "thus aimed at restricting public access to firearms" generally). The legislative interests in the case of section 922(g)(5) are far too broad, and create unconstitutional restrictions on certain individuals that otherwise would not be necessary. Furthermore, the consequences of violating the regulation are also overly broad. While firearm restrictions are permissible, a permanent ban based solely on immigration status is overly burdensome and does not stand up to the *Bruen* requirements of finding a "relevantly similar" historical analogue that discredits the

---

[13] Section 922(g)(5) is listed as an 'aggravated felony' under immigration law. *See* 8 U.S.C. § 1101(a)(43)(E)(ii). Aggravated felonies have particularly serious consequences for non-citizens. *See inter alia* 8 U.S.C. § 1227(a)(2)(A)(iii).

unconstitutional deference given to legislative interest balancing, and seen through the plain language of the statute.

Section 922(g)(5) represents an intentional broadening of the disarmament of undocumented individuals, regardless of individual concerns over dangerousness or misuse. Specifically, the statute intentionally disarms individuals based solely on their immigration status, regardless of any connection to rebellion, misuse of firearms, "dangerousness," or any other historically supported ground. Lack of immigration status alone should not be enough, and a similar historical analogue does not exist to justify such a disarmament. Further, the Government does not offer any analogous laws to support the burden that section 922(g)(5) places on the right to bear arms. The aliens-in-possession law's burden is historically unprecedented because it is both a permanent and total ban on firearm possession. Every historical law cited by the Government allowed for a carved-out exception for the right for self-defense, was limited in time, or operated as a contemporary forfeiture without prohibiting future possession. Overall, no historical law ever existed that completely and permanently prohibited an individual's right to bear arms. Such a permanent prohibition uniquely burdens Second Amendment rights to an unconstitutional degree.

And, just like the Government's proffered history does not offer any type of law that is relevantly similar to section 922(g)(5)'s purpose, the Government also cannot cite any laws with a comparable burden. For example, Catholic disarmament in England merely supports a more modest "regulatory tradition," than a broader approach. In fact, the restriction permitted Catholics the right to retain their arms, so long as they swore an oath of allegiance to the Crown. *See* 1 Wm. & Mary, Sess. 1, ch. 15, in 6 Statutes of the Realm 71 at 72 (1688). Catholics were able to take the oath to regain arms at any time, even after being initially refused, as they were

merely limited because of their own choice to not swear an oath of allegiance. *See* 1 Wm. & Mary, Sess. 1, ch. 15, in 6 Statutes of the Realm 71 at 72 (1688). And even still, the law provided an exception for self defense, where Catholics were given permission to possess firearms "for the defense of [their] House or person." *See* 1 Wm. & Mary, Sess. 1, ch. 15, in 6 Statutes of the Realm 71 at 72 (1688). In contrast, section 922(g)(5) represents a complete total and permanent ban on firearm possession, offering no opportunity for an undocumented individual to obtain a special exemption for purposes of self defense, and defense of the home. As such, this is a far greater burden on Second Amendment rights than those laws offered in comparison by the Government.

Colonial disarmament at the Founding, as the Government proffers, was no more permanent of a ban than those prior English bans. Those individuals that were supporters of Anne Huthinson, for instance, could recant their support at any time to avoid disarmament. Emery Battis, *Saints and Sectaries: Anne Hutchinson and the Antinomian Controversy in the Massachusetts Bay Colony* 212 (1962). And, even without recanting, the ban required only the surrender of *current* firearms, but not on future acquisition. Emery Battis, *Saints and Sectaries: Anne Hutchinson and the Antinomian Controversy in the Massachusetts Bay Colony* 212 (1962). Even laws that disarmed enslaved individuals did not completely prohibit their possession of firearms, as the laws made allowances for those who possessed "his master's special license[.]" *See, e.g.*, 2 The Statutes at Large of Pennsylvania from 1682 to 1801, at 235 (1896) (1706 Pa. Law). And, nearly every law applicable to Native Americans only banned white colonists from selling weapons to them, not current or future possession. *Compare* 2 Records of the Colony of Rhode Island and Providence Plantations 561 (1857) *with, e.g.*, 6 The Statutes at Large of

Pennsylvania from 1682 to 1801, at 319-20 (1899) (1763 Pa. Law) (finding it to be a crime to "give to, sell, barter or exchange with any Indian or Indians whatsoever any guns").

Even loyalty laws in past times have allowed for regaining the right to bear arms. Even in the midst of the American Revolution, an individual disarmed under a wartime statute could thereafter regain their right to bear arms at any point in time by swearing to a loyalty oath. *See* Robert H. Churchill, supra at 157. Just like the disarmament period of Anne Hutchinson supporters, an individual who was disarmed during that time was still free to acquire new, additional firearms. *See* C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Policy 695, 724 (2009) (explaining that loyalty statutes "read more like forfeiture laws than disabilities").

Firearm prohibition laws following the American Revolution confirm the historical uniqueness of permanent disarmament. For instance, those that participated in Shays's Rebellion, committing acts "bordering on treason," like attacking a courthouse, the federal arsenal, and the militia, for instance, were required to surrender their arms. *Range*, 69 F.4th at 106 n.10; Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 267-68 (2020). However, they were never *permanently* disarmed of their firearms. The firearms confiscated from them were held by the state, but then returned merely three years later. Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 267-69 (2020).

Ultimately, neither the Government nor the district court below has cited a single law in the historical tradition that disarmed undocumented individuals permanently. Instead, the Government attempts to piece together two limited and unrelated historical traditions: (1) broad categorical disarmament of individuals that have not taken an oath of loyalty to this country; and

(2) disarmament of those deemed untrustworthy adherents of the law. Regardless, none of the historical laws offered by the Government demonstrate a finding that permanent disarmament is appropriate for someone based on their immigration status, without anything more. As set forth below, these particular historical examples do not support any tradition of disarmament comparable to section 922(g)(5).

## IV.    SECTION 922(G)(5) IS UNCONSTITUTIONAL AS APPLIED DIRECTLY TO MR. CARBAJAL-FLORES.

Should this Circuit find that 18 U.S.C. § 922(g)(5) is constitutional on its face, Mr. Carbajal-Flores also argues that, alternatively, section 922(g)(5) is unconstitutional as applied directly to him. With regard to such an as-applied challenge, the court below correctly held that Mr. Carbajal-Flores' conduct was covered under the plain text of the Second Amendment. *See Order dated March 8, 2024* at *6-7. For the foregoing reasons, this Court should affirm the lower court's holding in this respect.

The Government argues that this Court should not even consider an as-applied challenge under 18 U.S.C. § 922. *See* GOB 45-47 (emphasizing the lack of as-applied challenges to date). Despite this argument, and even citing to the case, the Government fails to properly give credence to *Kanter*, where this Circuit has in fact entertained the validity of as-applied challenges to section 922. *Kanter*, 919 F.3d at 451 (referring to *United States v. Williams*, 616 F.3d 385, 691, 693 (7th Cir. 2010), where an as-applied challenge to section 922(g)(1) was allowed, noting the Circuit's prior holding that "§ 922(g)(1) may be subject to an overbreadth challenge at some point because of its disqualification of all felons, including those who are non-violent"). This Court prefaced that the Supreme Court "may be open to claims that some felonies do not indicate potential violence and cannot be the basis for applying a categorical ban," and "might even be open to highly fact-specific objections." *Kanter*, 919 F.3d at 443

(citing *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011), *cert denied*, 565 U.S. 1271, 132 S. Ct. 1766 (2012)). As such, this Circuit noted in *Kanter* that they–along with the Fourth, Eighth, and D.C. Circuits–have left open the possibility of "as applied" challenges to section 922(g)(1), and as such, the other subsections of section 922. *Id.*

Further, when faced with whether an as-applied challenge may be brought in "particular circumstances," the *Rahimi* Court, while ultimately holding that section 922(g)(8) was constitutional as it applied to Rahimi specifically, the Court nevertheless emphasized that its decision was because of the restriction's limited reach (in that it was for a "limited duration"--for the length of the restraining order), and Rahimi fell within the class of individuals subject to the restriction. *Rahimi*, 144 S. Ct. at 1909-10. Unlike section 922(g)(8), however, subsection (g)(5) is a *permanent* disarmament as it disarms individuals that have no way of overcoming the burden behind the law–to legalize their status in the United States. And for many undocumented individuals residing in the United States today, legalizing their status can be an impossible task without certain family ties or something more.[14] The Government argues that firearm restrictions on undocumented individuals is a mere temporary ban but, for the above reasons, it is instead permanent for many of those residing within the Nation. As such, certain individuals living within the bounds of the United States will forever be disarmed, despite the States being the only home they have known, and their willingness to take an oath of loyalty if given the opportunity, much like Mr. Carbajal-Flores.

---

[14] For many people, despite having lived in the United States for decades or more, and having United States citizen children, there is simply no pathway to legalization. *See Why Don't Immigrants Apply for Citizenship? There Is No Line for Many Undocumented Immigrants*, Pub. Oct. 7, 2021, Why Don't They Just Get In Line? There Is No Line for Many Unauthorized Immigrants | American Immigration Council

("[M]ost undocumented immigrants do not have the necessary family or employment relationships and often cannot access humanitarian protection, such as refugee or asylum status. This means that no matter how long they have been in the United States, most undocumented immigrants have no way of achieving legal status. Even those who pay taxes, work hard, and contribute to their communities have no way to 'get in line' unless Congress creates a new pathway to legal status.").

In making this argument against as-applied challenges under the Second Amendment, the Government argues that the lower court's reliance on British loyalty oath laws as support for individualized assessments is incorrect, however, the Government makes this argument despite it presenting such laws as examples of similar disarmament regulations for consideration. GOB 45-47. Specifically, the Government argues in its brief that while such laws show that the disarmament at issue was not permanent, they nevertheless do not show that individual assessments should be required. *Id.* Ultimately, the Government's war is with "individualized assessments" in general. Unfortunately for the Government, however, such a rigid approach to British loyalty oath laws goes against the Government's argument in reliance of such laws as relatively similar firearms regulations, as such individuals were disarmed to protect against perceived risk of rebellion, not because they were "untrustworthy adherents to the law." *See* GOB 41. Furthermore and most importantly, the Government misses the overall connection between such individual assessments and the permanency of British loyalty oath laws of disarmament. In fact, the two go hand-in-hand: British loyalty oath laws may only be seen as non-permanent because of the fact that such laws provided exceptions for individualized assessments. Without those assessments as an exception, those laws would, in fact, cause permanent disarmament. The lower Court understood this and applied such an exception for an individualized assessment to the case at hand. *See Order dated March 8, 2024* at \*6-7.

Citing to this particular historical analogue provided by the Government regarding British loyalists being "untrustworthy adherents to the law," the lower court noted that an exception to this particular type of law was required, where an individualized assessment was to be made of the targeted individual to determine if they fell into this "untrustworthy" group. *See Griffin*, 704 F. Supp. 3d at 862. Specifically, the exception required a determination as to whether a former

British loyalist was so "untrustworthy" or "dangerous" that they should therefore be barred from firearm possession. *Id*. Despite *Griffin* dealing with felons in possession, the lower court found the analogies equally applicable to section 922(g)(5) and undocumented individuals "unlawfully present in the country." *Order dated March 8, 2024* at *6-7. The Court reasoned that "to the extent the exception shows that some British loyalists were permitted to carry firearms despite the general prohibition, the Court interprets this history as supporting an individual assessment for Section 922(g)(5) as this Court previously found with Section 922(g)(1). *Order dated March 8, 2024* at *6-7.

In reliance on the early British loyalty laws proffered by the Government in making its decision based on individual assessment, the Court deferred to Seventh Circuit analysis in *Atkinson. See Order dated March 8, 2024* at *6-7; *Atkinson*, 70 F.4th at 1023-24. As specified herein, the *Atkinson* court provided "interrelated and non-exhaustive questions [that] may help focus the proper analysis," further clarifying the demands of *Bruen*'s text-and-history test. *Order dated March 8, 2024* at *4-5 (quoting *Atkinson*, 70 F.4th at 1023-24). Specific to an as-applied challenge, the *Atkinson* Court provided the following guidance:

> If history supports [Defendant's] call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony? And what evidence can a court consider in assessing whether a particular felony conviction was violent? For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements? *Bruen* shows that these distinctions should also have firm historical support. *See* 142 S.Ct. at 2132-33 (explaining that the court must assess whether modern and historical regulations are 'relevantly similar,' including in terms of how and why the regulations burden gun rights).

*Atkinson*, 70 F.4th at 1023-24.

Below and on appeal, the Government attempts to argue that Mr. Carbajal-Flores is a non-citizen, unlawfully present in the country, and should therefore be deemed "untrustworthy"

for purposes of the Second Amendment. However, for the very reason of Mr. Carbajal-Flores' immigration status, the lower Court correctly determined that an individual assessment was warranted to determine Mr. Carbajal-Flores' untrustworthiness, if any. Accordingly, the lower Court correctly utilized the *Atkinson* line of questions for such an assessment. In doing so, the Court correctly noted that Mr. Carbajal-Flores has neither been convicted of a felony, a violent crime, nor a crime involving the use of a weapon, that would otherwise suggest he cannot be trusted with a weapon. *Order dated March 8, 2024* at *6-7. The court noted further that, as for the charge under section 922(g)(5) specifically, Mr. Carbajal-Flores had consistently adhered to, and completed, all stipulated conditions for his release and, since his arrest, he had avoided being arrested again or receiving any type of outstanding warrant. *Id*. Furthermore, he was (and continues to be) gainfully employed, and active in his family and community. In fact, the lower court noted Mr. Carbajal-Flores' contentions that he received and used the handgun solely for self-protection, and protection of property, during a time of documented civil unrest in the Spring of 2020. *See Order dated March 8, 2024* at *7 (acknowledging the violence that occurred in the city of Chicago during that time due to protests following the death of George Floyd while in police custody); *see also* Ben Kesslen, *Curfews go into effect in cities around the country as George Floyd protests continue*, NBC News (May 30, 2020)[15] (documenting city-wide curfew mandates throughout the Nation, including within Chicago, during the Spring of 2020, following mass demonstrations and protests).

The Government attempts to argue that there was no provocation that caused Mr. Carbajal-Flores's possession and use of the firearm, however, it does not seem to consider the totality of the circumstances in general, with such unrest and racial tension city-wide during that

---

[15] https://www.nbcnews.com/news/us-news/curfews-go-effect-cities-around-country-george-floyd-protests-continue-n1219801.

time. *See* GOB 45. Counter to the Government's contentions, Mr. Carbajal-Flores was in fact told by officers prior to the events leading to his arrest, that he and his neighbors should arm themselves as the police would not be able to protect everyone. Exhibit A, p. 1-2. And, Mr. Carbajal-Flores has never denied that he did in fact fire warning shots. R. 7; Exhibit A, p 2; Exhibit B, p. 1. In fact, when recorded mid-shot, Mr. Carbajal-Flores was not shooting at a random car as the Government contends, but rather he had brandished the gun only at individuals Mr. Carbajal-Flores believed to be those that had broken into the neighborhood tire shop earlier that night and were coming back to the area, a fact he has asserted throughout the entirety of this arrest and prosecution. Exhibit A, p. 1-2. Truly, the whole Nation was placed on notice of the danger that enveloped Chicago.

Ultimately, the lower court properly concluded that the Government could not exhibit any reason whatsoever to deem Mr. Carbajal-Flores as in any way untrustworthy or violent. Mr. Carbajal-Flores' criminal record contained no improper weaponry usage. The circumstances surrounding Mr. Carbajal-Flores' arrest were non-violent in nature in that Mr. Carbajal-Flores' discharge of the firearm was for protective and defensive purposes only. And overall, nothing suggests that Mr. Carbajal-Flores should be considered a public safety risk, to such a degree that he cannot and should not be trusted to responsibly use a firearm. Accordingly, this Court should find that, as it is applied to Mr. Carbajal-Flores, section 922(g)(5) is in fact unconstitutional.

## **CONCLUSION**

For the foregoing reasons, Mr. Carbajal-Flores respectfully requests that this honorable Court summarily affirm the lower Court opinion without reaching the merits. If this Court

decides to reach the merits, then Mr. Carbajal-Flores respectfully requests that this honorable Cour affirm the dismissal of the underlying charge against him because 18 U.S.C. § 922(g)(5) is unconstitutional on its face as an absolute ban, and it is further unconstitutional as it applies directly to Mr. Carbajal-Flores. The Government has failed to show any history or tradition supporting an absolute ban on individuals based on alienage or nationality alone. Therefore, the Government failed to prove such a regulation can apply to Mr. Carbajal-Flores.

DATED: November 12, 2024.

Respectfully submitted,

*/s/ Jacob S. Briskman*

Jacob S. Briskman
Jacob S. Briskman, Attorney-at-Law
2624 W. Fullerton Avenue
Chicago, IL 60647
Tel: (312) 945-6207
jacob.briskman@gmail.com
Counsel for Defendant-Appellee, Heriberto Carbajal-Flores

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this brief complies with the type volume limitation of Federal Rule of Appellate Procedure 32(a)(7), in that Defendant-Appellee Carbajal-Flores' Opening Brief contains 13,037 words. This certification is based on the word count of Microsoft Word 13.0, which was used in preparing this response brief.

*/s/ Jacob S. Briskman*

Jacob S. Briskman
Jacob S. Briskman, Attorney-at-Law
2624 W. Fullerton Avenue

Chicago, IL 60647
Tel: (312) 945-6207
jacob.briskman@gmail.com
Counsel for Defendant-Appellee, Heriberto Carbajal-Flores

## CERTIFICATE OF ELECTRONIC SERVICE

The undersigned hereby certifies that he is an attorney of record for the Appellee and registered to file in the ECF system and that on November 18, 2024, he served an electronic copy of the above and foregoing response brief by electronic service (ECF) to the Assistant United States Attorney assigned on this case who is registered on ECF in this case to receive e-service of all documents.

Respectfully submitted,

*/s/ Jacob S. Briskman*

Jacob S. Briskman
Jacob S. Briskman, Attorney-at-Law
2624 W. Fullerton Avenue
Chicago, IL 60647
Tel: (312) 945-6207
jacob.briskman@gmail.com
Counsel for Defendant-Appellee, Heriberto Carbajal-Flores