In the
# UNITED STATES COURT OF APPEALS
for the Seventh Circuit

# No. 24-1534

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

HERIBERTO CARBAJAL-FLORES,

Defendant-Appellee.

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 20 CR 613 — Sharon Johnson Coleman, *Judge.*

# REPLY BRIEF OF THE UNITED STATES

MORRIS PASQUAL
Acting United States Attorney
 for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois  60604
(312) 353-5300

BRIAN J. KERWIN
Assistant United States Attorney
Chief of Appeals, Criminal Division

MARGARET STEINDORF
Assistant United States Attorney

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. ii

INTRODUCTION ........................................................................... 1

ARGUMENT ................................................................................ 2

   I.    Section 922(g)(5)(A) Is Facially Constitutional. .................................. 2

   II.   The District Court Erred in Deeming Section 922(g)(5)(A) Unconstitutional As-Applied to Defendant, and No Court of Appeals Has Endorsed Its Novel Approach. ..................................... 10

   III.  The Government's Appendix is Not Deficient, and Summary Affirmance Would Be Inappropriate and Contrary to Law.............. 16

CONCLUSION ............................................................................. 21

# TABLE OF AUTHORITIES

## CASES

*Animal Science Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865 (2018) .......................................................... 18

*Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023) ...................... 6, 12, 13, 15

*Burnham v. Superior Court*, 495 U.S. 604 (1990)........................................... 17

*Cabell v. Chavez-Salido*, 454 U.S. 432 (1982) .................................................. 6

*Chandris, Inc. v. Latsis*, 515 U.S. 347 (1995)................................................. 17

*Crawford v. Washington*, 541 U.S. 36 (2004) ................................................. 17

*Friedman v. City of Highland Park, Ill.*, 784 F.3d 406 (7th Cir. 2015) ........... 6

*Houston Community College System v. Wilson*, 142 S. Ct. 1253 (2022) ......... 17

*Huddleston v. United States*, 415 U.S. 814 (1974) ........................................... 8

*Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90 (1991) .................... 19

*Leo Sheep Co. v. United States*, 440 U.S. 668 (1979) ..................................... 17

*March v. Chambers*, 463 U.S. 783 (1983) ....................................................... 17

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) ....*passim*

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) .................................................. 18

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ..................................... 17

*United States v. Bullock*, No. 23-60408, 2024 WL 4879467 (5th Cir. 2024)... 18

*United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012) .......................... 10

*United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011).................................... 10

*United States v. Gates*, No. 22-CR-397, 2023 WL 5748362 (N.D. Ill. Sept. 6, 2023).................................................................................................................. 6

*United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012) .............. 4, 10

*United States v. Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022) .................. 10

*United States v. Medina-Cantu*, 113 F.4th 537 (5th Cir. Aug. 27, 2024) ... 8, 10

*United States v. Meza-Rodriguez,* 798 F.3d 664 (7th Cir. 2015) ............ 4, 9, 10

*United States v. Otradovec*, 72 F.4th 794 (7th Cir. 2023)............................... 16

*United States v. Perez*, 6 F.4th 448 (2d Cir. 2021) ......................................... 10

*United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011) ................... 9, 10

*United States v. Rahimi*, 602 U.S. 680 (2024)..........................................passim

*United States v. Rangel-Tapia*, No. 23-1220, 2024 WL 966385 (6th Cir. Mar. 6, 2024)................................................................................................... 9

*United States v. Singh*, 979 F.3d 697 (9th Cir. 2020) ................................. 6, 10

*United States v. Sitladeen*, 64 F.4th 978 (8th Cir. 2023)............................. 9, 10

*United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019) .................................. 10

*United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) ..................................... 4

*Yee v. City of Escondido*, 503 U.S. 519 (1992) .................................................. 19

*Zivotofsky v. Kerry*, 576 U.S. 1 (2015).............................................................. 17

## STATUTES

18 U.S.C. § 922(g)(5)(A) .............................................................................passim

18 U.S.C. § 922(y)(2) .......................................................................................... 7

18 U.S.C. § 922(y)(3) .......................................................................................... 7

## RULES

Fed. R. Evid. 201............................................................................................... 17

## INTRODUCTION

While unlawfully in the country, defendant used a semi-automatic pistol to fire seven bullets at a passing car from the Chicago street corner on which he was standing and, soon thereafter, would have fired additional shots at a second such car if his firearm had not jammed when he again pulled the trigger. Despite these undisputed facts, the district court concluded that defendant presents no risk to public safety and, therefore, that the Second Amendment precludes Congress from criminalizing his possession of a firearm. The district court erred in granting defendant's as-applied challenge to the constitutionality of 18 U.S.C. § 922(g)(5)(A). Such challenges are legally impermissible under the Supreme Court's Second Amendment jurisprudence. And, even if they were permitted, the version of an as-applied test devised by the district court—which absolved brazenly dangerous offense conduct, ignored defendant's criminal history, and erroneously considered his post-indictment behavior—is unworkable, unsound, and compels the opposite conclusion. Section 922(g)(5)(A) is constitutional as to defendant.

Defendant's request to reverse the district court's ruling that Section 922(g)(5)(A) is constitutional on its face should be rejected. That decision is consistent with this Court's precedent, as well as the analytical framework set out by the Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1 (2022), and *United States v. Rahimi,* 602 U.S. 680 (2024).

Defendant, a non-citizen who was present in the United States unlawfully, was not a member of "the people" granted the right to possess firearms under the Second Amendment's text. And even if he is, our nation's history and tradition of disarming (1) individuals who were not members of the political community, and (2) those who could not be trusted to obey our laws, renders constitutional the disarmament of undocumented noncitizens like defendant. Indeed, no federal court of appeals has found Section 922(g)(5)(A) to be unconstitutional on its face or as-applied to any particular defendant.

This Court should reverse the district court's order dismissing the indictment and remand for further proceedings.

## ARGUMENT

## I.     Section 922(g)(5)(A) Is Facially Constitutional.

Defendant concedes that "the historical record does reflect a finding that legislatures have categorically disarmed certain groups who were feared as being disregarding of the law and disturbing the social order." Rsp. Br. 24. Despite this acknowledgement, he contends that the specific historical analogues put forth by the government are each too dissimilar to Section 922(g)(5)(A) to support its constitutionality. *See* Rsp. Br. 35[1] ("Ultimately,

---

[1] Defendant's brief is cited as "Rsp. Br.," and the government's brief is cited as "Br.," followed by the page number(s). Citations to the Original Electronic Record on Appeal are to "R.," followed by the document number, citations to the required short appendix are to "RSA," followed by the page number, and citations to the government's appendix are to "G. App.," followed by the page number.

neither the Government nor the district court below has cited a single law in the historical tradition that disarmed undocumented individuals permanently."). Defendant's argument ignores the express teachings of *Rahimi*, which rejects his approach and underscores the statute's legality.

*Rahimi* instructed lower courts to analyze a challenged regulation by determining whether it "is consistent with the *principles* that underpin our regulatory tradition"—meaning, "laws that our tradition is understood *to permit*." 602 U.S. at 692 (emphasis added) (citing *Bruen*, 597 U.S. at 29). *Rahimi* took pains to correct the error defendant makes throughout his brief, by stressing that "some courts have misunderstood the methodology of [the Court's] recent Second Amendment cases," which "were not meant to suggest a law trapped in amber." *Id.* at 691. In fact, *Rahimi* stated explicitly that the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 692. And the *Rahimi* majority rejected Justice Thomas's dissenting view that Section 922(g)(8) ran afoul of Second Amendment tradition because "[n]ot a single historical regulation justifies the statute at issue." *Id.* at 747. Put simply, defendant's complaint about the absence of a "historical twin" runs counter to the Supreme Court's constitutional framework. *Id.* at 692 (quoting *Bruen*, 597 U.S. at 30).

History is replete with examples of groups who were disarmed because— like undocumented noncitizens—they were not members of our political

community and/or could not be trusted to obey our laws. Catholics, non-conformist Protestants, Moravians, Native Americans, political dissidents before and during the Revolutionary War, British loyalists, and others who refused to swear allegiance to our burgeoning democracy: each group was disarmed because the government did not trust its members to adhere to our legal code. *See* Br. 29-38. Defendant cannot reasonably contend that he did not fall within an analogous class of people when he possessed a firearm on June 1, 2020, at which time his very presence in this country was unlawful.

Defendant critiques loyalty laws as an analogous tradition on the purported grounds that British loyalists were "perceived as dangerous," whereas, in his view, "undocumented individuals in 2024" are not. Rsp. Br. 24. But defendant ignores that Section 922(g)(5)(A) was enacted to disarm "presumptively risky people" and "suppress armed violence." *United States v. Meza-Rodriguez*, 798 F.3d 664, 673 (7th Cir. 2015) (citing *United States v. Yancey*, 621 F.3d 681, 683-84 (7th Cir. 2010)); *see also* S. Rep. No. 90-1501 at 22 (1968). As this Court has previously recognized, unauthorized noncitizens are one such group, who live largely "'outside the formal system of registration, employment, and identification, [and] are harder to trace and more likely to assume a false identity'" and have "an interest in eluding law enforcement." *Meza-Rodriguez*, 798 F.3d at 673 (quoting *United States v. Huitron-Guizar*, 678 F.3d 1164, 1170 (10th Cir. 2012)). Defendant concedes that Congress's purpose

in enacting the Omnibus Crime Control and Safe Streets Act of 1968 and the Gun Control Act of 1968 focused "specifically on matters of loyalty by non-citizen residents of the United States." Rsp. Br. 31. The purpose in disarming undocumented noncitizens, therefore, closely tracks the rationale for disarming those previously suspected of British allegiance.

Defendant dismisses the historical disarmament of religious and ethnic minorities as "bigoted and racist." Rsp. Br. 22. But, as noted in the government's opening brief, "to fully understand the scope of the regulatory authority the Framers thought they had, one must actually consider the gun laws they *did* pass, even if we would reject those laws (perhaps for other constitutional reasons) today." Joseph Blocher & Catie Carberry, Historical Gun Laws Targeting "Dangerous" Groups and Outsiders at 12-13, in NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Blocher, J. et al. eds.) (2023). And when considered solely for the purpose of the historical inquiry required by *Bruen*, these laws nonetheless "reveal conclusively the scope of governmental power that was understood to exist at the time the Second

Amendment was adopted." *Atkinson v. Garland*, 70 F.4th 1018, 1035 (7th Cir. 2023) (Wood, J., dissenting).[2]

Defendant does not contest that those outside the political community traditionally were not allowed firearms, but instead submits that undocumented noncitizens do not constitute an analogous group, since they are included in "census data." Br. 25. But citizenship—not census data—dictates the polity, as the Supreme Court has said explicitly. *Cabell v. Chavez-Salido*, 454 U.S. 432, 438-40 (1982) (observing that "citizenship" is a required part of "membership in the political community" and that "[a]liens are by definition . . . outside of this community."); *see also United States v. Singh*, 979 F.3d 697, 724 (9th Cir. 2020) ("those unlawfully present [in the United States] . . . are neither citizens nor members of the political community").

Purpose aside, defendant argues that the burden inflicted by Section 922(g)(5)(A) is greater than that which its historical analogues imposed, since

---

[2] Defendant also contends laws prohibiting the sale of firearms to Native Americans are not sufficiently analogous because they only prohibited the sale rather than "possession" by Native Americans. Br. 13. But of course, prohibiting the sale (or repair) of firearms was a disarmament measure in the 1700s when firearms were far less available than they are today. *See United States v. Gates*, No. 22-CR-397, 2023 WL 5748362, at *8 (N.D. Ill. Sept. 6, 2023) (upholding constitutionality of Section 922(g)(1) after observing that "[m]odern firearms can fire multiple rounds without reloading, whereas most guns available in 1791 'could not fire more than one shot without being reloaded'" and "[m]odern firearms manufacturers can produce firearms at greater volumes than those in 1791") (quoting *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 410 (7th Cir. 2015)). Moreover, *Rahimi* found going armed and surety laws sufficient analogues to 922(g)(8) even though neither of those banned possession. 602 U.S. at 698.

the statute acts as a "permanent and total ban on firearm possession." Br. 33. As a factual matter, that is not so: the characteristics that trigger disarmament under Section 922(g)(5)(A)—being a noncitizen, unlawfully present in the United States—are not inherently permanent conditions. And, moreover, Congress permits noncitizens who are in the country lawfully to possess firearms under certain circumstances. *See, e.g.,* 18 U.S.C. §§ 922(y)(2) and (y)(3).

In any event, even for undocumented noncitizens whose status never changes, the burden is analogous to those imposed historically. For instance, defendant argues that "British loyalist dispossession laws"—which he concedes "were in fact prominent throughout the colonies during the Revolutionary Era"—were not a "permanent firearms ban," given the existence of loyalty oaths that permitted opting out of the class. Rsp. Br. 26, 35. But that those who *took* the oath could possess firearms is irrelevant in comparing the burden imposed by Section 922(g)(5)(A), because oath takers were—by definition—not members of the untrustworthy class of people who the government deemed risky. Noncitizens unlawfully in the country are. And while some undocumented noncitizens might later gain citizenship or lawful residence—and the right to possess a firearm with it—British loyalists and other suspect class members (Catholics, outspoken critics, etc.) who refused to swear allegiance to the new Republic had no such hope. In that sense, the

7

burdens are identical. In any event, *Rahimi* counsels that no one historical analogue need be a "dead ringer" for Section 922(g)(5)(A); rather, all relevant traditions—including the disarmament of members outside the political community—should be viewed "together" to discern the full scope of permissible firearm regulation. 602 U.S. at 698.

When "taken together," as *Rahimi* commands, the many analogues submitted by the government confirm that Section 922(g)(5)(A)'s ban on firearm possession by undocumented noncitizens fits neatly within our tradition of disarming those who fall outside our political community and who cannot be trusted to abide by our laws. *Id.* That is especially true when accounting for the "unprecedented societal concerns" and "dramatic technological changes" that prompted Congress's enacting of Section 922(g)(5)(A)—concerns that *Bruen* cautioned "require a more nuanced approach," 587 U.S. at 27. *See Huddleston v. United States*, 415 U.S. 814, 824 (1974) (by the 1960s, Congress was facing "the widespread traffic in firearms," "their general availability," and the "ease with which firearms could be obtained").

Indeed, every federal court of appeals to consider the constitutionality of Section 922(g)(5)(A), including this one, has found it constitutional. And the Fifth Circuit recently joined the Sixth and Eighth Circuits in determining that Section 922(g)(5)(A) remains constitutional after *Bruen*. *See United States v.*

*Medina-Cantu*, 113 F.4th 537 (5th Cir. Aug. 27, 2024) (per curiam);[3] *see also United States v. Sitladeen,* 64 F.4th 978 (8th Cir. 2023) (holding Section 922(g)(5)(A) constitutional because undocumented noncitizen was not part of "the people" and therefore had no Second Amendment right to possess a firearm); *United States v. Rangel-Tapia*, No. 23-1220, 2024 WL 966385 (6th Cir. Mar. 6, 2024) (finding no plain error in an as-applied challenge to Section 922(g)(5)(A) where no federal court of appeals has declared Section 922(g)(5)(A) unconstitutional either before or after *Bruen*).

As the government argued in its opening brief, *Meza-Rodriguez* was decided without the benefit of *Bruen* and *Rahimi*'s repeated use of "Americans" and "citizens" to describe the scope of the Second Amendment. *See Bruen*, 597 U.S. at 8-9, 26, 29, 31-32, 38, 70, 71, 78; *Rahimi*, 602 U.S. at 691, 700, 702, 709, 752. This Court should overturn *Meza-Rodriguez* and find noncitizens unlawfully in the country are not part of "the people" granted the right to

---

[3] In *Medina-Cantu*, the Fifth Circuit determined that neither *Bruen* nor *Rahimi* abrogated its prior circuit precedent in which it held that noncitizens unlawfully present in the United States are not part of "the people" in the Second Amendment. *See United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011).

possess firearms.[4] But even if this Court declines to do so, history and tradition

supports Congress's ability to disarm undocumented noncitizens under Section

922(g)(5)(A).

## II. The District Court Erred in Deeming Section 922(g)(5)(A) Unconstitutional As-Applied to Defendant, and No Court of Appeals Has Endorsed Its Novel Approach.

The district court erred in deeming Section 922(g)(5)(A) unconstitutional

as-applied to defendant, and its rationale showcases why as-applied challenges

are improper—and unworkable—in this context.

As set forth in the government's opening brief, history supports the

legislature's ability to disarm categories of risky individuals, and there are no

---

[4] *Meza-Rodriguez* remains an outlier. 798 F.3d at 666-73. Prior to *Meza-Rodriguez*, the Fourth, Fifth, and Eighth Circuits determined that noncitizens unlawfully in the country were not part of the people granted the right to possess a firearm under the Second Amendment. *See United States v. Carpio-Leon,* 701 F.3d 974 (4th Cir. 2012); *Portillo-Munoz,* 643 F.3d at 442; *United States v. Flores,* 663 F.3d 1022 (8th Cir. 2011) (per curiam). Post-*Bruen*, the Fifth and Eighth Circuits have upheld their prior circuit precedent. *See Medina-Cantu,* 113 F.4th at 539; *Sitladeen,* 64 F.4th at 987. Also prior to *Meza-Rodriguez*, the Tenth Circuit assumed, without deciding, that noncitizens unlawfully in the country are part of the people, but upheld Section 922(g)(5)(A) using the now-inapplicable intermediate scrutiny test. *Huitron-Guizar,* 678 F.3d at 1169. This Court was the first to extend Second Amendment protections to *some* unauthorized noncitizens. But since *Meza-Rodriguez* was decided in 2015, not a single court of appeals has followed suit. The Second, Ninth, Tenth, and Eleventh Circuits have also assumed, without deciding, that noncitizens unlawfully in the country are part of the people. *See United States v. Perez,* 6 F.4th 448 (2d Cir. 2021); *United States v. Torres,* 911 F.3d 1253 (9th Cir. 2019); *United States v. Jimenez-Shilon,* 34 F.4th 1042 (11th Cir. 2022). The Ninth Circuit also upheld 922(g)(5)(B) by assuming, without deciding, that the Second Amendment extends to nonimmigrant visa holders, but also writing, "nonimmigrant aliens, like those unlawfully present, are neither citizens nor members of the political community." *Singh,* 979 F.3d at 724.

exceptions for individual members who otherwise possess virtuous traits. Br. 45-47; *see also Rahimi*, 602 U.S. at 698 ("[W]e do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse"). Any such individual (as-applied) determinations would yield disparate, ad hoc results, and—if the district court's approach were sanctioned—generate notice and vagueness concerns in virtually every case.

According to the government's evidence, defendant used a semi-automatic pistol to fire seven bullets at a passing car on a city street, and he would have fired additional shots at a second car if his gun had not jammed when he pointed and pulled the trigger again—all of which was captured on video. *See* R. 46, 48. Defendant took these actions after sustaining misdemeanor convictions for reckless conduct (two of them), obstructing identification, possession of a controlled substance, and driving on a suspended license. R. 11 at 3-9. Yet his guilt concerning Section 922(g)(5)(A)—a status-based (possession) crime—depends on none of these aggravating characteristics. Rather, Section 922(g)(5)(A) disarms defendant because he falls within a class of persons, noncitizens unlawfully in the country, who are outside the political community and, by virtue of their unlawful presence in the United States, cannot be trusted to obey the law. History and tradition

support Congress's authority to enact such categorical ban, and this Court should hold as-applied challenges impermissible.

Even if as-applied challenges to Section 922(g)(5)(A) were to be allowed, the methodology employed by the district court is not sensible and—even under its own test—the judgment should be reversed. In the district court's view, because suspected British loyalists could possess a firearm after taking a loyalty oath, every Section 922(g)(5)(A) defendant is entitled to an "individualized assessment" to determine whether he is "so 'untrustworthy' or 'dangerous' that [he] should be barred from possessing a weapon." RSA 6. As pointed out in the government's opening brief, loyalty oaths served to distinguish between those who fell within a prohibited class that was disarmed and those who did not; loyalty oaths, therefore, offer no sound basis for permitting as-applied challenges for those who fall *within* the class. Br. 47. Moreover, the district court's construct permits judges to substitute their own judgment for that of Congress, and it effectively gives courts permission to annul a Section 922(g)(5)(A) charge for reasons that have nothing to do with a defendant's membership in that untrustworthy, prohibited class. As Judge Wood forecasted in *Atkinson*, enabling such case-specific exemptions from a generally applicable criminal law would create "an arbitrary patchwork of decisions—as far from the rule of law as one could imagine." 70 F.4th at 1027 (Wood, J., dissenting).

This case exemplifies that concern. Despite defendant's criminal history (which included crimes of dishonesty, reckless behavior, and drug possession) and offense conduct that, by any rational measure, was brazen, violent, and gravely dangerous, the district court deemed defendant a person so trustworthy and non-threatening that, in its view, any law seeking to dispossess him of a firearm violates his Second Amendment rights. RSA 7. In reaching that result, the court made multiple reversible errors.

First, it found dispositive that defendant—charged with violating Section 922(g)(5)(A), not (g)(1)—had not previously been convicted of a "felony, a violent crime, or a crime involving the use of a weapon." *Id.* In other words, the court assessed his criminal history in the context of a statute, Section 922(g)(5)(A), where such history is irrelevant, and, even then, it failed to account for five separate convictions that plainly show defendant is not a trustworthy adherent to the law.

Second, without even holding an evidentiary hearing, the court wrongly concluded that the circumstances of defendant's arrest were "non-violent." RSA 7. In doing so, the court ostensibly ignored the video evidence, submitted with the government's response to defendant's motion to dismiss, which renders that finding clearly erroneous. *See* R. 46 at 4, 46-1, 48. Moreover, in reaching that conclusion, the court accepted as true defense counsel's representation—

not supported by any evidence or affidavit[5]—that defendant "used the gun solely for self-protection and protection of property during a time of documented civil unrest." RSA 7. Even if that had been defendant's motivation for firing seven bullets into traffic, his subjective intent on that occasion does not establish that he poses no risk to the public.

Finally, the court improperly considered defendant's behavior while on pretrial release—that is, conduct occurring *after* the date the indictment alleged he unlawfully possessed a firearm. RSA 2, 7 (lauding defendant for adhering to his bond conditions, providing Pre-Trial Services with accurate employment information, and not triggering any "new arrests or outstanding warrants" while on release). Logically, defendant's behavior after the commission of his crime is not relevant to whether he was "trustworthy" or "dangerous" on the date of he committed his status-based offense.

On appeal, defendant cites no legal authority in support of the district court's as-applied methodology. *See* Rsp. Br. 40-41. Instead, he offers additional self-serving factual representations, which were never found by the district court, to bolster the court's erroneous conclusion that defendant was not behaving dangerously on the date of his arrest. Rsp. Br. 41. For instance,

---

[5] In fact, the affidavit submitted by defendant is five paragraphs long and establishes only the length of time that defendant has been in the United States and the fact that he said the pledge of allegiance every day while in middle school. R. 71-1.

14

he asserts that, in the video, he was "not shooting at a random car" but merely "fir[ing] warning shots" at people who "had broken into the neighborhood tire shop earlier that night." *Id.* Likewise, he claims that police "told" him "and his neighbors" to "arm themselves," in light of "the danger that enveloped Chicago." *Id.* Again, such facts were never found by the district court and contrary to his suggestion on appeal, in the district court, defense counsel conceded that defendant's purported interaction with police occurred after he was in possession of the firearm. *See* R. 43 at 4-5. To the extent his offense conduct is relevant, it plainly supports a finding that he is dangerous and may constitutionally be disarmed. *See* R. 48 (video of defendant's public shooting).

At bottom, defendant was unlawfully in the country at the time of his arrest, and he is among the class of individuals that Congress prohibited from possessing firearms. The district court found Section 922(g)(5)(A) to be consistent with this nation's history and tradition of disarming non-citizens and untrustworthy adherents to the law. Yet the district court nullified Congress's judgment, and absolved defendant of criminal liability, on the basis of arbitrary criteria that it grossly misapplied. The district court's order should be reversed, and defendant's Section 922(g)(5)(A) charge should be reinstated.

### III.    The Government's Appendix is Not Deficient, and Summary Affirmance Would Be Inappropriate and Contrary to Law.

This Court should reject defendant's claim that the government's appendix violates Circuit Rule 30 and somehow compels summary affirmance. Each of defendant's contentions is wholly without merit.

Most fundamentally, defendant is simply incorrect that the government's appendix contains new "evidence," not presented to the district court. The government provided copies of the historical sources it cites as a courtesy, for the Court's ease of reference, not because any Rule required their inclusion in an appendix. And while the majority of these sources were, in fact, cited to the district court,[6] there is nothing improper about citing additional sources on appeal. *See United States v. Otradovec*, 72 F.4th 794, 796 (7th Cir. 2023) ("Nothing prevents [an appellant] from amplifying and elaborating on appeal a properly preserved argument."). Indeed, it is well settled that the historical sources relevant to the *Bruen* analysis are not "evidence" at all.  As

---

[6] *Compare* R. 90 at 14 (citing Massachusetts and Virginia laws forbidding the arming of Native Americans) and R. 96 at 18 (defendant citing laws of New Netherland and New Plymouth prohibiting the sale of firearms to Native Americans), *with* G. App. 60-68, 81-82 (laws prohibiting the sale of arms to Native Americans); *compare* R. 90 at 13-15 (citing Amar, Churchill, Cornell & DeDino, and Schwartz), *with* G. App. 86-190 (citing the same); *compare* R. 74 at 5 (the district court citing early state constitutions limiting the right to bear arms to citizens), *with* G. App. 191-310 (citing the same); *compare* R. 90 at 17-18, 20 (citing historical sources of English disarmament laws), *with* G. App. 311-317 (citing the same); *compare* R. 90 at 14 n.7, 21 n.9 (citing historical sources concerning colonial America disarmament laws), *with* G. App. 318-364, 422-434 (citing the same); *compare* R. 90 at 20-21 (citing Revolutionary War sources), *with* G. App. 435-474 (citing the same).

the *Bruen* Court made clear, it is the "job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies." 597 U.S. at 25 n.6. And the Supreme Court expressly described its test as a "legal inquiry," not a fact question requiring the submission of evidence. *Id.* (internal citation omitted).

Even before *Bruen*, it was well established that the "interpretation" of a constitutional or statutory provision "is a question of law." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 369 (1995). That is so even when interpretation involves historical work or otherwise depends in part on "legislative facts"—that is, facts that bear on "the formulation of a legal principle or ruling by a judge or a court" as distinct from "the facts of the particular case." Fed. R. Evid. 201 advis. comm. note. The Supreme Court, for example, has relied on history and tradition in interpreting a range of constitutional provisions, including Article II, *see Zivotofsky v. Kerry*, 576 U.S. 1, 23-28 (2015); Article III, *see TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021); the Establishment Clause, *see March v. Chambers*, 463 U.S. 783, 786-92 (1983); the Free Speech Clause, *see Houston Community College System v. Wilson*, 142 S. Ct. 1253, 1259-1260 (2022); the Due Process Clause, *see Burnham v. Superior Court*, 495 U.S. 604, 610-16 (1990) (plurality opinion); and the Confrontation Clause, *see Crawford v. Washington*, 541 U.S. 36, 42-50 (2004). And "courts, in construing a statute, may with propriety recur to the history of the times when it was passed." *Leo*

17

*Sheep Co. v. United States*, 440 U.S. 668, 669 (1979) (citation omitted). Yet in all those contexts, courts treat the inquiry into history as a legal question, not a factual question. Courts naturally follow the same approach when analyzing the Second Amendment. *See United States v. Bullock*, No. 23-60408, 2024 WL 4879467 (5th Cir. 2024) (unpublished) ("Because the Second Amendment analysis is a legal inquiry into the text and history related to the relevant regulation, the government may provide additional legal support for its arguments on appeal."); *see also Teter v. Lopez*, 76 F.4th 938, 946-67 (9th Cir. 2023) (vacated for rehearing en banc) ("[T]he historical research required under *Bruen* involves issues of so-called "legislative facts"—those "which have relevance to legal reasoning and the lawmaking process," such as "the formulation of a legal principle or ruling by a judge or court"—rather than adjudicative facts, which "are simply the facts of the particular case." (citations omitted).[7]

---

[7] In addition, as the Supreme Court explained in discussing the common-law rule that treated questions of foreign law as questions of fact, treating *Bruen*'s historical inquiry as a question of fact would produce "a number of undesirable practical consequences." *Animal Science Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018) (citation omitted). The relevant historical material would have to be established in each case "in accordance with the rules of evidence," and appellate review would be "deferential and limited to the record made in the trial court." *Id.* (citation omitted). As a result, the meaning of the Second Amendment could vary from case to case depending on the particular record the parties compiled in the district court.

Because applying *Bruen* involves answering a question of law, a court of appeals may even rely on legal arguments that are raised for the first time on appeal. "Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992). And "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties." *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 99 (1991). In *Bruen* itself, the Supreme Court evaluated a broad range of potential historical analogies proffered by the State of New York and its amici, without pausing to consider whether New York had invoked the same analogies in the lower courts. *See* 597 U.S. at 32-71. Put simply, there is nothing unusual or improper about a party citing additional legal authority on appeal, or in providing copies of that authority in an appendix for the Court's convenience.

Defendant's other gripes also miss the mark. Defendant complains that two district court orders should have been included in the government's appendix because the district court "presumed familiarity" with at least one of them in its order dismissing the indictment. Rsp. Br. 6. But the government does not seek reversal of those orders, they are part of the public record (readily available on the docket), and Circuit Rule 30 encourages litigants to be judicious in discerning the contents of any filed appendix. *See* Cir. R. 30(e). Moreover, if

defendant finds them pertinent on appeal, Circuit Rule 30(e) contemplates that he may attach them in a supplemental appendix of his own, exactly as occurred here. The Rule likewise permits appellants to file a supplemental appendix, if ultimately necessary. In short, there was no requirement to attach the two orders about which defendant complains, and if it was error not to do so, it was unintentional, harmless, and could have been corrected if necessary.

Lastly, defendant complains that the government's brief includes a photograph of him firing a pistol at passing traffic. Rsp. Br. 6 (citing Br. 4). Yet he cites no rule prohibiting the inclusion of photographs (nor charts, summaries, etc.) in appellate briefs—a common practice in this Circuit—where, as here, the factual information is contained in the record. Here, both the photograph at issue, and the surveillance footage from which it was taken, were before the district court and are available for this Court's viewing. *See* R. 46 at 4, 46-1, 48.

## CONCLUSION

This Court should reverse the district court's order dismissing the indictment and remand for further proceedings.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

BRIAN J. KERWIN
Assistant United States Attorney
Chief of Appeals, Criminal Division

By:    */s/ Margaret A. Steindorf*
MARGARET A. STEINDORF
Assistant United States Attorney

## RULE 32 CERTIFICATION

I hereby certify that this brief complies with the type volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32(c) because it contains 4,938 words. It complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and Circuit Rule 32(b), because it has been prepared using the Microsoft Office Word proportionally-spaced typeface of Century Schoolbook with 13-point font in the text and 12-point font in the footnotes.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:        /s/ *Margaret A. Steindorf*
MARGARET A. STEINDORF
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois
(312) 353-3540

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2024, I electronically filed the foregoing Reply Brief of the United States with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted,

By:    /s/ *Margaret A. Steindorf*
MARGARET A. STEINDORF
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois
(312) 353-3540