In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 24-1534

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

HERIBERTO CARBAJAL-FLORES,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cr-00613-1 — **Sharon Johnson Coleman**, *Judge*.

———————————

ARGUED JANUARY 22, 2025 — DECIDED JULY 16, 2025

———————————

Before ROVNER, BRENNAN, and ST. EVE, *Circuit Judges*.

BRENNAN, *Circuit Judge*. Chicago Police arrested Heriberto
Carbajal-Flores after he repeatedly fired his pistol in a city
street. A grand jury later indicted him for possessing a firearm
as an illegal alien in violation of 18 U.S.C. § 922(g)(5)(A). We
must decide whether that federal law comports with the Second Amendment.

## I

Carbajal-Flores was born in Mexico. His mother brought him to the United States in 2002 when he was ten years old. Since then, he has resided in Chicago. Carbajal-Flores now claims the status of a lawful permanent resident. But at all times relevant to this appeal, he was an illegal alien.

On the night of June 1, 2020, during a summer of unrest across the country, a police-observation camera captured video of Carbajal-Flores in Chicago's Little Village neighborhood shooting a pistol seven times at a passing car. Surveillance showed that he later tried to shoot at another car, but his firearm jammed. Based on this footage, officers arrested him.

Carbajal-Flores justifies the shooting, explaining that he was protecting his community from a perceived threat. He claims to have merely fired warning shots toward individuals he believed looted a neighborhood store. In the government's view, Carbajal-Flores took to the streets amid the civil unrest and, without provocation, indiscriminately fired his weapon at passing cars.

Either way, Carbajal-Flores does not dispute that he possessed a firearm that night. And, at the time, he was unlawfully present in the United States. A grand jury thus indicted him for violating 18 U.S.C. § 922(g)(5)(A), which forbids "an alien" who "is illegally or unlawfully in the United States" from possessing a firearm.

Carbajal-Flores moved to dismiss the indictment, challenging the constitutionality of § 922(g)(5)(A), as applied to him, on Second Amendment grounds. *See* FED. R. CRIM. P. 12(b)(3)(B). The district court denied the motion and cited *United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015), in

which this court upheld the same statute in the face of a similar constitutional challenge.

The Supreme Court then issued its landmark Second Amendment decision, *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). There, the Court clarified the proper framework courts must apply when analyzing Second Amendment challenges to firearm regulations. The test is "rooted in the Second Amendment's text, as informed by history." *Id.* at 19. Following *Bruen*, Carbajal-Flores again moved to dismiss the indictment, arguing § 922(g)(5)(A) violated the Constitution under the text-and-history test. The district court was unpersuaded, concluding that the law is consistent with our Nation's tradition of regulating firearms.

This court then decided *Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023). In that case, we offered district courts and parties guidance on how to analyze challenges to § 922(g)(1)—which bars felons from possessing firearms—under *Bruen*'s framework. *See id.* at 1023–24. Carbajal-Flores, seeing an opportunity, moved to dismiss the indictment once more and cited *Atkinson* for support. He urged the district court to hold § 922(g)(5)(A) unconstitutional both on its face and as applied to him.

The district court declined Carbajal-Flores's first request and deemed the statute facially constitutional. Applying *Bruen*'s text-and-history framework, it concluded that the plain text of the Second Amendment presumptively secures for illegal aliens the right to possess firearms. But it held that the government rebutted the presumption by identifying a historical tradition of disarming "untrustworthy adherents to the law," including British loyalists at the time of the

Founding. To the court, that tradition justified disarming illegal aliens today.

Although the district court rejected Carbajal-Flores's facial challenge, it found merit in his as-applied challenge. Laws disarming British loyalists did not apply to those willing to pledge their loyalty to the nascent American government. Once an individual disclaimed his loyalty to the British government, he was no longer considered dangerous or untrustworthy and could therefore possess a firearm. From this historical exemption, the district court reasoned that Congress may disarm only untrustworthy or dangerous illegal aliens. It then concluded that Carbajal-Flores is a trustworthy adherent to the law because, among other things, he is employed and has no felony convictions. So, as applied to him, § 922(g)(5)(A) violated the Second Amendment.

The government appeals, contesting the district court's dismissal of the indictment.

## II

The Second Amendment secures "the right of the people to keep and bear Arms." U.S. CONST. amend II. In *District of Columbia v. Heller*, the Supreme Court held that the right belongs to individuals, irrespective of their ties to the military. 554 U.S. 570, 595 (2008). And the Court has since confirmed that the people's freedom to carry arms is not a "second-class right." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion). It ranks instead "among the fundamental rights necessary to our system of ordered liberty." *United States v. Rahimi*, 602 U.S. 680, 690 (2024) (internal quotation omitted).

The protections contained in the Second Amendment have their limits, though. *Heller*, 554 U.S. at 626. The government maintains some latitude to regulate who may possess firearms, *Rahimi*, 602 U.S. at 702, what firearms they may possess, *Heller*, 554 U.S. at 625, and where they may possess them. *Bruen*, 597 U.S. at 30; *see also Range v. Att'y Gen.*, 124 F.4th 218, 225 (3d Cir. 2024) (en banc) (listing the ways in which firearms are regulated).

But like the constitutional right itself, the government's power to regulate has its limits. The Supreme Court in *Bruen* set out the now-familiar test for evaluating whether a firearm restriction exceeds those limits. To begin, a court must interpret the Second Amendment's plain text. When the text covers an individual and his conduct, "the Constitution presumptively" offers protection. *Bruen*, 597 U.S. at 24; *United States v. Williams*, 113 F.4th 637, 649–50 (6th Cir. 2024).

The government may rebut that presumption, however, by persuading the court that the regulatory burden "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. This requires reasoning by analogy. A modern regulation with "relevantly similar" historical counterparts will survive scrutiny. *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29). The task does not demand identifying "historical twin[s]" or "dead ringer[s]." *Bruen*, 597 U.S. at 30 (emphasis omitted). The government must instead show only that its modern regulation conforms to "the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. Courts rely on two metrics when assessing the strength of analogies. *Bruen*, 597 U.S. at 29. We compare "how" the challenged regulation burdens the right to bear arms to the way in which the historical precursors did. And

we consider whether the reasons for regulating are similar—that is, we ask "why" the government burdened the right now and then. The closer the fit, the more likely the challenged law "fall[s] within a permissible category of regulations." *Rahimi*, 602 U.S. at 692.

A

We begin with the Second Amendment's text. Nobody disputes that Carbajal-Flores's weapon, a .25 caliber semi-automatic pistol, is an arm. *Heller*, 554 U.S. at 581 (defining "arms as any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." (internal quotations omitted)). Rather, the parties argue about whether Carbajal-Flores, an illegal alien, is among "the people" that the Amendment protects. According to the government, he is not because that term covers only American citizens.

The Supreme Court has not squarely addressed this textual question. But it stated in *Heller* that "'[t]he people' seems to have been a term of art employed in select parts of the Constitution" to "refer[] to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 554 U.S. at 580 (internal quotations omitted). The Court imported that definition from *United States v. Verdugo-Urquidez*, a Fourth Amendment decision. 494 U.S. 259, 265 (1990). To be sure, the Court cautioned that its "textual exegesis" in *Verdugo-Urquidez* was "by no means conclusive." *Id*. Nonetheless, this court relied in part on that definition in *Meza-Rodriguez* to conclude that some illegal aliens are among "the people" presumptively entitled to Second Amendment protections. 798 F.3d at 670–72; *see also United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044–45 (11th Cir.

2022) (collecting Founding-era dictionary definitions that provide some support for the *Verdugo-Urquidez* definition).

This court's holding in *Meza-Rodriguez* positions us as an outlier among our fellow circuits. Some courts of appeals have concluded that illegal aliens are categorically excluded from "the people." *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011); *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) (per curiam); *see also United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) (holding "that the Second Amendment right to bear arms does not extend to *illegal* aliens"). Still others have assumed without deciding that illegal aliens fall within the scope of the Second Amendment's protections. *United States v. Perez*, 6 F.4th 448, 453 (2d Cir. 2021); *United States v. Torres*, 911 F.3d 1253, 1261 (9th Cir. 2019); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012); *Jimenez-Shilon*, 34 F.4th at 1045–46.

*Meza-Rodriguez* predates the Supreme Court's decisions in *Bruen* and *Rahimi*, which are part of a sea change in Second Amendment jurisprudence. Portions of this court's decision were no doubt abrogated by the intervening precedent—specifically, those portions in which we engaged in an interest balancing inquiry to uphold § 922(g)(5)(A), as opposed to relying solely on text and history. *Meza-Rodriguez*, 798 F.3d at 672–73. But the Supreme Court in *Bruen* said "nothing about who may lawfully possess a firearm." 597 U.S. at 72 (Alito, J., concurring). And in *Rahimi* it all but passed over the threshold textual inquiry—perhaps because nobody really disputed that the Second Amendment presumptively covered the individual and conduct at issue there. *See* 602 U.S. at 751–52 (Thomas, J., dissenting). So, no intervening Supreme Court precedent requires us to reassess here whether some illegal

aliens are among "the people." *See United States v. Medina-Cantu*, 113 F.4th 537, 539 (5th Cir. 2024) (per curiam) (concluding that neither *Bruen* nor *Rahimi* "unequivocally abrogate[d]" that court's earlier holding that illegal aliens were not among "the people"), *cert. denied*, 145 S. Ct. 1318 (2025); *United States v. Sitladeen*, 64 F.4th 978, 985 (8th Cir. 2023) (same but only post-*Bruen*).

In any event, doing so would not alter the outcome here. Even if the plain text of the Second Amendment presumptively protects Carbajal-Flores because he falls within "the people," a long tradition exists of disarming individuals, like illegal aliens, who have not sworn allegiance to the sovereign. We turn to that issue now.

**B**

Whether § 922(g)(5)(A) is consistent with the Second Amendment depends on whether the law adheres to "our regulatory tradition." *Rahimi*, 602 U.S. at 692. Courts must proceed with caution when examining historical evidence, as "not all history is created equal." *Bruen*, 597 U.S. at 34.

The strongest evidence that a modern federal law accords with the historical understanding of permissible firearm regulations comes from around the time of the Second Amendment's adoption in 1791. *Id.* That said, the Amendment "codified a pre-existing right" to bear arms, so the English common-law tradition informs our analysis. *Heller*, 554 U.S. at 592 (emphasis omitted); *see also Rahimi*, 602 U.S. at 693–94 (examining common-law sources); *Bruen*, 597 U.S. at 35 (cautioning that "[a] long, unbroken line of common-law precedent … is far more likely to be part of our law than a short-lived, 14th-century English practice"). Post-ratification

history may help illuminate the scope of the government's authority to regulate firearms as well. *Heller*, 554 U.S. at 605. The most compelling evidence, though, will be that of a consistent regulatory practice from ratification onward. *Bruen*, 597 U.S. at 35–36; *see also Vidal v. Elster*, 602 U.S. 286, 323 (2024) (Barrett, J., concurring in part) ("A course of deliberate practice might liquidate ambiguous constitutional provisions."); William Baude, *Constitutional Liquidation*, 71 STAN. L. REV. 1, 16–21 (2019) (same).

We therefore consider whether common-law, Founding-era, and, to a lesser extent, post-ratification sources support § 922(g)(5)(A)'s ban on illegal aliens possessing firearms.

## 1

In the English tradition, one's alien status carried with it a smaller basket of rights. Blackstone, "who exerted considerable influence on the Founders," *Reid v. Covert*, 354 U.S. 1, 26 (1957) (plurality opinion), distinguished between "aliens and natural-born subjects." 1 WILLIAM BLACKSTONE, COMMENTARIES *354. Natural-born subjects, as the label implies, were those "born within the dominions of the crown of England" and thus had an allegiance to the sovereign as a consequence of birth. *Id.* A natural-born subject's allegiance bound him to the King, and he received the sovereign's protection in exchange. *Id.* at *354, *359. Importantly, this status also guaranteed "a great variety of rights." *Id.* at *359; *see also Jimenez-Shilon*, 34 F.4th at 1047 (discussing the same).

An alien, on the other hand, was born outside the dominions of the Crown. His status afforded him fewer rights than those enjoyed by natural-born subjects. BLACKSTONE, *supra*, at *359. And an alien's rights could be conditioned on his

"allegiance to the laws and government." Patrick J. Charles, *Representation Without Documentation?: Unlawfully Present Aliens, Apportionment, the Doctrine of Allegiance, and the Law*, 25 BYU J. PUB. L. 35, 78 (2011). Early international law confirms that sovereigns wielded authority to limit benefits conferred upon foreigners. 1 M. DE VATTEL, THE LAW OF NATIONS § 213, at 102 (1797); *see also Jimenez-Shilon*, 34 F.4th at 1047 (discussing the same).

Aliens' rights were accordingly circumscribed in important ways at English common law. They could not, for example, hold land. *See, e.g.*, *M'Ilvaine v. Coxe's Lessee*, 6 U.S. (2 Cranch) 280, 297 (1805) (explaining "[t]he rule of the common law [was] that all persons may hold lands, except aliens" (emphasis omitted)). This prohibition on land ownership was indeed rooted in the doctrine of allegiance. As Blackstone explained, "[i]f an alien could acquire a permanent property in lands," he would "owe an allegiance, equally permanent with that property, to the king of England." BLACKSTONE, *supra*, at *360. But such an allegiance "would probably be inconsistent with that[] which he owe[d] to his own" sovereign. *Id.*

Relevant here, land and gun ownership were historically linked. "[T]he right to own guns in eighteenth-century England was statutorily restricted to the landed gentry." *Jimenez-Shilon*, 34 F.4th at 1046 (citing PATRICK J. CHARLES, ARMED IN AMERICA 51, 58 (2018)). This provides early evidence, then, that concerns over an alien's lack of allegiance to the Crown, which justified barring him from holding land, also warranted barring him from keeping arms. *See* Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 217 n.54 (1983) (discussing

the common-law tradition of disarming persons based on "alienage or untrustworthiness").

But an alien could overcome these impediments through naturalization. That process offered aliens a path to securing largely the same basket of rights afforded to natural-born subjects. *See* BLACKSTONE, *supra*, at \*362; VATTEL, *supra*, § 214, at 102. Naturalization required an alien to "take[] the oaths of allegiance and supremacy in the presence of the parliament." BLACKSTONE, *supra*, at \*362 (footnote omitted). Once he pledged his allegiance to the sovereign, he would be placed in almost "exactly the same state as if he had been born in the" dominions of the Crown. *Id.*; *see also* Patrick J. Charles, *The Plenary Power Doctrine and the Constitutionality of Ideological Exclusions: An Historical Perspective*, 15 TEX. REV. L. & POL. 61, 73 (2010) ("The entire basis of England's early immigration and naturalization laws were intertwined with the doctrine of allegiance."). So, like a natural-born subject, the naturalized alien could take an interest in land. James E. Pfander & Theresa R. Wardon, *Reclaiming the Immigration Constitution of the Early Republic: Prospectivity, Uniformity, and Transparency*, 96 VA. L. REV. 359, 378–79 (2010). And with landownership came the right to keep arms. *See, e.g.*, *Cross-Bows*, A NEW LAW-DICTIONARY (Giles Jacob ed., 8th ed. 1762) ("None shall shoot in, or keep any … Hand gun … but those who have Lands of" a certain value.).

The disarmament of Catholics confirms that the English tradition linked the right to bear arms with one's allegiance to the sovereign. The Second Amendment's predecessor, housed in the English Bill of Rights, guaranteed "the subjects which are Protestants" the right to "have arms for their defence, suitable to their conditions, and as allowed by law." 1 W. & M. c.

2, § 7 (1689). Because the right was limited to Protestants, Parliament was free to bar English Catholics from possessing firearms. And it did. *Id.* c. 15, § 3 (disarming "Papist[s] or reputed Papist[s]"); *see also Kanter v. Barr*, 919 F.3d 437, 457 (7th Cir. 2019) (Barrett, J., dissenting) (discussing the same).

Catholics were perceived as resident enemy aliens because they owed an allegiance to a foreign sovereign, the Pope. C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 722–23 (2009). That "they acknowledge[d] a foreign power, superior to the sovereignty of the kingdom," meant Catholics were not entitled to bear arms as "good subjects" were. *Id.* at 722 (internal quotation omitted). But that restriction could be removed by pledging allegiance to the Crown. After swearing the requisite oath, a Catholic could be trusted to possess firearms. *Id.* at 723.

All told, the English tradition establishes a historical pattern of disarming persons who lacked allegiance to the sovereign. Importantly, though, an individual could overcome that limitation by swearing an oath to the sovereign.

**2**

The English tradition continued through the colonial and Founding eras. On this side of the Atlantic, too, "it was well understood that the right to bear arms 'did not extend to all New World residents.'" *Jimenez-Shilon*, 34 F.4th at 1047 (quoting Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 140 (1994)).

To begin, bans and other constraints on slaves and Native Americans possessing firearms were, regrettably, commonplace. *See, e.g., id.*; Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*,

20 WYO. L. REV. 249, 250 (2020). The colonists did not consider either group to be citizens that possessed rights commensurate with English subjects. *Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment); MALCOM, *supra*, at 140–41. So, like aliens in England, slaves and Native Americans faced gun restrictions "'on the ground of alienage' or lack of allegiance to the" English sovereign. *Jimenez-Shilon*, 34 F.4th at 1047 (citing Kates, *supra*, at 217 n.54).

As an example, the New York Colony made it unlawful for "Indian[s]" and "Slave[s] to have or use any Gun or Pistoll." An Act for Preventing Suppressing and Punishing the Conspiracy and Insurrection of Negroes and Other Slaves (Dec. 10, 1712), *reprinted in* 1 THE COLONIAL LAWS OF NEW YORK 761, 766–67 (1894). And the Colony of Connecticut banned the sale of firearms and other "Instrument[s] of warre" "to the Indeans." An Act of October 25, 1644, *reprinted in* THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 111, 113–14 (J. Hammond Trumbull ed., 1850). So did the Colony of Virginia. An Act of March 2, 1642, *reprinted in* 1 A COLLECTION OF ALL THE LAWS OF VIRGINIA 238, 255 (William Waller Hening ed., 1823); *see also United States v. Duarte*, 137 F.4th 743, 765 nn.3–4 (9th Cir. 2025) (en banc) (Collins, J., concurring in the judgment) (collecting additional colonial statutes). These discriminatory laws would unquestionably fail to overcome constitutional scrutiny today. *See Kanter*, 919 F.3d at 458 n.7 (Barrett, J., dissenting). But they nonetheless illuminate a historical throughline of disarming people based on their allegiances—or lack thereof.

Disarmament was not, however, strictly tied to race. The colonies also prohibited white men who refused to swear an oath to the English sovereign from possessing firearms.

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 158 (2007); Adam Winkler, Gun Fight: The Battle Over the Right to Bear Arms in America 116 (2011).

Further in line with the English tradition, some colonies restricted Catholics' ability to keep arms. An Act for Disarming Papists, and Reputed Papists, Refusing to Take the Oaths to the Government (Mar. 1756), *reprinted in* 7 A Collection of All the Laws of Virginia 35, 35–39 (William Waller Hening ed., 1820); *see also* Winkler, *supra*, at 116 (citing a similar practice in Maryland). Here again, the prohibitions were premised on fears a person of that faith owed allegiance to the Pope. But "those Catholics willing to swear undivided allegiance to the sovereign enjoyed a right to keep arms" like any other English subject. Churchill, *supra*, at 157.

Concerns over one's loyalty to the Crown and the polity thus continued to drive firearm regulations. *See* Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. on Firearms & Pub. Pol'y 1, 21 (2004); *see also Kanter*, 919 F.3d at 457 (Barrett, J., dissenting) (explaining that the "confiscation of guns" helped "deal with the potential threat coming from armed citizens who remained loyal to another sovereign" (internal quotation omitted)). Still, relief was often possible as long as a person precluded from keeping arms was prepared to pledge an oath to the King.

British control over the colonies eventually gave way to revolutionary forces. Yet disarming people based on the doctrine of allegiance endured. Revolutionaries demanded that anyone who did not support the rebellion surrender his weapons. Winkler, *supra*, at 116. Indeed, the Continental

Congress recommended that each colonial legislature disarm all those "within their respective colonies, who are notoriously disaffected to the cause of America." 4 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789, at 205 (Worthington Chauncey Ford ed., 1906). And the colonies quickly acted on that recommendation. *See* Churchill, *supra*, at 159 n.49 (collecting resolutions). But consistent with earlier practices, those willing to pledge allegiance to the Revolution could retain their arms. WINKLER, *supra*, at 116.

In time, the Founders declared total independence from the Crown. At that point, "the shift of allegiance was complete," and the newly minted states began adopting the embedded practice of conditioning the right to bear arms on one's loyalty to the sovereign—now, each respective state. Churchill, *supra*, at 159; *see also Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment) ("Those refusing to swear allegiance to their states … lacked the right to keep and bear arms."). The Commonwealth of Pennsylvania, for example, passed the Test Act while the ink was still drying on the Declaration of Independence. That law "disarmed" any man over the age of eighteen who would not swear "allegiance to the Common-Wealth of Pennsylvania." An Act, Obliging the Male White Inhabitants of This State to Give Assurance of Allegiance to the Same (June 13, 1777), *reprinted in* THE ACTS OF THE GENERAL ASSEMBLY OF THE COMMON-WEALTH OF PENNSYLVANIA 36, 36–37 (1779). North Carolina passed a similar law. An Act to Amend an Act For Declaring What Crimes and Practices Against the State Shall Be Treason, and What Shall Be Misprision of Treason, and Providing Punishments Adequate to Crimes of Both Classes, and for Preventing the Dangers Which May Arise from Persons Disaffected to the State (1777), *reprinted in* THE ACTS OF ASSEMBLY OF THE STATE

OF NORTH CAROLINA 41, 43 (1778). So too did New Jersey. An Act for Constituting a Council of Safety (Sep. 20, 1777), *reprinted in* ACTS OF THE GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY 84, 90 (1777). In fact, shortly after the Nation's birth, "[a]t least six states enacted such laws" disarming non-associators. *Duarte*, 137 F.4th at 794 & n.10 (VanDyke, J., concurring in the judgment in part and dissenting in part) (collecting additional laws). And they did so based on the same underlying principle of allegiance. Churchill, *supra*, at 159–60.

The unfortunate practice of disarming slaves and Native Americans survived the Revolutionary War, confirming the Founders adhered to the tradition of barring groups deemed outside the polity from keeping arms. *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). But again, disarmament was not solely based on race. Aliens of all backgrounds, despite being free to "exercise sundry other civil rights" at the time, could not exercise "the right to bear arms." AKHIL AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 48 (1998). Some of the first state constitutions, moreover, extended arms-bearing protections only to "citizens." *See, e.g.*, PA. CONST. of 1790, art. IX, § 21; KY. CONST. of 1792, art. XII, § 23; Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 TEX. REV. L. & POL. 191, 208–09 (2006).

From the colonies to—most critically—the early Republic, governments consistently conditioned the ability to possess firearms on one's loyalty to the sovereign. People outside the polity were regularly disarmed unless and until they swore an oath of allegiance. This provides strong historical evidence that the Founders would have considered such regulations compatible with the Second Amendment.

**3**

Post-ratification understandings on the scope of the right to bear arms confirm the same. *See Heller*, 554 U.S. at 605 (analyzing 19th-century sources). Our discussion here is brief, though, as courts must beware of "giving postenactment history more weight than it can rightly bear." *Bruen*, 597 U.S. at 35.

Tellingly, early-19th-century American legal scholarship described the relationship between one's alien status and his accompanying rights as consistent with the common-law tradition in important ways. St. George Tucker explained that aliens in the United States were either aliens by birth or by election. 2 William Blackstone & St. George Tucker, Blackstone's Commentaries: With Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia app. 101 (1803). "Aliens by birth" included "all persons born out of the dominions of the United States, since the fourth day of July, 1776." *Id.* "Aliens by election," on the other hand, included "naturalized subjects of the crown of Great-Britain" that had not "since become actual citizens of the United States." *Id.* at app. 102.

Relevant here, aliens by birth were "generally subject to all the incapacities to which aliens [were] subject by the rules of the common law." *Id.* As explained already, that included the incapacity to keep and bear arms. But the Constitution vested Congress with authority to create uniform naturalization rules. U.S. Const. art. I, § 8, cl. 4. So, it was understood that an alien could secure the rights of citizenship—including the right to bear arms—after making "the requisite declarations of his intention to become a citizen, and to renounce for ever

all allegiance and fidelity to any foreign prince[] or state." BLACKSTONE & TUCKER, *supra*, at app. 100; *see also Bruen*, 597 U.S. at 70 (explaining the Second Amendment protects "all Americans" (internal quotation omitted)).

Other notable thinkers at the time spoke of the right to bear arms as belonging to citizens. *Jimenez-Shilon*, 34 F.4th at 1048 (citing 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1890, at 746 (1833)). Consistent with that view, additional states adopted constitutions well into the 19th century that protected the right only for those people. *See, e.g.*, MISS. CONST. of 1817, art. I, § 23; TENN. CONST. of 1870, art. I, § 26; Volokh, *supra*, at 209–13; *see also Heller*, 554 U.S. at 600–01 (accounting for post-ratification state constitutions).

All this provides additional evidence that a long tradition existed of linking the right to bear arms with one's allegiance to the sovereign. And the tradition extended to the period following the Second Amendment's adoption. *See Bruen*, 597 U.S. at 35–36 (explaining post-ratification practices have more persuasive value when they are consistent with longstanding practices).

### 4

That brings us back to the criminal law here, 18 U.S.C. § 922(g)(5)(A), and the question of whether it conforms to our Nation's regulatory tradition. Congress, in passing the law, decided to prohibit any "alien" who "is illegally or unlawfully in the United States" from possessing a firearm. *Id.* We conclude that the provision sits comfortably alongside the line of firearm regulations that came before it. To see how, consider the two metrics courts use for assessing "whether the

challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692.

We begin with "why" aliens have been precluded from possessing firearms then and now. As explained, governments have consistently conditioned the right to bear arms on one's allegiance to the sovereign. Allegiance serves as a mark of trustworthiness. *See Kanter*, 919 F.3d at 457–58 (Barrett, J., dissenting). And it shows one's willingness to accede to the terms of social order in exchange for the full benefits of citizenship. Aliens, as a matter of their status, have not yet affirmed their allegiance to the sovereign. That has uniformly served as the basis for disarming them. It serves as the basis for § 922(g)(5)(A)'s prohibition, too.

Compare also "how" governments have traditionally regulated firearms to how Congress has chosen to do so today. From the common law onward, aliens have historically been disarmed unless and until they swore an oath of allegiance to the sovereign. The way § 922(g)(5)(A) operates maps onto that tradition. The law precludes only illegal aliens—those who have necessarily forgone the naturalization process—from possessing firearms. But an alien who obtains citizenship by taking the oath of renunciation and allegiance, 8 U.S.C. § 1448, is entitled to keep and bear arms like every other law-abiding American. In other words, the same relief—pledging allegiance—exists today that has existed throughout history.

Section 922(g)(5)(A) is thus sufficiently analogous to many earlier firearm regulations. Because the law "comport[s] with the principles underlying the Second Amendment," we hold that it overcomes Carbajal-Flores's facial challenge. *Rahimi*, 602 U.S. at 692–93 (explaining such a challenge "requires a

defendant to establish that no set of circumstances exists under which the Act would be valid" (internal quotation omitted)).

## III

Carbajal-Flores argues that even if § 922(g)(5)(A) is facially constitutional, as we have now concluded, the law still operates in an unconstitutional manner as applied to him. In his view, our Nation's regulatory tradition supports disarming only dangerous and untrustworthy aliens. And because he is neither, he should be able to possess a pistol notwithstanding the general prohibition on aliens keeping arms. Recall that the district court agreed with Carbajal-Flores and dismissed the indictment.

After *Bruen*, our circuit has not yet decided whether a defendant can lodge an as-applied challenge to any subsection of § 922(g). In *United States v. Gay*, we "assume[d] for the sake of argument that there [was] *some* room for as-applied challenges" to § 922(g)(1)'s ban on felons possessing firearms. 98 F.4th 843, 846 (7th Cir. 2024). And other courts have entertained such challenges. *See, e.g.*, *Range*, 124 F.4th at 224.

Several circuits have upheld § 922(g)(1) on the ground that a long tradition exists of "disarm[ing] groups … deemed to be dangerous." *See, e.g.*, *Williams*, 113 F.4th at 657. But because not all felons are inherently dangerous, some courts have left open the possibility of allowing non-violent felons to challenge the constitutionality of that provision as applied to them. *Range*, 124 F.4th at 232 (holding § 922(g)(1) unconstitutional as applied to food-stamp fraudster); *see also Duarte*, 137 F.4th at 748 (collecting cases); *but see id.* at 747–48 (surveying circuits that have rejected as-applied challenges). In other

words, the class of persons disarmed under § 922(g)(1) is potentially overinclusive: The historical justification for disarming some felons may not support disarming all felons.

Section 922(g)(5)(A) does not present the same potential overinclusion problem. As discussed, our Nation's regulatory tradition supports disarming aliens who have not sworn an oath of allegiance to the sovereign. The challenged statute extends no further than disarming people "illegally or unlawfully in the United States." 18 U.S.C. § 922(g)(5)(A). That is, people who have not naturalized and taken the oath of renunciation and allegiance. *See* 8 U.S.C. § 1448.

We express no views on whether criminal defendants may lodge as-applied challenges to other provisions contained in § 922(g)'s various subsections. But district courts need not conduct individualized assessments of illegal aliens for purposes of § 922(g)(5)(A). The district court here accordingly erred in holding the statute unconstitutional as applied to Carbajal-Flores.[†]

---

[†] Carbajal-Flores alternatively requests that we summarily affirm dismissal of the indictment based on the government's alleged failures to comply with Circuit Rule 30, which sets out the required contents of the appendix to an appellant's brief. *See United States v. Matthews*, 140 F.4th 893, 899 (7th Cir. 2025).

He first faults the government for failing to include two of the district court's orders denying his earlier motions to dismiss the indictment. *See id.* ("Circuit Rule 30(b)(1) requires appellants to include in the appendices to their briefs copies of all opinions, orders, or oral rulings in the case that address the issues sought to be raised." (internal quotation omitted)). But the government included in its appendix the one order on which it seeks reversal. So, although it may have been helpful for the government to include the other orders, it can hardly be said to have "blatant[ly] and unjustifi[ably]" disregarded Circuit Rule 30. *Jaworski v. Master Hand*

\*        \*        \*

The Second Amendment secures for the people a fundamental right. The government thus bears the substantial burden of proving that a law limiting the right fits within our Nation's regulatory tradition. That burden has been carried here. The district court's decision to dismiss the indictment against Carbajal-Flores is REVERSED and the case is REMANDED for proceedings consistent with this opinion.

---

*Contractors, Inc.*, 882 F.3d 686, 690 (7th Cir. 2018). Summary affirmance is therefore inappropriate.

Carbajal-Flores also faults the government for including in its appendix historical sources that it did not submit to the district court. But the government did provide that court with many of the same sources it included in its appendix. To the extent it offered additional materials on appeal, their inclusion did not alter the outcome of this case. Summary affirmance therefore remains inappropriate. Carbajal-Flores's additional arguments pertaining to Circuit Rule 30 do not merit discussion.